**No. 2023-2374**

# United States Court of Appeals for the Federal Circuit

**ACORDA THERAPEUTICS, INC.,**
*Petitioner-Appellant*
v.
**ALKERMES PLC,**
*Respondent-Appellee*

Appeal from the District Court for the Southern District of New York in 1:23-cv-00223-NRB, Judge Naomi Reice Buchwald

## Appellant's Principal Brief

Garrard R. Beeney
beeneyg@sullcrom.com
Stephen J. Elliott
elliotts@sullcrom.com
Morgan R. Knudtsen
knudtsenm@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

Brittany S. Bruns
brunsb@sullcrom.com
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500

*Attorneys for Petitioner-Appellant Acorda Therapeutics, Inc.*

March 18, 2024

## CERTIFICATE OF INTEREST

Counsel for Appellant Acorda Therapeutics Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Acorda Therapeutics, Inc.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. 47.4(a)(3).

   None.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47(a)(4).

   John Samuel Gibson (DLA Piper LLP US) (appeared in the District Court)
   Michael A. Sitzman (DLA Piper LLP US) (appeared in the District Court)
   James Evan Berger (DLA Piper LLP US) (appeared in the District Court)
   Joshua Shu Wan (DLA Piper LLP US) (appeared in the District Court)
   Tracy Block (DLA Piper LLP US) (appeared in the District Court)

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   None.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal

cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: New York, New York
March 18, 2024

*/s/ Garrard R. Beeney*
Garrard R. Beeney
Stephen J. Elliott
Morgan R. Knudtsen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

Brittany S. Bruns
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500

*Attorneys for Petitioner-Appellant Acorda Therapeutics, Inc.*

# TABLE OF CONTENTS

**Page**

Statement of Related Cases .......... xii

Statement of Jurisdiction .......... 1

Statement of the Issues .......... 5

Statement of the Case .......... 6

A. Introduction. .......... 6

B. Alkermes Granted a License to Acorda to Use the '938 Patent, in Exchange for an 18% Royalty on Acorda's Sales. .......... 9

C. Alkermes Demanded That Acorda Continue to Pay Royalties after Expiration of the '938 Patent. .......... 11

D. Acorda Sought Arbitration of the Parties' Dispute Regarding the Post-Expiration Royalties Paid by Acorda. .......... 12

E. On Summary Judgment, the Tribunal Ruled That Acorda Is Entitled to Restitution for Payments in Violation of *Brulotte*. .......... 13

F. Acorda Was Prevented from Arguing Federal Preemption of the NYVPD in the Post-Summary Judgment Arbitration Proceedings. .......... 15

G. The Tribunal Found *All* Post-Expiration Royalties to Be Illegal but Limited Restitution to 20% of Acorda's Post-Expiration Royalty Payments to Alkermes. .......... 16

1. The Tribunal Held That Alkermes Violated *Brulotte* by Receiving All Post-Expiration Royalties. .......... 16

2. The Tribunal Held That the License and Supply Agreements Constituted a Single Agreement Rendered Unenforceable by Alkermes's *Brulotte* Violation. .......... 17

3. The Tribunal Applied the NYVPD to Limit Restitution for Alkermes's *Brulotte* Violation. .......... 17

H. The District Court Confirms the Tribunal's Award, Holding That *Brulotte* and *Kimble* Did Not "Clearly" Require Restitution of All Post-Expiration Royalties......................................19

Summary of the Argument......................................................................................21

Argument..................................................................................................................24

I. Standard of Review...........................................................................................24

II. The District Court Erred in Holding That the Tribunal Did Not Manifestly Disregard Clear Law. ..................................................................25

A. *Brulotte* Prohibits a Patentee from Profiting from the Licensee's Use of an Expired Patent.................................................27

B. *Brulotte* Requires Full Restitution of *All* Royalty Payments Made by Acorda after Expiration of the '938 Patent. .........................30

C. Federal Patent Law Preempts the NYVPD. .......................................37

III. Acorda's Preemption Argument Should Be Resolved on Its Merits. ...........44

A. The District Court Abused Its Discretion in Finding That Acorda Forfeited Its Preemption Argument......................................44

B. The Federal Circuit Has Discretion to Reach the Merits of Preemption, Regardless of Any Purported Forfeiture.........................47

IV. The District Court Had the Power to Modify the Arbitration Award. ..........51

V. This Court May Modify the Arbitration Award. ..........................................54

Conclusion ..............................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc.* v. *Roxane Lab'ys, Inc.*,
903 F.3d 1310 (Fed. Cir. 2018) ....................9

*Amaprop Ltd.* v. *Indiabulls Fin. Servs. Ltd.*,
No. 11 Civ. 2001, 2011 WL 4344437 (S.D.N.Y. Sept. 9, 2011)....................53

*Amber Res. Co.* v. *United States*,
538 F. 3d 1358 (Fed. Cir. 2008) ....................38

*Amgen Inc.* v. *Sandoz Inc.*,
877 F.3d 1315 (Fed. Cir. 2017) ....................40, 47, 48, 49

*In re Arb. Between Gen. Sec. Nat'l Ins. Co.*,
785 F. Supp. 2d 411 (S.D.N.Y. 2011) ....................53

*Aronson* v. *Quick Point Pencil Co.*,
440 U.S. 257 (1979)....................3

*AstraZeneca AB* v. *Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ....................32

*Baker* v. *Dorfman*,
239 F.3d 415 (2d Cir. 2000) ....................49

*Bayer CropScience AG* v. *Dow Agrosciences LLC*,
680 F. App'x 985 (Fed. Cir. 2017) (nonprecedential)....................54

*Biotechnology Indus. Org.* v. *Dist. of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007) ....................3, 29, 40, 42

*Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989)....................23, 40, 42, 43

*Brulotte* v. *Thys Co.*,
379 U.S. 29 (1964)....................*passim*

*California Fed. Sav. Loan Ass'n* v. *Guerra*,
479 U.S. 272 (1987)....................41

*Chen* v. *Kyoto Sushi, Inc.*,
No. 15-CV-7398, 2021 WL 1224377 (E.D.N.Y. Apr. 1, 2021)..........................53

*Christianson* v. *Colt Indus. Operating Corp.*,
486 U.S. 800 (1988)..............................................................................1

*Cleland* v. *Off. of Pers. Mgmt.*,
984 F.2d 1193 (Fed. Cir. 1993) ............................................................41

*Coats* v. *Merrick Thread Co.*,
149 U.S. 562 (1893)..............................................................................41

*Columbia Sportswear N. Am., Inc.* v. *Seirus Innovative Accessories, Inc.*,
80 F.4th 1363 (Fed. Cir. 2023) ............................................................59

*Conoco Inc.* v. *J.M. Huber Corp.*,
289 F.3d 819 (Fed Cir. 2002) ..............................................................33

*Cordance Corp.* v. *Amazon.com, Inc.*,
727 F. Supp. 2d. 310 (D. Del. 2010)......................................................28

*Dillon* v. *U-A Columbia Cablevision of Westchester*,
790 N.E.2d 1155 (N.Y. 2003)..................................................................7

*Dillon* v. *U-A Columbia Cablevision of Westchester, Inc.*,
740 N.Y.S.2d 396 (App. Div. 2002)......................................................35

*DiRussa* v. *Dean Witter Reynolds Inc.*,
121 F.3d 818 (2d Cir. 1997) ...............................................8, 21, 25, 51

*EcoServs., LLC* v. *Certified Aviation Servs., LLC*,
830 Fed. Appx. 634 (Fed. Cir. 2020) (nonprecedential) ........................29

*English* v. *Gen. Elec. Co.*,
496 U.S. 72 (1990)................................................................................40

*ePlus, Inc.* v. *Lawson Software, Inc.,*
700 F.3d 509 (Fed. Cir. 2012) ........................................................46, 47

*Fahnestock & Co.* v. *Waltman*,
935 F.2d 512 (2d Cir. 1991) .................................................................52

*Firestone Tire & Rubber Co.* v. *Bruch*,
489 U.S. 101 (1989)....................................................................................33

*Flex-Foot, Inc.* v. *CRP, Inc.*,
238 F.3d 1362 (Fed. Cir. 2001) ......................................................................25

*Goughnour* v. *Hayward Baker, Inc.*,
No. 16-CV-191, 2018 WL 265588 (N.D. Va. Jan. 2, 2018) ..............................28

*Gunn* v. *Minton*,
568 U.S. 251 (2013)......................................................................................1

*Hall Street Associates., L.L.C.* v. *Mattel, Inc.*,
552 U.S. 576 (2008)...........................................................................24, 51, 52, 53

*Hall* v. *Bed Bath & Beyond, Inc.*,
705 F.3d 1357 (Fed. Cir. 2013) ......................................................................48

*Halligan* v. *Piper Jaffray, Inc.*,
148 F.3d 197 (2d Cir. 1998) ..........................................................................52

*Hansen Bancorp, Inc.* v. *United States*,
367 F.3d 1297 (Fed. Cir. 2004) ......................................................................38

*High Point SARL* v. *T-Mobile, USA, Inc.*,
640 Fed. Appx. 917 (Fed. Cir. 2016) (nonprecedential) ...................................30

*Hines* v. *Davidowitz*,
312 U.S. 52 (1941)........................................................................................40

*Interactive Gift Express, Inc.* v. *Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ......................................................................48

*Kaplan* v. *Bank Saderat PLC*,
77 F.4th 110 (2d Cir. 2023) ..........................................................................25

*Kellogg Co.* v. *National Biscuit Co*,
305 U.S. 111 (1938)...........................................................................28, 42, 43, 49

*Kewanee Oil Co.* v. *Bicron Corp.*,
416 U.S. 470 (1974)......................................................................................42

*Kimble* v. *Marvel Entertainment, LLC*,
576 U.S. 446 (2015)............................................................................*passim*

*Krumme* v. *WestPoint Stevens Inc.*,
238 F.3d 133 (2d Cir. 2000) ..........................................................47, 49

*L.E.A. Dynatech, Inc.* v. *Allina*,
49 F.3d 1527 (Fed. Cir. 1995) ..........................................................48

*Lear, Inc.* v. *Adkins*,
395 U.S. 653 (1969)............................................................................43

*Long Island Sav. Bank, FSB* v. *United States*,
503 F.3d 1234 (Fed. Cir. 2007) ........................................................38

*Mazzei* v. *Money Store*,
308 F.R.D. 92 (S.D.N.Y. 2015) ........................................................37

*MedImmune, LLC* v. *PDL BioPharma, Inc.*,
No. 08-5590, 2011 WL 61191 (N.D. Cal. Jan. 7, 2011) ...................................35

*Motion Med. Techs., L.L.C.* v. *Thermotek, Inc.*,
875 F.3d 765 (Fed. Cir. 2017) ..........................................................43

*New York Tel. Co.* v. *Commc'ns Workers of Am. Loc. 1100, AFL-CIO Dist. One*,
256 F.3d 89 (2d Cir. 2001) ..............................................................52

*Olin Corp.* v. *Am. Home Assurance Co.*,
704 F.3d 89 (2d Cir. 2012) ..............................................................25

*Overbay, LLC* v. *Berkman, Henoch, Peterson, Peddy & Fenchel, P.C.*,
128 N.Y.S.3d 56 (N.Y. App. Div. 2020)..................................................7

*Owner-Operator Ind. Drivers. Assoc., Inc.* v. *Comerica Bank*,
562 Fed. Appx. 312 (6th Cir. 2014) (unpublished) ...................................33

*P.C. Films Corp.* v. *Turner Entertainment Corp.*,
954 F. Supp. 711 (S.D.N.Y. 1997) ....................................................30

*Pacific Gas & Elec. Co.* v. *State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983)............................................................................41

*Phoenix Bulk Carriers, Ltd.* v. *Am. Metals Trading, LLP*,
No. 10 Civ. 2963, 2013 WL 5863608 (S.D.N.Y. Oct. 31, 2013) ........................53

*Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*,
497 F.3d 133 (2d Cir. 2007) ........................................................................26

*Schwartz* v. *Merrill Lynch & Co.*,
665 F.3d 444 (2d Cir. 2011) ........................................................................52

*SCM Corp*. v. *Radio Corp. of Am*.,
318 F. Supp. 433 (S.D.N.Y. 1970) ...............................................................35

*Scott Paper Co.* v. *Marcalus Mfg. Co*.,
326 U.S. 249 (1945)........................................................................*passim*

*Sears, Roebuck & Co.* v. *Stiffel Co.*,
376 U.S. 225 (1964)...........................................................42, 43, 49, 50

*SEC* v. *Elan Corp. plc*,
Civil Action No. 1:05-cv-00282 (LR No. 19066) (Feb. 8, 2005) ......................10

*Silver Ent. LLC* v. *Rabin*,
No. 10 Civ. 5303, 2011 WL 1097548 (S.D.N.Y. Mar. 21, 2011)......................53

*Singer Mfg. Co.* v. *June Mfg. Co.*,
163 U.S. 169 (1896)....................................................................................42

*Smarter Tools Inc.* v. *Chongging SENCI Imp. & Exp. Trade Co.*,
57 F.4th 372 (2d Cir. 2023) .........................................................................25

*St. Regis Paper Co.* v. *Royal Indus.*,
552 F.2d 309 (9th Cir. 1977) .......................................................................36

*State Street Bank & Trust Co.* v. *Denman Tire Corp.*,
240 F.3d 83 (1st Cir. 2001)..........................................................................33

*Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010)...............................................................................52, 53

*Subway Int'l B.V.* v. *Seistola*,
No. 3:13-CV-1610, 2014 WL 9861978 (D. Conn. Apr. 7, 2014) ......................53

*T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*,
592 F.3d 329 (2d. Cir. 2010) ....................25, 53

*Tessera, Inc.* v. *Toshiba Corp.*,
15 Civ. 2543 (BLF), 2019 WL 5395158 (N.D. Cal. Oct. 22, 2019) ....................35

*Troxel Mfg. Co*. v. *Schwinn Bicycle Co.*,
465 F.2d 1253 (6th Cir. 1972) ....................36

*Trs. of Ne. Carpenters Health, Pension, Annuity, Apprenticeship, & Lab. Mgmt. Coop. Funds* v. *Patriot Field Servs., Inc.*,
No. 18-CV-5825, 2019 WL 1333256 (E.D.N.Y. Mar. 25, 2019) ....................53

*Ukshini* v. *Comity Realty Corp.*,
No. 15-CV-6214, 2018 WL 4625801 (S.D.N.Y. Sept. 26, 2018) ....................53

*Ultra-Precision Mfg., Ltd.* v. *Ford Motor Co.*,
411 F.3d 1369 (Fed. Cir. 2005) ....................39

*United States* v. *Brunner*,
726 F.3d 299 (2d Cir. 2013) ....................49

*Univ. of Colorado Found., Inc.* v. *Am. Cyanamid Co.*,
342 F.3d 1298 (Fed. Cir. 2003) ....................40

*Utica Mut. Ins. Co.* v. *Am. Re-Ins. Co.*,
193 N.Y.S.3d 594 (N.Y. App. Div. 2023) ....................7

*Van Buren* v. *Cargill, Inc.*,
No. 10-CV-701S, 2016 WL 231399 (W.D.N.Y. Jan. 19, 2016) ....................53

*Vermont* v. *MPHJ Tech. Invs., LLC*,
803 F.3d 635 (Fed. Cir. 2015) ....................2

*Whitfield* v. *Jones*,
No. 11 Civ. 2936, 2013 WL 6183096 (S.D.N.Y. Nov. 15, 2013) ....................53

*XY, LLC* v. *Trans Ova Genetics, LC*,
No. 13-CV-0876, 2020 WL 2128739 (D. Col. May 5, 2020) ....................28

*Yusuf Ahmed Alghanim* v. *Toys "R" Us, Inc.*,
126 F.3d 15 (2d Cir. 1997) ....................52

*Zervos* v. *Verizon N.Y., Inc.*,
252 F.3d 163 (2d Cir. 2001) ....................25

*Zila, Inc.* v. *Tinnell*,
No. 2:00-CV-1345 (D. Nev. Apr. 22, 2004), *aff'd* 502 F.3d 1014 (9th Cir. 2007)....................34

**Statutes**

9 U.S.C. § 10 ....................19, 25, 52

9 U.S.C. § 11 ....................19, 25, 52

9 U.S.C. § 12 ....................19

9 U.S.C. § 207 ....................19

28 U.S.C. § 1295 ....................1

28 U.S.C. § 2106 ....................54

28 U.S.C. § 2107 ....................1

**Other Authorities**

American Arbitration Association, Commercial Arbitration Rules & Mediation Procedures, Rule 49-1 (2022)....................33

Restatement (Second) of Contracts §197 (Am. L. Inst. 1981) ....................34

Restatement (Second) of Contracts § 198 (Am. L. Inst. 1981) ....................34, 38

Restatement (Third) of Restitution § 32 (Am. L. Inst. 2011) ....................37

U.S. Const. art. I, § 8, cl. 8 ....................42

U.S. Const. art. VI, cl. 2 ....................*passim*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), counsel for Acorda states that they are aware of no related cases.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The district court entered final judgment on August 7, 2023. Acorda timely filed its notice of appeal on September 1, 2023. *See* 28 U.S.C. § 2107(a).

Alkermes previously filed a motion to transfer this appeal to the Second Circuit. (Dkt. 9.) After the parties completed briefing on the motion,[1] this Court denied Alkermes's motion without prejudice and directed the parties to address this Court's jurisdiction in their merits briefs. (Dkt. 22.)

This Court has exclusive jurisdiction over appeals from final decisions of the district courts "in any civil action arising under . . . any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1). A civil action arises under the patent laws where "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson* v. *Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988). A patent law question is "substantial" if its resolution is "importan[t] . . . to the federal system as a whole." *Gunn* v. *Minton*, 568 U.S. 251, 260 (2013).

[1] Acorda's Response was filed as Dkt. 15. Alkermes's Reply was filed as Dkt. 18. The Court granted Acorda's request to file a Sur-Reply, Dkt. 22, which is filed as Exhibit A to Dkt. 19.

The question presented here is whether patent law and policy permit a patentee to demand, receive, and retain patent license royalties for use of the patented invention after the licensed patent expired. An arbitration tribunal held that all post-expiration royalties were "illegally" collected by Alkermes, but then applied state law to severely limit the amount of such royalties Acorda was able to recover.

At issue are at least two substantial questions of federal patent law: *first*, whether *Brulotte* v. *Thys Co.*, 379 U.S. 29 (1964), and *Kimble* v. *Marvel Entertainment, LLC*, 576 U.S. 446, (2015) require a patent owner to disgorge all royalties received for the period after expiration of their patent; and *second*, if, as the Supreme Court has held, "all benefits from [patents] must end when their terms expire," *Kimble*, 576 U.S. at 463, whether disgorgement required by federal patent law may be frustrated by application of state law.

The answers to these questions are found in patent law. "The nature and extent of the legal consequences of the expiration of a patent are federal questions, the answers to which are to be derived from the patent laws and the policies which they adopt." *Scott Paper Co.* v. *Marcalus Mfg. Co*., 326 U.S. 249, 255 (1945). Whether state law is preempted by patent law also is a question answered by patent law. *See Vermont* v. *MPHJ Tech. Invs., LLC*, 803 F.3d 635, 645 (Fed. Cir. 2015) ("[A] preemption claim does 'arise under' the patent laws." (citing

*Biotechnology Indus. Org.* v. *Dist. of Columbia*, 496 F.3d 1362, 1368 (Fed. Cir. 2007))).

Whether a patent owner is required to disgorge royalties it obtains by exploiting an expired patent is substantial and important to the federal patent system as a whole (and not merely to the parties here) because, among other reasons, complete disgorgement is the only remedy to prevent incentives to extend a patent beyond its limited monopoly and prevent the patentee from benefiting from use of the invention after the patent monopoly expires. As the Supreme Court has held, two critical objectives of the federal patent system are to "permit the public to practice the invention once the patent expires" and "assure that ideas in the public domain remain there for the free use of the public." *Aronson* v. *Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979). These fundamental objectives are undermined if the public is required to pay for use of expired patents and state law is allowed to reward patentees for collecting illegal post-expiration royalties.

While Acorda, the exclusive licensee of U.S. Patent No. 5,540,938 (the "'938 Patent"), was the only party penalized for using the '938 patent post-expiration by the arbitration decision to allow Alkermes to retain illegal post-expiration royalties, the Supreme Court has held that "post-expiration restraints on even a single licensee's access to the invention clash" with Congress's judgment, as expressed in the patent laws: "the day after a patent lapses, the formerly protected

invention must be available to all for free." *Kimble*, 576 U.S. at 463. A patentee's restriction of the use of the invention of an expired patent by even a single manufacturer affects the public because it deprives both the manufacturer and "the consuming public of the advantage to be derived from his free use of the disclosures." *Scott Paper*, 326 U.S. at 255-56.

As to the question posed by this appeal of whether federal patent law preempts state law, this Court has held that "[w]hether federal patent laws preempt or invalidate" a state law "has considerable significance" beyond any individual case because a "hypothetical finding that the [state law] is not invalid or preempted . . . would affect the development of a uniform body of patent law, as such a decision would be binding in [that state], but would not be in other states with similar laws or in federal court." *MPHJ Tech.*, 803 F.3d at 646. As in *MPHJ Tech.*, the preemption question here is substantial because "the resolution of this case would assist in delineating the metes and bounds of patent law." *Id.* at 646.

For these reasons, this Court has exclusive subject matter jurisdiction over this appeal.

## STATEMENT OF THE ISSUES

1. Whether the Tribunal manifestly disregarded clear patent law requiring full restitution of post-expiration patent royalties.

2. Whether the Tribunal manifestly disregarded clear law when it applied a state law—the New York Voluntary Payments Doctrine—to limit Acorda's recovery of post-expiration patent royalties.

3. Whether the district court erred in holding that it could not modify the arbitration award.

## STATEMENT OF THE CASE

### A. Introduction.

The Arbitration Tribunal held that (i) Alkermes's collection of royalties after the '938 Patent expired was specifically prohibited by *Brulotte*; (ii) Alkermes was unjustly enriched by its receipt of post-expiration royalties; and (iii) Alkermes violated *Brulotte* because its "use of a royalty agreement that projects beyond the expiration date of the patent" was "unlawful *per se*." Appx40 (quoting *Brulotte*, 379 U.S. at 32), Appx49-50. Alkermes has not contested any of these holdings, which are thus determined for purposes of appeal.

Thus, this appeal concerns whether (i) patent law as announced in *Brulotte* and *Kimble* requires full disgorgement of royalties illegally received; and (ii) if one is required to look to state law for a *Brulotte* violation remedy, whether that law may be applied in contravention of federal law and policy. At the heart of this appeal are the meaning and effect of the "categorical principle" that "all patents, and ***all benefits from them***, must end when their terms expire," *Kimble*, 576 U.S. at 463 (emphasis added), and whether that bedrock principle of patent law may be abrogated by applying state law to allow the patentee to retain such "benefits."

Alkermes took advantage of its contractual position as Acorda's key raw material supplier to demand and collect nearly $82 million in royalties after Alkermes's patent expired. Acorda took the matter to arbitration and, after a hearing,

the Tribunal held that Alkermes's illegal collection of royalties rendered its agreement with Acorda unenforceable in light of *Brulotte* and *Kimble.*

Rather than ordering full restitution as federal law requires, the Tribunal looked to state law for a remedy and applied state law in contravention of federal law and policy. The Tribunal awarded Acorda only 20% of the post-expiration royalties it had paid and allowed Alkermes to retain more than $65.6 million in "illegal" royalties, reasoning that the New York Voluntary Payments Doctrine ("NYVPD") prevented Acorda's recovery of payments made without a "formal" protest.[2] Further prejudicing Acorda, the Tribunal applied the NYVPD to deny Acorda recovery of over $65.6 million of post-expiration royalties without notice to the parties *and* having previously ruled that the NYVPD had no application to the arbitration.

After the Tribunal decision, Acorda petitioned the district court to modify the Tribunal's monetary Award to include the illegal royalties the Tribunal

---

[2] The NYVPD "is a common-law principle that bars recovery for 'payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law.'" *Utica Mut. Ins. Co.* v. *Am. Re-Ins. Co.*, 193 N.Y.S.3d 594, 597 (N.Y. App. Div. 2023) (quoting *Dillon* v. *U-A Columbia Cablevision of Westchester*, 790 N.E.2d 1155, 1156 (N.Y. 2003)). Under this state law doctrine, a party that receives an improper demand for money may only recover its payments if it protests them "at the time of payment," unless there was fraud or mistake of material fact or law. *Id.* (quoting *Overbay, LLC* v. *Berkman, Henoch, Peterson, Peddy & Fenchel, P.C.*, 128 N.Y.S.3d 56, 58 (N.Y. App. Div. 2020)).

allowed Alkermes to keep. Acorda noted that a court may vacate or modify an arbitral award rendered in "manifest disregard of the law." *DiRussa* v. *Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir. 1997). The district court declined, stating it could not conclude that the Award violated clear law because *Brulotte* and *Kimble* "have not clearly articulated a rule on the refund of royalties."

Contrary to the district court's decision, the holdings in *Brulotte*, *Kimble*, and *Scott Paper* make crystal clear that the patent laws do not permit a patent owner to benefit in any way from an expired patent, or permit a licensee to be penalized for its use of an invention that has entered public domain, and that any illegal payments received must be returned. The Tribunal's decision limiting restitution by relying on state law flouted that clear law, effectively rewarding Alkermes and penalizing Acorda to the tune of $65.6 million for Acorda's use of an expired patent. The decision rewarded Alkermes for its illegal conduct, and created powerful incentives for patentees to seek to skirt unambiguous patent law forbidding collection of post-expiration royalties. Moreover, the Tribunal's reliance on state law to limit restitution, even after acknowledging that all of Acorda's payments were "improper" under *Brulotte*, ignored the black-letter principle that state laws are preempted when they conflict with the objectives and purposes of federal patent laws.

For the reasons explained below, Acorda respectfully submits that this Court should confirm that *Brulotte* and *Kimble* prevent the collection of post-expiration royalties, that full restitution of such royalties collected is required to enforce that principle, and that state law cannot be used to thwart these important objectives. Acorda respectfully requests that the Award be modified to add the $65,629,716 million (plus interest) the Tribunal wrongly allowed Alkermes to keep.

### B. Alkermes Granted a License to Acorda to Use the ’938 Patent, in Exchange for an 18% Royalty on Acorda’s Sales.

In the 1990s, Acorda was developing dalfampridine into an FDA-approved drug treatment for multiple sclerosis. Appx617. At that time, Alkermes[3] owned the ’938 Patent, which claims a sustained release formulation of dalfampridine. *Acorda Therapeutics, Inc.* v. *Roxane Lab’ys, Inc.*, 903 F.3d 1310, 1313 (Fed. Cir. 2018).

In 1998, Acorda and Alkermes entered into a joint venture agreement. Appx38-39, Appx320. Under that agreement, Alkermes licensed the ’938 Patent to Acorda in exchange for a payment of $15,000,000 and an ongoing royalty of 18% of the net sale price (“NSP”) of any drug approved and sold as a result of the joint

[3] Acorda’s original relationship was with Elan Corporation, PLC, Alkermes’s predecessor in interest. Alkermes later merged with Elan. Appx354. For clarity, we refer to the Respondent-Appellee as Alkermes throughout this brief.

venture. Appx38-39. Following FDA approval, Acorda sold sustained release dalfampridine under the brand name Ampyra®. Appx39, Appx357.

In 2003, the parties dissolved the joint venture and entered into a new agreement, largely in response to issues raised by the Securities and Exchange Commission with Alkermes.[4] Appx39, Appx329-30. Under the new agreement, Acorda was required to purchase 75% of its dalfampridine from Alkermes, pay Alkermes a "compensating payment" for the 25% it purchased from the Alkermes-approved second source, and, as in the joint venture agreement, pay Alkermes an 18% royalty on its sales. Appx154-56, Appx200, Appx202, Appx214. The new agreement was split into two contracts: a License Agreement under which Acorda received a license to the '938 Patent in exchange for a 10% NSP royalty, and a Supply Agreement with an additional 8% NSP royalty (collectively, the "Agreements"). Appx39, Appx154-56, Appx200, Appx202, Appx214, Appx329-30. As the Tribunal found and Alkermes has not contested, the Supply Agreement and License Agreement are a single agreement with a single combined patent royalty of 18%. Appx49.

4 Alkermes terminated most of its joint ventures in the early 2000s after regulators claimed Alkermes was using them to commit fraud. Appx294; *SEC* v. *Elan Corp. plc*, Civil Action No. 1:05-cv-00282 (LR No. 19066) (Feb. 8, 2005).

### C. Alkermes Demanded That Acorda Continue to Pay Royalties after Expiration of the ’938 Patent.

The ’938 Patent expired on July 30, 2018, Appx388, and several generic versions of Ampyra® entered the market. Appx365. After the ’938 Patent expired, Acorda, dependent on Alkermes for most of its physical supply of dalfampridine, asked Alkermes to confirm that Acorda was no longer required to pay license royalties for use of the expired ’938 Patent. Appx34, Appx40-42, Appx265, Appx391, Appx394. Alkermes responded that it would study the matter[5] but ultimately said that it did “not see a reason to change” the parties’ arrangement and demanded that Acorda continue to pay under the License and product Supply Agreements. Appx34, Appx40, Appx391, Appx394. Acorda acceded to Alkermes’s royalty demand because it feared that Alkermes would cut off the supply of dalfampridine Acorda was required to buy from Alkermes if Acorda refused royalty payments or protested further. Appx628. Acorda’s fear for its business stemmed from the fact that Alkermes was virtually the sole supplier to Acorda for dalfampridine under the Agreements, and should Alkermes terminate supply because Acorda refused to pay the demanded royalties, Acorda would be unable to

[5] Despite what Alkermes told Acorda, Alkermes had “studied the matter” years earlier, and knew it had no basis for its royalty demand. In 2009, Alkermes’s then in-house patent agent reported to the company that expiration of the ’938 Patent would “no longer trigger a royalty.” Appx238.

market and distribute Ampyra®. Appx616. However, because Alkermes demanded that Acorda continue to pay a royalty of 18% of its sales to Alkermes, Acorda soon found that it was at a substantial competitive disadvantage compared to its generic competitors who paid no royalties. Appx365, Appx405, Appx637-38.

On April 22, 2020, Acorda once again informed Alkermes that the License Agreement was unenforceable, citing *Brulotte* and *Kimble*, but Alkermes still demanded royalty payments under the Agreements. Appx40, Appx390, Appx394. In July 2020, Acorda began to include a formal protest with each of its payments under the License Agreement. Appx41-42, Appx446.

### D. Acorda Sought Arbitration of the Parties' Dispute Regarding the Post-Expiration Royalties Paid by Acorda.

In light of Alkermes's continued demand for post-expiration royalties, Acorda filed a Demand for Arbitration with the American Arbitration Association on July 28, 2020. Acorda asserted eight claims against Alkermes, including a claim for unjust enrichment based on Alkermes's demand for, and collection of, royalties after the '938 Patent expired in violation of *Brulotte*. Appx34-35.[6] Among other

[6] Alkermes asserted counterclaims against Acorda which were dismissed by the Tribunal on July 2, 2021 and have no bearing on this appeal. Appx267-68.

things, Acorda asked the three-judge[7] Tribunal for restitution of all of the post-expiration royalties paid.

### E. On Summary Judgment, the Tribunal Ruled That Acorda Is Entitled to Restitution for Payments in Violation of *Brulotte*.

In 2021, the parties filed cross-motions for summary judgment. Appx263. Among other things, Acorda asked the Tribunal to determine that patent law required that Acorda recover all of the post-expiration patent royalties paid to Alkermes if Acorda proved at the arbitration hearing that these payments violated *Brulotte*. Appx615-17, Appx632-39. Alkermes asserted that Acorda was not entitled to any refund, even if Alkermes received payments in violation of *Brulotte*, contending that: (i) the License Agreement forbade such refunds; (ii) the NYVPD precluded certain types of refunds; and (iii) *Brulotte* does not require refund of post-expiration royalties. Appx553-56, Appx577-93.

The Tribunal granted Acorda summary judgment that it was entitled to restitution should it prove a *Brulotte* violation at trial, and denied Alkermes's cross-motion to dismiss the restitution claim. Appx274. The Tribunal also explicitly rejected Alkermes's assertion that *Brulotte* does not require restitution, explaining that "if Acorda is successful on its *Brulotte* claim it could also be entitled to recover

---

[7] The panel consisted of the Honorable Arthur J. Gajarsa, Honorable Jose L. Linares, and Honorable Robert S. Smith.

unjust enrichment/restitution damages for the time following [patent expiration] because its performance under the License and Supply Agreements would have been pursuant to an unenforceable provision." Appx274. The Tribunal further agreed with Acorda that restitution "may be awarded" where payment was rendered "under an agreement that is illegal or otherwise unenforceable for reasons of public policy." But the Tribunal then cited a "no-refund clause" in the License Agreement and stated that "[a]ny potential remedy Acorda continues to have [is limited to] payments made *under protest* beginning in July 2020"—two years after the '938 Patent expired. Appx274-75.

While limiting restitution based on a clause in a contract the Tribunal declared unenforceable, the Tribunal addressed the NYVPD and stated that "the NYVPD does not have any implication for this Arbitration."[8] Appx274-75. As explained *infra*., ultimately and without notice, the Tribunal reversed course in the Arbitration Award and limited Acorda's recovery not based on the "no-refund" clause, but based on the NYVPD.

---

[8] The Tribunal held that "while the NYVPD might preclude any refund remedy for payments by Acorda that were made voluntarily," such a refund was "unavailable in any event for those payments made prior to July of 2020" under the no-refund clause. Appx274-75.

### F. Acorda Was Prevented from Arguing Federal Preemption of the NYVPD in the Post-Summary Judgment Arbitration Proceedings.

In its pre-Hearing Brief after summary judgment, Acorda continued to maintain that it was entitled to restitution of ***all*** post-expiration payments it made under both the License and Supply Agreements—a total of $80,429,015.[9] Appx297-301. In response, Alkermes asked the Tribunal to "bar Acorda from presenting evidence or argument" that it was entitled to any recovery of post-expiration payments in light of the summary judgment application of the "no-refund" clause. Acorda, citing *Brulotte*, responded that the Tribunal would have "to make a further decision of whether or not it can allow the unlawful payments made after patent expiry to stand in violation of public policy." Appx308. The Tribunal rejected Acorda's preemption argument, and ruled that "Acorda's potential recovery is strictly limited to those payments made under protest as of July 2020." The Tribunal ordered that it would "not entertain evidence regarding payments made prior to July 2020 as said payments are no longer pertinent to this Arbitration." Appx311.

Accordingly, at the arbitration hearing Acorda sought recovery of only the $23,905,401 it paid after July 2020, although it continued to maintain that it was

[9] This amount does not include Acorda's payments of $1,595,439 in royalties under the License Agreement and $214,611 in royalties under the Supply Agreement after submission of Acorda's pre-hearing brief. Appx50, Appx95. Alkermes does not challenge the Tribunal's computation of "illegal" royalties Alkermes collected. Appx496 (seeking complete confirmation of the Award).

legally entitled to the refund of *all* payments made after expiration of the patent in light of federal law and policy. Appx671-72. Neither Acorda nor Alkermes addressed the NYVPD at trial or in post-hearing briefing in light of the Tribunal's summary judgment ruling that the statute "d[id] not have any implication" for the arbitration. Appx275.

### G. The Tribunal Found *All* Post-Expiration Royalties to Be Illegal but Limited Restitution to 20% of Acorda's Post-Expiration Royalty Payments to Alkermes.

The Arbitration Award found that: (1) Alkermes's collection of all royalties after the '938 Patent expired violated *Brulotte*; (2) the License and Supply agreements constituted a single agreement unenforceable under *Brulotte*; and (3) Alkermes was unjustly enriched by its receipt of all post-expiration royalties. Appx40, Appx48-51. None of these holdings are challenged in this appeal.

#### 1. The Tribunal Held That Alkermes Violated *Brulotte* by Receiving All Post-Expiration Royalties.

The Tribunal found that Alkermes's receipt of post-expiration royalties violated *Brulotte* because "use of a royalty agreement that projects beyond the expiration date of the patent" was "unlawful *per se*"; indeed the Tribunal specifically held that *Brulotte* prohibited Alkermes's conduct to collect post-expiration royalties. Appx40. The Tribunal also held that the expiration of the '938 Patent on July 30, 2018, "inherently rendered all the claims therein unenforceable," and further noted

that Alkermes's claims to obtain the royalties in dispute were made "in contravention of *Brulotte*.[10]

### 2. The Tribunal Held That the License and Supply Agreements Constituted a Single Agreement Rendered Unenforceable by Alkermes's *Brulotte* Violation.

The Tribunal also held that the "License and Supply Agreements are, for all intents and purposes, one agreement" because they were "so tied together" as to "operate as a single unified business agreement." Appx48-49. The Tribunal noted that the Supply Agreement under which Alkermes supplied the dalfampridine Acorda needed for its business was tied directly to the License Agreement and that together the combination provided a patent royalty that was "identical to the pre-2003 1998 joint venture agreement of 18%." Appx48. The Tribunal ruled that this combined agreement was unenforceable as a result of Alkermes's *Brulotte* violation. Appx49.

### 3. The Tribunal Applied the NYVPD to Limit Restitution for Alkermes's *Brulotte* Violation.

While finding that all post-expiration payments were received in violation of *Brulotte*, the Tribunal looked to state law to remedy the *Brulotte* violation. In contravention of its summary judgment ruling that "the NYVPD does

[10] The Tribunal rejected Alkermes's claim that its collection of post-expiration royalties was permissible under exceptions to *Brulotte* identified in *Kimble*. Appx42-46.

not have any implication for this Arbitration," Appx274-75, and its holding that "***[a]ll*** of the payments Acorda made after the '938 Patent expired were improper as Alkermes was no longer . . . entitled to any royalty payments," Appx50, the Tribunal awarded Acorda only $16,554,267 of the $82,183,983 in post-expiration royalties Alkermes had collected. Appx50, Appx95.

The Tribunal limited Alkermes's obligation to return its "illegal" royalties to 20% of the amount received, ruling that state law—the NYVPD—required disgorgement only of that portion of payments made in violation of *Brulotte* that were specifically coupled with a formal written protest. Appx50, Appx54. The Tribunal denied Acorda any recovery for payments Acorda had in fact questioned in communications with Alkermes in light of patent expiration before formal protest, as well as all payments under the Supply Agreement, including for royalties paid after July 2020. The Tribunal did so despite also ruling in the Arbitration Award that (1) both Agreements should be treated as one and (2) all of the royalties Alkermes received under both contracts were illegal.

Critically, the Tribunal did not rely (as it had in summary judgment), on the "no-refund" provision of the License Agreement to deny full restitution. Although it gave no reason for abandoning this original ground to prevent Acorda from obtaining full restitution, the Tribunal may have realized it could not enforce the "no-refund" provision of a contract it ruled to be unenforceable. Instead, the

Tribunal relied entirely on the NYVPD to allow Alkermes to keep over $65.6 million of royalties obtained in violation of *Brulotte*, a state law doctrine the Tribunal previously said "had no application" to the case.[11]

### H. The District Court Confirms the Tribunal's Award, Holding That *Brulotte* and *Kimble* Did Not "Clearly" Require Restitution of All Post-Expiration Royalties.

Acorda petitioned the District Court for the Southern District of New York for modification of the Tribunal's Award to include all post-expiration royalties, and otherwise for confirmation of the Award pursuant to 9 U.S.C. §§ 10-12 and 9 U.S.C. § 207. Appx77-78. Alkermes cross-moved to affirm the Award without modification, taking no issue with the Tribunal's holding that all royalties Alkermes collected were illegal. Appx475, Appx496.

Acorda explained that the Tribunal "manifestly disregarded" federal patent law established by *Brulotte* and *Kimble* by looking to state law to provide a remedy for payments made in violation of *Brulotte*. Appx90-92. Acorda showed that royalties collected after expiration of a patent "violate[] the public policy of the federal patent law system," that the only remedy that would effectuate that policy was disgorgement and restitution of all payments made in violation of *Brulotte* and

---

[11] The Tribunal erroneously stated that it "already concluded that the NYVPD has precluded any recovery by Acorda up until it made its formal protest in July 2020." Appx50.

*Kimble*, and that one need not look to state law for a remedy. Appx112-15. Acorda asserted that the Tribunal's reliance on the NYVPD to limit restitution was a manifest disregard of clear law because it ignored that federal law and public policy preempted the NYVPD and required full restitution. Appx115-19.

The district court declined to modify the Award based on three errors: (i) that the Supreme Court has cast doubt on "the ongoing viability of the manifest disregard doctrine"; (ii) that the Tribunal did not manifestly disregard the law because it was "not clear" that federal law required complete refund of unlawfully paid royalties; and (iii) that Acorda had forfeited any preemption argument. Appx11, Appx14.

Central to this appeal, the district court agreed that *Brulotte* "rendered the Agreements unenforceable" but held that *Brulotte* and its progeny "did not dictate whether the royalties that had already been paid by Acorda needed to be refunded." Appx16. Absent such "clear guidance on whether royalties that have already been paid under offending contracts are recoverable," the district court found, it could not "conclude that the Tribunal refused to apply a clear legal principle on th[e] issue" of whether *Brulotte* and *Kimble* require a patent owner to fully disgorge post-expiration benefits of illegally obtained royalties. Appx16-17. Instead, the district court held that the Tribunal was entitled to "look[] elsewhere," including to state law, to determine "whether Acorda's royalties should be

refunded." Appx17-18. Nowhere in its opinion did the district court assess *Brulotte* and *Kimble* or the patent law and federal policies they promote. Nor did it consider whether clear federal law prohibited the Tribunal from relying on state law to undermine federal laws and policies.

In a single paragraph of the opinion, the district court opined that Acorda's argument that the NYVPD was preempted by federal patent law was "new" and "not specifically raised before the Tribunal." Appx19. But the district court concluded that this did not "change th[e] outcome" because *Brulotte* and *Kimble* "have not clearly articulated a rule on the refund of royalties." Appx19.

## SUMMARY OF THE ARGUMENT

A court may modify an arbitral award if the tribunal "manifestly disregarded" the law in rendering its decision. *DiRussa*, 121 F.3d at 822. Here, the Tribunal held that *all* of the post-expiration payments Acorda made to Alkermes were "improper" and violated the Supreme Court's decision in *Brulotte*. Appx50. Despite that, and its further finding that Acorda was entitled to at least *some* restitution because of the *Brulotte* violation, the Tribunal awarded Acorda only a small fraction of its post-expiration royalty payments. In doing so, the Tribunal ignored that federal law required restitution and instead relied on state law to frustrate federal policy, benefitting Alkermes and penalizing Acorda over $65.6 million for its use of an expired patent.

The district court's refusal to modify the Award to require full restitution because of a "lack of clarity" under federal law was legal error. *Brulotte* and *Kimble* are clear: a patent owner is not allowed to demand, collect, *or keep* any post-expiration royalties. These decisions make it absolutely clear that patented inventions, and the right to make, use, or sell them, "become[] public property" when the patent expires. *Kimble*, 576 U.S. at 453. They establish as a "categorical principle that all patents, and all benefits from them must end when their terms expire," and that a licensee may not be penalized for its use of an expired patent. *E.g.*, *Kimble*, 576 U.S. at 463. "Any attempt[]" to extend a patent monopoly past expiration "runs counter to the policy and purpose of the patent laws." *Brulotte*, 379 U.S. at 31; *see also Kimble*, 576 U.S. at 453 (same); *Scott Paper*, 326 U.S. at 256 (same). Consequently, federal law provides a remedy for a *Brulotte* violation: full restriction of payments made after patent expiration. Enforcing federal policy and the limitations of the patent monopoly does not depend on whether state law requires "formal protest" to receive a refund of payments made in violation of federal law.

While *Kimble* explicitly states that "all benefits" from a patent "must end" at patent expiration, *Kimble*, 576 U.S. at 473, and the Tribunal and district court allowed Alkermes to retain post-expiration benefits, it is not just explicit Supreme Court holdings that provide a clear federal remedy for a *Brulotte* violation. Such a remedy also is required to further the federal policies the Court and Congress have

repeatedly announced to limit the patent monopoly. These policies only can be effectuated by requiring complete restitution of any post-expiration royalties received. Such a remedy is required to avoid incentives (such as those created by the Award) for patentees to "game" licensees unaware of *Brulotte*, or (as here) to use commercial leverage to demand royalties knowing they may not be legally collected, or to use other methods to try to evade the *Brulotte* and *Kimble* holdings.

The Tribunal's decision to rely on state law to limit restitution also manifestly disregarded clear law because it applied state law to defeat express federal policy regarding patent expiration, in violation of basic principles of preemption. As the Supreme Court has held, "the nature and extent of the legal consequences of the expiration of a patent are federal questions, the answers to which are to be derived from the patent laws and the policies which they adopt." *Scott Paper*, 326 U.S. at 255. Both the Supreme Court and the Federal Circuit have repeatedly held that state laws that interfere with the free use of ideas in the public domain are preempted by federal patent law. *See, e.g.*, *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U.S. 141, 151 (1989) ("[T]he federal patent laws must determine not only what is protected, but also what is free for all to use.").

Contrary to the district court's conclusion that Acorda forfeited this argument, Acorda *did* present its preemption argument to the Tribunal. Even if it were not presented, moreover, this Court has discretion to reach the argument and

should exercise that discretion to (1) confirm the strictly term-limited nature of the patent monopoly and (2) eliminate any incentive for patent owners to impermissibly enlarge their patent monopolies.

Finally, the district court erred in finding that it could not modify the Tribunal's award under the manifest disregard doctrine, based on its erroneous holding that the Second Circuit's acceptance of the doctrine is limited to requests to vacate arbitral awards, not modify them. To the contrary, the Second Circuit has decided that the manifest disregard doctrine survived the Supreme Court's decision in *Hall Street Associates., L.L.C.* v. *Mattel, Inc.*, 552 U.S. 576, 584 (2008), and the Circuit Court has not abandoned its many prior holdings that courts may modify arbitral awards made in manifest disregard of the law, simply because it has not addressed the issue post-*Hall*.

Acorda respectfully requests that this Court reverse the district court's denial of Acorda's petition, and modify the Tribunal's Award to include an additional $65,629,716, plus pre- and post-award interest, that the Tribunal failed to include in manifest disregard of federal law. Appx78, Appx95.

## ARGUMENT

### I. Standard of Review.

The standard of review of the district court's determination that the Tribunal did not manifestly disregard the law and whether an argument was forfeited

is governed by Second Circuit law. *Flex-Foot, Inc.* v. *CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001). The Second Circuit reviews *de novo* a district court's application of the "manifest disregard" standard and a district court's legal rulings, including a district court's determination that it lacks the power to modify the Tribunal's Award. *T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d. Cir. 2010). A district court finding that a party forfeited an argument is reviewed for abuse of discretion. *Olin Corp.* v. *Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012). A district court abuses its discretion where "its decision reflects an 'error of law,' rests on a 'clearly erroneous factual finding,' or 'cannot be located within the range of permissible decisions.'" *Kaplan* v. *Bank Saderat PLC*, 77 F.4th 110, 116-17 (2d Cir. 2023) (quoting *Zervos* v. *Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (footnote omitted)).

## II. The District Court Erred in Holding That the Tribunal Did Not Manifestly Disregard Clear Law.

In addition to the statutory grounds for vacatur or modification of arbitral awards provided in 9 U.S.C. § 10 and § 11, a court may vacate or modify arbitral awards that constitute "manifest disregard of the law." *DiRussa*, 121 F.3d at 821. A petitioner seeking vacatur or modification must establish that "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether" and that the arbitrators ignored a law that "was well-defined, explicit, and clearly applicable to the case." *Smarter Tools Inc.* v. *Chongging SENCI Imp. &*

*Exp. Trade Co.*, 57 F.4th 372, 373 (2d Cir. 2023) (quoting *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007)); *DiRussa*, 121 F.3d at 821.

Contrary to the district court's ruling, the Tribunal's Award manifestly disregarded federal patent law, the holdings of *Brulotte* and *Kimble*, and the Supremacy Clause of the U.S. Constitution. For multiple reasons, these authorities clearly and explicitly (1) required the Tribunal to award full restitution of *all* post-expiration royalty payments; and (2) prohibited the Tribunal from applying the NYVPD as the sole ground to limit restitution in violation of federal policies.[12]

First, in *Brulotte,* the Supreme Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*." 379 U.S. at 32. Relying on this rule, the Court held that a judgment in favor of a patentee "must be reversed insofar as it allows royalties to be collected which accrued after the last of the [patentee's] patents had expired." *Id.* at 30.

Second, the Court's subsequent decision in *Kimble* confirmed the *Brulotte* rule, and explicitly held that a patentee can neither "charge" nor "receive" royalties for the use of a patented invention after the patent's term has expired. 576

12 Given the partial restitution award of amounts paid after "formal protest," it is clear that the Tribunal would have awarded full restitution but for its application of the NYVPD.

U.S. at 443, 449. *Brulotte* and *Kimble* thus prohibit a patentee from profiting, and a licensee from paying (even voluntarily), for the licensee's use of an expired patent. The only remedy consistent with this law and federal policy is disgorgement of royalties received in violation of the law and policy. Otherwise, as here, a patentee "receives" post-expiration royalties by being allowed to retain them.

Even if one looks to state law for a remedy, that state law may not be applied to defeat or contravene federal law and policy. Nothing in the Supreme Court decisions suggest that a licensee's failure to explicitly make payments "under protest" impacts whether the payments are "unlawful *per se*." Nor do these decisions remotely suggest that federal policy allows a patentee to retain post-expiration payments if they are not explicitly made "under protest." Under the Supremacy Clause, these Court decisions, and the law and policy they announce cannot be superseded or limited by state law.

### A. *Brulotte* Prohibits a Patentee from Profiting from the Licensee's Use of an Expired Patent.

*Brulotte* stands squarely for the proposition that a patentee may not benefit in any way from an expired patent. *Brulotte* makes clear that all rights to make, use or sell a patented invention "become public property" once the patent expires, and "any attempt[]" to extend those rights beyond the expiration of a patent to the benefit of the patentee "runs counter to the policy and purpose of the patent laws." *Brulotte*, 379 U.S. at 31; *see also Kimble*, 576 U.S. at 453 (same); *Scott*

*Paper*, 326 U.S. at 256 (same).[13] Federal law prohibits a patentee from benefiting from exploiting its former rights "whatever the legal device [it] employ[s]," including by demanding, "collect[ing]," *Brulotte*, 379 U.S. at 31, or "***receiving***" post-expiration royalties. *Kimble*, 576 U.S. at 450 (emphasis added); *see also Scott Paper*, 326 U.S. at 256 ("the patent laws preclude the patentee of an expired patent and all others . . . from recapturing any part of the former patent monopoly"). As the Supreme Court recognized in *Kimble*, *Brulotte* ***"applied a categorical principle that all patents, and all benefits from them must end when their terms expire."***[14] *Kimble*, 576 U.S. at 463 (emphasis added).[15]

---

[13] In *Kimble*, the Court noted that *Scott Paper* v. *Marcalus Mfg. Co.*, 326 U.S. 249 (1945), "is the decision on which *Brulotte* primarily relied" and that it "remains good law." 576 U.S. at 458.

[14] The rule that a patentee cannot receive or retain any benefit from an expired patent extends to "the goodwill which the patent has built up in the patented article or product" during the life of the patent. *Scott Paper*, 326 U.S. at 256. For example, a patentee may not secure a benefit by "registering a trademark [for] any particular descriptive matter appearing [in] the expired patent, whether or not such matter describes essential elements of the invention." *Id.* (citing *Kellogg Co.* v. *National Biscuit Co*, 305 U.S. 111, 117-20 (1938)).

[15] Numerous courts have acknowledged this "no post-expiration benefit" principle as clear law set out in *Brulotte* and *Kimble*. *See, e.g.*, *XY, LLC* v. *Trans Ova Genetics, LC*, No. 13-CV-0876, 2020 WL 2128739, at *8 (D. Col. May 5, 2020) (Supreme Court's "categorical" rule "that all patent-related benefits must end when the patent term expires" is "an established background principle of law"); *Goughnour* v. *Hayward Baker, Inc.*, No. 16-CV-191, 2018 WL 265588, at *6 (N.D. Vi. Jan. 2, 2018) (citing *Kimble* for "[t]he categorical principle that all patent-related benefits must end when the patent term expires"); *Cordance Corp.* v. *Amazon.com, Inc.*, 727 F. Supp.

In addition to forbidding a patentee's receipt of post-expiration royalties, *Brulotte* also establishes, as a matter of patent law, that no member of the public can be penalized or suffer any loss as a result of making, using or selling an invention claimed in an expired patent. The Court explained that, when a patent has expired, its disclosure "has entered the public domain" and may be freely used by anyone without cost. *Brulotte*, 379 U.S. at 33; *Kimble*, 576 U.S. at 453-54 (the *Brulotte* "decision bars . . . royalties for using an invention after it has moved into the public domain"). *Brulotte* reflects "Congress['] . . . judgment " that "[t]he day after a patent lapses, the formerly patented invention must be available to all ***for free***." *Kimble*, 576 U.S. at 463 (emphasis added); *see also Biotechnology Industry Org.*, 496 F.3d at 1374 ("The underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make."). Any "post-expiration restraints on even a single licensee's access"—such as any royalty paid for post-expiration access to a formerly patented invention —"clash[es] with that principle." *Kimble*, 576 U.S. at 463.[16]

2d. 310, 335 (D. Del. 2010) ("*Brulotte* suggests that . . . courts must be wary of [and] guard against . . . coercive attempts to use a patent monopoly as leverage to extend the benefits of patent protection beyond the life of a patent.").

16 Many courts, including this Court, have recognized this "post-expiration free use" principle as clear law established in *Brulotte* and *Kimble*. *See, e.g.*, *EcoServs., LLC* v. *Certified Aviation Servs., LLC*, 830 Fed. Appx. 634, 652 (Fed. Cir. 2020) (nonprecedential) (citing *Kimble* for the proposition that "[W]hen the patent expires, the patentee's prerogatives expire too, and the

Moreover, *Brulotte*, along with *Kimble* and *Scott Paper*, establish clearly that a licensee cannot volunteer to pay for access to an invention after a patent expires. A patentee cannot "waive[]" free access to the formerly patented invention, or do anything that would prevent it "from enjoying rights which it is the policy of the patent laws to free from all restrictions." *Scott Paper*, 326 U.S. at 257. More specifically, "in the *Brulotte* Court's view," a licensee's agreement to pay royalties after expiration "conflict[s] with patent law's policy of establishing a 'post-expiration . . . public domain' in which every person can make free use of a formerly patented product." *Kimble*, 576 U.S. at 453.

### B. ***Brulotte* Requires Full Restitution of *All* Royalty Payments Made by Acorda after Expiration of the '938 Patent.**

The Tribunal ruled that all of the provisions of both "the License and Supply Agreements [were] unenforceable" as a consequence of Alkermes's *Brulotte* violation, and that as a result of that violation "[***a***]***ll*** of the payments Acorda made after the '938 Patent expired were improper." Appx49-50 (emphasis added). The Tribunal's determination that "all" of the post-expiration payments from Acorda

---

right to make or use the article, free from all restriction, passes to the public."); *High Point SARL* v. *T-Mobile, USA, Inc.*, 640 Fed. Appx. 917, 928 (Fed. Cir. 2016) (nonprecedential) (same); *P.C. Films Corp.* v. *Turner Entertainment Corp.*, 954 F. Supp. 711, 715 (S.D.N.Y. 1997) (noting that the Supreme Court in *Brulotte* "emphasized the public domain" nature of an expired patent when it stated that "[t]he exaction of royalties for use of a machine after the patent has expired is an assertion of monopoly power in the post-expiration period").

were illegal under *Brulotte* should have been the end of the matter. An award of full restitution was the only remedy compatible with federal law and policies following the Tribunal's finding that the payments were prohibited by *Brulotte.*

As explained above, *Brulotte* and *Kimble* establish, as a matter of patent law and policy, that a patentee may not benefit in any way from post-expiration use of its patent—including by "receiving" post expiration royalties, *Kimble*, 576 U.S. at 450—and a licensee may not be penalized in any way for post-expiration use of an invention in the public domain. *See supra* at Argument II.A. Without full restitution, the licensee is "penalized" for access to an invention in the public domain, and the patentee is permitted to "receive" unlawful post-expiration royalties.

Moreover, from the express holdings of *Brulotte* and *Kimble* that after expiration a patentee may not benefit from a patent, may not collect, demand or receive royalty payments, must allow free use of the invention, and a licensee may not even ***volunteer***[17] to make post-expiration payments, it necessarily follows that

[17] Indeed, both *Brulotte* and *Kimble* addressed contracts voluntarily entered into by a licensee. The Supreme Court explained that these voluntarily entered into agreements "conflict with patent law's policy of establishing a 'post-expiration . . . public domain' in which every person can make free use of a formerly patented product." *Kimble*, 576 U.S. at 453 (quoting *Brulotte*, 379 U.S. at 33).

federal law forbids retention of illegal royalty payments and requires full restitution. The Tribunal's decision to ignore a federal remedy and reduce the award of restitution to 20% of the illegal payments Alkermes received did precisely what federal law and policy forbid: allowed the patentee to demand, receive, and retain post-expiration benefits, and penalized Acorda for use of the expired patent. And the district court's decision to uphold the Tribunal's determination, based on a finding that full restitution is not clearly required, ignores and undermines significant federal policy and the holdings of the Supreme Court.

Conversely, no public policy is advanced by limiting restitution to only that portion of post-expiration royalties paid under formal protest. Once the patent expires, the patentee is entitled to no benefit, and whether the forbidden benefit may be retained should not hinge on the words the licensee uses to accompany the post-expiration payments, regardless of whether such payments are a product of ignorance of the law, fear of retribution, patentee demand, or any other reason. *See AstraZeneca AB* v. *Apotex Corp.*, 782 F.3d 1324, 1342 (Fed. Cir. 2015) (noting that *Brulotte* deemed "extract[ing] royalties after the patent expired" to be "a wrongful leverage of the patent monopoly").

Awarding only a portion of the illegal payments, as the Tribunal did, only encourages gamesmanship and creates incentives for a patent owner such as Alkermes to use business leverage to demand payments it knew were improper under

*Brulotte,* hoping it might keep millions of dollars if Acorda did not demand arbitration or formally protest. *See supra* at 10 & n.5 (Alkermes demanded royalties it was aware it had no right to collect after the '938 patent expired). In sum, *Brulotte* and *Kimble*, as well as the federal policies that underlie those decisions, clearly mandate full restitution of payments received in violation of those laws and policies. The district court thus erred in its contrary conclusion that "*Brulotte* and its progeny do not provide clear guidance on whether royalties that have already been paid under offending contracts are recoverable."[18] Appx16.

[18] It is well established that federal courts have the ability to grant restitution as an equitable remedy, including as a matter of federal common law to promote federal law and policies. *See, e.g.*, *Conoco Inc.* v. *J.M. Huber Corp.*, 289 F.3d 819, 825 (Fed Cir. 2002) (recognizing that federal common law actions for restitution exist under the Economic Stabilization Act and the Emergency Petroleum Allocation Act); *Owner-Operator Ind. Drivers. Assoc., Inc.* v. *Comerica Bank*, 562 Fed. Appx. 312, 324 (6th Cir. 2014) (unpublished) (recognizing an action for restitution under the federal common law of trusts). In *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 110 (1989), the Supreme Court explicitly approved the development of federal common law in ERISA cases. In the wake of *Firestone*, courts have recognized a federal common law action for restitution in ERISA cases. *See State Street Bank & Trust Co.* v. *Denman Tire Corp.*, 240 F.3d 83, 89-90 (1st Cir. 2001).

Here, the Arbitration was governed by the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules"), which expressly gave the Tribunal the power to grant equitable remedies, including "any relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties . . . ." AAA Rule 49-1.

That erroneous determination was not based on analysis of *Brulotte* and *Kimble* and the policies they advance. Instead, the district court relied on a lack of affirmative case law requiring restitution of post-expiration royalties. Appx17. But the paucity of cases does not show that the law set out in *Brulotte* and *Kimble* is ambiguous or unclear. To the contrary, such cases may be rare because *Brulotte* so clearly makes the receipt of post-expiration royalties illegal, and informs patentees that there is nothing to be gained from seeking them.

The district court cited a single trial court decision holding that a patentee was not required to return post-expiration royalty payments. *See* Appx18 (discussing *Zila, Inc.* v. *Tinnell*, No. 2:00-CV-1345 (D. Nev. Apr. 22, 2004), *aff'd* 502 F.3d 1014 (9th Cir. 2007).[19] But *Zila* was wrongly decided and implicitly was overruled by the later *Kimble* decision. *Zila* relied on Section 197 of the Restatement (Second) of Contracts, which states that restitution is "generally unavailable." The *Zila* court, however, failed to fully consider Section 198, which provides for restitution where (as here) the licensee is a member of the class the public policy at issue is designed to protect. *See Zila, slip. op.* at 4; *see also supra* at note 22. *Zila* was also decided prior to the Supreme Court's 2014 decision in *Kimble*, where the

---

19 The Ninth Circuit's affirmance did not address or even discuss any relevant aspect of the district court's decision.

Supreme Court confirmed that the patentee may not benefit from an expired patent and the public may not be penalized for its use.[20]

The district court also relied on case law holding that restitution is not available for royalties paid for a license to a patent later found to be invalid. *See* Appx18-19 (discussing *MedImmune, LLC* v. *PDL BioPharma, Inc.*, No. 08-5590, 2011 WL 61191 (N.D. Cal. Jan. 7, 2011) (holding petitioner was not entitled to restitution of pre-invalidation royalty payments). Those cases have no bearing on whether *Brulotte* and federal law require full restitution of post-expiration royalties—they stand for the proposition that a patentee has a right to collect royalties for the use of the patent up to the time it enters the public domain when it is declared invalid. *See, e.g.*, *SCM Corp*. v. *Radio Corp. of Am*., 318 F. Supp. 433, 457 (S.D.N.Y. 1970). In contrast, *Brulotte* makes clear that there is no right to receive royalties ***after*** the patent enters the public domain when it expires. Unlike post-expiration royalties, royalties paid before a patent is adjudged invalid are not illegal.

---

[20] The district court here also cited *Dillon* v. *U-A Columbia Cablevision of Westchester, Inc.*, 740 N.Y.S.2d 396 (App. Div. 2002) and *Tessera, Inc.* v. *Toshiba Corp.*, 15 Civ. 2543 (BLF), 2019 WL 5395158, (N.D. Cal. Oct. 22, 2019) for the proposition that restitution was not required. *See* Decision at 18. However, *Dillion* was not a patent case, and did not concern payments that violated federal law or public policy. In *Tessera*, the plaintiff had made royalty payments based on its belief that its products practiced "additional patents" that had not expired.

The difference between post-expiration and pre-invalidity royalties follows from the fact that, while restitution under *Brulotte* preserves the integrity of the marketplace, allowing restitution of royalties paid before an adjudication of invalidity would distort it.[21] "The possibility of obtaining a refund of all royalties paid [before a determination of invalidity] might induce a manufacturer to accept a license based on a patent of doubtful validity, derive the benefits of suppressed competition which the patent affords, and challenge validity only after the patent's expiration." *St. Regis Paper Co.* v. *Royal Indus.*, 552 F.2d 309, 314 (9th Cir. 1977). Restitution in these circumstances would give the licensee a chance to "regain all the royalties [it] paid," after "enjoy[ing] the fruits of the license agreement" for the lifetime of the patent. *Id.* Self-interest would keep licensees from challenging invalid patents before expiration, because the license could discourage others from entering the market. *Id.; see also Troxel Mfg. Co*. v. *Schwinn Bicycle Co.*, 465 F.2d 1253, 1259-60 (6th Cir. 1972) ("The public interest is protected adequately under *Lear* without imposing on the patent holder the obligation to refund royalties paid under the license of a patent procured and asserted in good faith.").

---

[21] This case itself illustrates how rigorous enforcement of the principles of *Brulotte* and *Kimble* preserve marketplace integrity. Alkermes's collection and retention of post-expiration royalties prevented Acorda from competing effectively against generic competitors who did not have the additional costs of paying post-expiration royalties. Appx365, Appx405, Appx649-49.

* * *

*Brulotte* and *Kimble* made clear that the federal patent laws prohibit a patentee from benefitting from the use by the public of an expired patent or penalizing a licensee for such use. Indeed, the Tribunal decided as much. Clear federal law requires full restitution of all payments that are illegal under those decisions—including the payments made by Acorda to Alkermes after the '938 Patent expired. Any other conclusion—including one that it is not clear whether full restitution is required—undermines federal patent laws and policies. The district court erred when it confirmed without modification the Tribunal's award of only partial restitution in manifest disregard of those patent laws and policies.

### C. Federal Patent Law Preempts the NYVPD.

Even assuming (contrary to the above) that federal law does not provide the remedy for payments made in violation of *Brulotte* and that one must look to state law, state law provides for restitution and the Tribunal recognized as much. It is black-letter law that restitution is generally awarded where payment was rendered "under an agreement that is illegal or otherwise unenforceable for reasons of public policy." Appx274 (quoting *Mazzei* v. *Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015); s*ee*, *e.g.*, Restatement (Third) of Restitution § 32 (Am. L. Inst. 2011) ("A person who renders performance under an agreement . . . unenforceable for reasons

of public policy may obtain restitution from the recipient[s] . . . if restitution is required by the policy of the underlying prohibition.").[22]

While state law *consistent* with federal law may provide the remedy for a violation of federal law and policy, state law may not be applied in contradiction of federal policy or to thwart the goals of limiting the patent monopoly and its

---

[22] Similarly, the Restatement (Second) of Contracts § 198 provides that restitution is available for payments that a party "has rendered under or in return for a promise that is unenforceable on grounds of public policy" to the extent the party "was not equally in the wrong with the promisor." Restatement (Second) of Contracts § 198 (Am. L. Inst. 1981). Comment b to § 198 states that a party is considered "less in the wrong," and thus entitled to restitution of its payments, if "the public policy is intended to protect persons of the class to which he belongs." *Id.*, cmt. b. Acorda, as an entity seeking to exploit the '938 Patent after it entered the public domain, unquestionably was a member of the class *Brulotte* was designed to protect during the entire time it paid post-expiration royalties. *See Kimble*, 576 U.S. at 452 ("[a]llowing ***even a single company*** to restrict its use of an expired or invalid patent . . . would impermissibly undermine the patent laws" (emphasis added)); *id.* at 453 (it is the "patent law's policy" to establish a "'post-expiration . . . public domain' in which ***every person*** can make free use of a formerly patented product" (emphasis added)); *id.* at 463 ("post-expiration ***restraints on even a single licensee's access*** to the invention clash with th[e] principle that after a patent lapses, the formerly protected invention must be available to all for free" (emphasis added)). Accordingly, applying this Restatement to *Brulotte* also required restitution of all, not just some, of Acorda's post-expiration payments.

This Court has cited the Restatement (Third) of Restitution and the Restatement (Second) of Contracts as authoritative statements in these areas of the law. *See Hansen Bancorp, Inc.* v. *United States*, 367 F.3d 1297, 1308 n.9 (Fed. Cir. 2004); *Long Island Sav. Bank, FSB* v. *United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007); *Amber Res. Co.* v. *United States*, 538 F. 3d 1358, 1380 (Fed. Cir. 2008).

benefits to the period of the patent grant. The Supremacy Clause mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Arbitration panels are required to follow the Supremacy Clause.[23]

Here, however, after determining that ***all*** of the post-expiration royalties paid by Acorda were prohibited under federal law and that at least some restitution was required for post-expiration royalties paid, the Tribunal invoked a state law, the NYVPD (which it had previously ruled had no application in the arbitration), to limit Acorda's recovery to only those payments Acorda made under "formal protest." Appx50. The Tribunal manifestly disregarded the Supremacy Clause by relying on the NYVPD to limit restitution of post-patent expiration payments. Federal patent law preempts application of the NYVPD in the way the Tribunal applied it.

This Court applies Federal Circuit law to determine whether federal patent law preempts state law. *Ultra-Precision Mfg., Ltd.* v. *Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005). Federal preemption is applied in three different

---

[23] The parties agreed the arbitration was governed by New York substantive law *and* federal patent law. Appx35. The Supremacy Clause governs the interaction of those two sources of law, so the Tribunal necessarily was aware of and bound by it.

ways: express, field, or conflict. *Amgen Inc.* v. *Sandoz Inc.*, 877 F.3d 1315, 1326 (Fed. Cir. 2017). Conflict preemption, at issue here, occurs "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quoting *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941)); *Amgen*, 877 F.3d at 1329 (conflict preemption barred state law claims where state law "'clash[ed]' with" federal law "and the differences in remedies between the federal scheme and state law claims support concluding that those claims are preempted").

Here, applying the NYVPD to limit restitution of royalties found to be illegal under *Brulotte* and *Kimble*, "stands as an obstacle" to and "clash[es] with" the "purposes and objectives of Congress" as expressed in the patent laws. *English*, 496 U.S. at 79; *Amgen*, 877 F.3d at 1329. At a minimum, the Tribunal's application of the NYVPD to allow Alkermes to receive and keep over $65.6 million in post-expiration royalties had the effect of extending Alkermes's patent monopoly beyond the term set by Congress. This Court has explained that the "underlying determination about the proper balance between innovators' profit and consumer access to [an invention] . . . is exclusively one for Congress to make," and state law cannot be used to upset that balance. *Biotechnology Indus. Org.*, 496 F.3d at 1374; *see also Bonito Boats*, 489 U.S. at 151 ("[T]he federal patent laws must determine not only what is protected, but also what is free for all to use."); *Univ. of Colorado*

*Found., Inc.* v. *Am. Cyanamid Co.*, 342 F.3d 1298, 1305-06 (Fed. Cir. 2003) ("Through the federal patent laws, Congress has balanced innovation incentives against promoting free competition, and state laws upsetting that balance are preempted.")[24]

As discussed above, *see supra* at Argument II.A, for decades the Supreme Court has repeatedly and consistently held that, under the patent laws enacted by Congress, once a patent expires, its claims must be available for the ***free*** use of all: "The aim of the patent laws is not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitation, by others, of its disclosures." *Scott Paper*, 326 U.S. at 255; *see also Kimble*, 576 U.S. at 451-53, 463; *Coats* v. *Merrick Thread Co.*, 149 U.S.

---

24 If Acorda's recovery were understood to come from New York's law of unjust enrichment rather than from federal patent law, Acorda would still be entitled to full recovery. Unlike the NYVPD, New York's unjust enrichment law does not conflict with the federal patent laws and policies set out in *Brulotte* and *Kimble* and thus is not preempted. State law is preempted only "***to the extent that it actually conflicts with federal law***." *Pacific Gas & Elec. Co.* v. *State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (emphasis added); *California Fed. Sav. Loan Ass'n* v. *Guerra*, 479 U.S. 272, 281 (1987) ("[I]n those areas where Congress has not completely displaced state regulation, ***federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law***." (emphasis added)); *Cleland* v. *Off. of Pers. Mgmt.*, 984 F.2d 1193, 1195 (Fed. Cir. 1993) (North Carolina's *in loco parentis* law was not preempted except for one provision that conflicted with express federal law).

562, 572 (1893); *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U.S. 169, 185 (1896); *Kellogg Co.* v. *Nat'l Biscuit Co.*, 305 U.S. 111, 117-18 (1938); *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U.S. 225, 230-31 (1964); *Brulotte*, 379 U.S. at 31-34; *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470, 480-81 (1974); *Bonito Boats*, 489 U.S. at 152.[25] The Tribunal's application of the NYVPD undermined the balance established by Congress because it allowed Alkermes to retain over $65.6 million for its *per se* illegal extension of a patent monopoly which restrained Acorda's use of an invention after it entered the public domain.

*Brulotte* and *Kimble* also stand for the "categorical principle" that limiting—in any way—even one person's free use of an idea in the public domain conflicts with Congress's decision that expired patents are available to all for use without restriction. *See Kimble*, 576 U.S. at 463 ("[P]ost-expiration restraints on

---

[25] The term limits of the patent monopoly are enshrined in the Constitution, which grants to Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The limitation of the patent monopoly set by Congress balances two competing objectives of patent law—"to reward innovators with higher profits and to keep prices reasonable for consumers"—with the ultimate purpose of "providing the public with the benefit of lower price through unfettered competition." *Biotechnology Indus. Org.*, 496 F.3d at 1373; *see also Bonito Boats*, 489 U.S. at 150-51 ("The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years.").

even a single licensee's access to the invention clash with" the principle that "the day after a patent lapses, the formerly protected invention must be available to all for free."); *see also Scott Paper*, 326 U.S. at 256 ("[A]ny attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, *whatever the legal device employed*, runs counter to the policy and purpose of the patent laws." (emphasis added)); *Kellogg Co.*, 305 U.S. at 117-18; *Sears*, 376 U.S. at 230-31; *Lear, Inc.* v. *Adkins*, 395 U.S. 653, 670-74 (1969); *Bonito Boats*, 489 U.S. at 152; *Motion Med. Techs., L.L.C.* v. *Thermotek, Inc.*, 875 F.3d 765, 777 (Fed. Cir. 2017). Accordingly, no state-law doctrine—whether arising from common law, statute, contract law, or the law of waiver or estoppel—may be applied to reward a patentee for the use of the patentee's invention by any member of the public, including a former licensee, once the patent has expired. *Scott Paper*, 326 U.S. at 255-57.

The Tribunal's reliance on the NYVPD to permit Alkermes to charge Acorda and then retain over $65.6 million for Acorda's use of an expired patent conflicts with the clear federal patent law and policies set out in *Brulotte* and *Kimble* because it denied Acorda the benefit of free use of an invention that had entered the public domain. The Tribunal's application of the NYVPD clearly stood as an obstacle to the "policy and purpose of the patent laws" because it prevented Acorda, as a member of the public, "from enjoying rights which it is the policy of the patent

laws to free from all restrictions." *Scott Paper*, 326 U.S. at 256-57. As such, the Tribunal's application of the NYVPD was clearly preempted by *Brulotte* and other Court decisions. The Tribunal manifestly disregarded this clear law when it relied on New York's NYVPD to limit the restitution the Tribunal decided was required because of Alkermes's *Brulotte* violation.

## III. Acorda's Preemption Argument Should Be Resolved on Its Merits.

### A. The District Court Abused Its Discretion in Finding That Acorda Forfeited Its Preemption Argument.

The district court abused its discretion in finding that Acorda forfeited the argument that application of the NYVPD is preempted by federal patent law. The district court's forfeiture decision rests on a clearly erroneous factual finding—that Acorda did not raise preemption before the Tribunal. *See* Appx19. Acorda raised the preemption argument to the Tribunal in its motion for summary judgment and was thereafter ordered not to raise the issue again.

In its motion for summary judgment, Acorda explained that, "[a]s a matter of law, *Brulotte* and *Kimble* preclude the assessment of royalties on an expired patent." Appx637. Acorda went on to explain that *Brulotte* held that a contract calling for payment of post-expiration royalties was "unenforceable ***under the Supremacy Clause of the Constitution***." Appx635 (emphasis added). Acorda's citation to the Supremacy Clause in its summary judgment briefing before the Tribunal constitutes an argument that federal law announced in *Brulotte* preempts

contrary state laws, including the NYVPD—the same argument Acorda made before the district court and now makes on appeal.

In its summary judgment decision, the Tribunal ignored Acorda's Supremacy Clause arguments and determined that full restitution was limited by the "no-refund" clause in the parties' contract, which it found prevented refund of payments for which "no protest is made." Appx274. The Tribunal applied this limitation on recovery to all of Acorda's payments under the Supply Agreement, and to all of its payments under the License Agreement before Acorda's "formal" protest in July 2020. Appx274. In expressly relying on the "no refund" clause, the Tribunal rejected reliance on the NYVPD, stating "the NYVPD does not have any implication for this Arbitration." Appx275.

After the Tribunal's summary judgement ruling, Acorda explicitly sought but was prevented from re-raising full restitution arguments, including those relying on preemption. In response to Alkermes's request to bar Acorda's full restitution argument, Appx304, the Tribunal ruled that it would "not entertain evidence regarding payments made prior to July 2020 as said payments are no longer pertinent to this Arbitration." Appx311. Thus, Acorda raised federal policy and cited the Supremacy Clause at the summary judgment stage in support of full restitution, but was ordered not to raise the issue again once the Tribunal ruled that full restitution was precluded by contract and that it would not entertain arguments

about pre-July 2020 payments. At that point, Acorda had no way to press the argument that state law was preempted by federal patent law because the Tribunal refused to hear it.

After determining that "the NYVPD does not have any implication for this Arbitration," Appx275, and instructing Acorda not to raise full restitution because it was "no longer pertinent" after summary judgment, Appx311, the Tribunal reversed course in its final award. It held for the first time that "the NYVPD has precluded any recovery by Acorda up until it made its formal protest in July 2020." Appx50. The Tribunal said nothing about the "no-refund" clause, and instead applied the NYVPD without providing notice to the parties or affording Acorda any chance to reassert its preemption arguments at trial. As there was no post-trial motion practice, Acorda's first opportunity to raise the argument again was in the district court.

The Federal Circuit has found in similar circumstances that a party did not forfeit an argument. In *ePlus, Inc.* v. *Lawson Software, Inc.*, the Court held that a patent challenger did not forfeit an indefiniteness argument when it raised the argument in a motion for summary judgment, which the district court denied. 700 F.3d 509, 517 (Fed. Cir. 2012). Thereafter, the patent challenger did not raise the indefiniteness argument at trial, but raised it in an oral pre-verdict motion for judgment as a matter of law and in writing in its post-verdict motions. *Id.* The

Federal Circuit found that the patent challenger did not forfeit its indefiniteness argument because "it is abundantly clear from the record that the district court did not intend to revisit the indefiniteness issue once it denied summary judgment" and because indefiniteness is an issue of law. *Id.* at 517-18. The patent challenger "was not required to ignore the writing on the wall and press the issue over and over again to preserve it for appeal." *Id.* at 518.

Here, as in *ePlus*, Acorda did not forfeit its preemption argument where it raised it at the summary judgment stage, but did not raise it again once the Tribunal explicitly ruled it would "not entertain" further arguments on full restitution—the issue implicating preemption. *See* Appx311. After the first and surprising reliance on the NYVPD in the final award, Acorda re-raised its preemption argument at the earliest opportunity—in its petition to the district court. Appx77-78. The district court's finding that Acorda forfeited the argument was simply wrong, because, like the patent challenger in *ePlus*, Acorda was "not required to ignore the writing on the wall and press the issue over and over again."

### B. The Federal Circuit Has Discretion to Reach the Merits of Preemption, Regardless of Any Purported Forfeiture.

Even assuming, *arguendo*, that Acorda did forfeit its preemption argument, the Federal Circuit has discretion to consider it. *See Amgen*, 877 F.3d at 1324 (overlooking forfeiture of preemption argument); *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 141 (2d Cir. 2000) (explaining that the appellate court

need "not address whether the district court abused it[s] discretion in finding a forfeiture" and exercising the appellate court's "discretion to reach [an] issue whether or not it was raised below").

The Federal Circuit has articulated five reasons that may justify an appellate court's consideration of an issue not argued to the district court: (1) "the issue presents significant questions of general impact or of great public concern"; (2) "the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice"; (3) "the proper resolution is beyond any doubt"; (4) the appellant had no opportunity to raise the issue at the trial court (or, here, with the Tribunal); or (5) "the interest of substantial justice is at stake." *Amgen*, 877 F.3d at 1324 (quoting *L.E.A. Dynatech, Inc.* v. *Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995)).

All of these independent justifications support reaching Acorda's preemption argument. *First*, preemption issues "present[] 'a significant question[] of general impact or of great public concern,'" as this Court has repeatedly held. *Amgen*, 877 F.3d at 1325 (quoting *Hall* v. *Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1371 (Fed. Cir. 2013)); *Hall*, 705 F.3d at 1371 ("We have considered the issue [of preemption], for waiver is generally inapplicable to 'significant questions of general impact or of great public concern.'" (quoting *Interactive Gift Express, Inc.* v. *Compuserve Inc.*, 256 F.3d 1323, 1345 (Fed. Cir. 2001)).

The Supreme Court likewise has held that whether state law is preempted by federal patent law is an issue of deep public concern. *Sears*, 376 U.S. at 231 ("Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." (quoting *Kellogg Co.*, 305 U.S. at 122)).

*Second*, whether the Tribunal's application of the NYVPD is preempted by federal patent law is a pure issue of law and refusal to consider the issue would result in a miscarriage of justice. *See Amgen*, 877 F.3d at 1325 ("Preemption is a legal question[.]"). The Second and Federal Circuits have each exercised discretion to reach purely legal issues on the merits after forfeiture. *See id.*; *see also Krumme*, 238 F.3d at 142 (Second Circuit excusing forfeiture because the "allegedly forfeited claim raises 'a pure question of law'" (citing *Baker* v. *Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (reaching the merits of a pure question of law)); *United States* v. *Brunner*, 726 F.3d 299, 304 (2d Cir. 2013) (forfeiture rule is prudential, not jurisdictional, and it is appropriate to overlook forfeiture of an argument that presents a question of law and does not require additional fact-finding).

*Third*, proper resolution of the preemption issue here is "beyond any doubt" because the Supreme Court has repeatedly and consistently held that no state law can extend either a patent term or the benefits of a patent beyond the limit set by federal statute. *See supra* at Argument II.C; *Kimble*, 576 U.S. at 453 ("Any attempt

to limit a licensee's post-expiration use of the invention, '*whatever the legal device employed*, runs counter to the policy and purpose of the patent laws.'" (emphasis added) (quoting *Brulotte*, 379 U.S. at 31)); *Sears*, 376 U.S. at 231 ("State could not, consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date" because to do so "would run counter to the policy of Congress of granting patents . . . only for a limited time" and further explaining that "[j]ust as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws" (footnote omitted)).

*Fourth*, as explained, Acorda had no opportunity to re-raise the preemption issue before the Tribunal after that Tribunal's summary judgment decision. *See supra* at Argument III.A. The Federal Circuit has rejected forfeiture where there was no occasion to challenge the ruling. *See Columbia Sportswear N. Am., Inc.* v. *Seirus Innovative Accessories, Inc.*, 80 F.4th 1363, 1374 (Fed. Cir. 2023).

*Fifth*, the interest of substantial justice is at stake. Permitting Alkermes to retain over $65.6 million in post-expiration royalties, despite clear Supreme Court statements as to the illegality of such royalties under federal patent law, would permit an obvious injustice to stand, particularly in light of the Tribunal's reliance on the NYVPD after informing the parties that the NYVPD had no relevance to the

arbitration. Moreover, as explained, the injustice wrought by limiting Acorda's recovery through application of state law has general impact on the public: "[a]llowing even a single company to restrict its use of an expired or invalid patent . . . 'would deprive . . . the consuming public of the advantage to be derived' from free exploitation of the discovery." *Kimble*, 576 U.S. at 452 (quoting *Scott Paper*, 326 U.S. at 256).

* * *

Because Acorda did not forfeit the argument, or as an exercise of its discretion, Acorda respectfully asks this Court to reach the merits of Acorda's preemption claim.

## IV. The District Court Had the Power to Modify the Arbitration Award.

The district court erred in holding that it did not have the power to modify the arbitration award to include all of the post-expiration royalties paid by Acorda. A court may modify arbitral awards that evidence "manifest disregard of the law." *DiRussa*, 121 F.3d at 821. The district court incorrectly concluded that "since the Supreme Court cast doubt on the ongoing viability of the manifest disregard doctrine" in *Hall Street Associates., L.L.C.* v. *Mattel, Inc.*, 552 U.S. 576, 584 (2008), "the doctrine has only been recognized by the Second Circuit as a basis for vacatur, not modification." Appx14. This statement misconstrues Second

Circuit precedent, which recognizes the continuing application of the manifest disregard doctrine to modify an arbitral award.

After the Supreme Court questioned survival of the manifest disregard doctrine in *Stolt-Nielsen* (see *infra*.)—the Second Circuit affirmed its continued vitality. *See, e.g.*, *Schwartz* v. *Merrill Lynch & Co.*, 665 F.3d 444, 451-52 (2d Cir. 2011). And the Second Circuit has never held, post-*Stolt-Nielsen*, that the manifest disregard doctrine no longer applies to requests to modify an arbitral award. Nor has it abandoned its many pre-*Hall Street* decisions explicitly stating that arbitral awards may be modified under the manifest disregard doctrine. *See DiRussa*, 121 F.3d at 821 ( Second Circuit has "often recognized this judicially-created ground for modifying or vacating an arbitration award" and compiling cases); *Yusuf Ahmed Alghanim* v. *Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (Arbitral "awards may be vacated, *see* 9 U.S.C. § 10, or modified, *see id.* § 11, in the limited circumstances where the arbitrator's award is in manifest disregard of the terms of the agreement . . . or where the award is in 'manifest disregard of the law[.]'" (quoting *Fahnestock & Co.* v. *Waltman*, 935 F.2d 512, 515-16 (2d Cir. 1991) (citations omitted)); *Halligan* v. *Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998) (noting that courts may modify or vacate an award if it is in manifest disregard of the law); *New York Tel. Co.* v. *Commc'ns Workers of Am. Loc. 1100, AFL-CIO Dist. One*, 256 F.3d 89, 91 (2d Cir. 2001) (same).

Moreover, district courts applying Second Circuit law post-*Hall Street* continue to modify arbitral awards under the manifest disregard doctrine. *See, e.g.*, *Chen* v. *Kyoto Sushi, Inc.*, No. 15-CV-7398, 2021 WL 1224377, at *3 n.6 (E.D.N.Y. Apr. 1, 2021) ("In extraordinary circumstances, the Court may also modify or vacate an arbitration award when an arbitrator committed manifest disregard of the law." (citing *T.Co Metals*, 592 F.3d at 338)); *Trs. of Ne. Carpenters Health, Pension, Annuity, Apprenticeship, & Lab. Mgmt. Coop. Funds* v. *Patriot Field Servs., Inc.*, No. 18-CV-5825, 2019 WL 1333256, at *3 (E.D.N.Y. Mar. 25, 2019) ("'[T]he Second Circuit has recognized an implied basis' for modifying an arbitration award where the award 'is in "manifest disregard" of the law.'" (quoting *In re Arb. Between Gen. Sec. Nat'l Ins. Co.*, 785 F. Supp. 2d 411, 417 (S.D.N.Y. 2011)).[26]

The Supreme Court has expressly stated that it has not decided whether the manifest disregard doctrine remains good law. *Stolt-Nielsen S.A.* v. *AnimalFeeds*

---

[26] *See also Ukshini* v. *Comity Realty Corp.*, No. 15-CV-6214, 2018 WL 4625801, at *3 (S.D.N.Y. Sept. 26, 2018); *Van Buren* v. *Cargill, Inc.*, No. 10-CV-701S, 2016 WL 231399, at *7 (W.D.N.Y. Jan. 19, 2016); *Subway Int'l B.V.* v. *Seistola*, No. 3:13-CV-1610, 2014 WL 9861978, at *1 (D. Conn. Apr. 7, 2014); *Whitfield* v. *Jones*, No. 11 Civ. 2936, 2013 WL 6183096, at *2 (S.D.N.Y. Nov. 15, 2013); *Phoenix Bulk Carriers, Ltd.* v. *Am. Metals Trading, LLP*, No. 10 Civ. 2963, 2013 WL 5863608, at *4 (S.D.N.Y. Oct. 31, 2013); *Amaprop Ltd.* v. *Indiabulls Fin. Servs. Ltd.*, No. 11 Civ. 2001, 2011 WL 4344437, at *2 (S.D.N.Y. Sept. 9, 2011); *In re Arb. Between Gen. Sec. Nat'l Ins. Co. & AequiCap Program Adm'rs*, 785 F. Supp. 2d 411, 417 (S.D.N.Y. 2011); *Silver Ent. LLC* v. *Rabin*, No. 10 Civ. 5303, 2011 WL 1097548, at *4-5 (S.D.N.Y. Mar. 21, 2011).

*Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) (explicitly declining to answer the question of "whether '"manifest disregard"' survives . . . *Hall Street*"). Moreover, there is no principled reason, and the district court failed to provide one, for the court to both acknowledge that the manifest disregard doctrine continues to permit vacatur of awards but not modification of awards. If the tribunal has manifestly disregarded law, it is more efficient for a court to modify the flawed award to correct the error than require that the tribunal be reconstituted—possibly years after it issued its original award—to re-decide the issue in accordance with clear law. That is particularly true here where Alkermes sought affirmance of the award in full and Acorda only seeks a modification that is a matter of mathematics.

For these reasons, the district court erred in finding that it did not have the power to modify the Tribunal's final award in light of the Tribunal's manifest disregard of federal law and patent policy.

**V. This Court May Modify the Arbitration Award.**

This Court need not remand to the district court to modify the arbitration award. Under 28 U.S.C. § 2106, an appellate court may "affirm, modify, vacate, set aside or reverse" a district court's decision to confirm an arbitration award. *See Bayer CropScience AG* v. *Dow Agrosciences LLC*, 680 F. App'x 985, 988 (Fed. Cir. 2017) (modifying the arbitration award to change the interest rate for post-judgment interest). Here, there is no reason to require reconstitution of the

Tribunal to re-decide matters both parties agree were correctly decided in the first instance or apply math the parties agree to. Remanding would waste judicial resources and unnecessarily burden the parties. Thus, this Court should modify the Award to include the amount the Tribunal excluded as a result of its manifest disregard of applicable law.

## CONCLUSION

For the foregoing reasons, we respectfully submit that the Court should reverse the district court and modify the Tribunal's order to award Acorda an additional $65,629,716 along with pre- and post-award interest and costs as authorized by law, including the costs of this appeal. Appx78, Appx95.

Dated: New York, New York
March 18, 2024

/s/ Garrard R. Beeney

Garrard R. Beeney
Stephen J. Elliott
Morgan R. Knudtsen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

Brittany S. Bruns
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500

*Attorneys for Petitioner-Appellant Acorda Therapeutics, Inc.*

# ADDENDUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X

ACORDA THERAPEUTICS, INC,

Petitioner,

- against -

ALKERMES PLC,

Respondent.

---------------------------------------X

**MEMORANDUM AND ORDER**

23 Civ. 223 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Petitioner Acorda Therapeutics, Inc. ("petitioner" or "Acorda") brings this petition under the Convention for the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 38, and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10-12, 201-208, to confirm in part and modify in part an award of $16,554,267 plus interest and costs (the "Award") issued in an arbitration between Acorda and Alkermes PLC ("respondent" or "Alkermes"). See ECF No. 1 ("Pet."). While Acorda believes that the Tribunal's "core rulings were indisputably correct" and should be confirmed, Acorda claims that the Tribunal manifestly disregarded the law in its damages analysis, resulting in an improper damages reduction of $65,629,716. See ECF No. 3 ("Pet. Br.") at 7. For the reasons stated below, Acorda's petition to modify the Award in part is denied and the Award is confirmed in its entirety.

## BACKGROUND

### A. Factual Background

#### 1. Dispute Concerning Royalty Payments

This case arises from a dispute concerning royalty payments owed under two agreements -- the Amended and Restated License Agreement (the "License Agreement") and the Supply Agreement (collectively, the "Agreements") -- between Acorda and Elan Corporation, PLC, the predecessor in interest to Alkermes, which were executed in 2003. See Pet. ¶ 9; ECF Nos. 6-2, 6-3. Acorda is the developer of Ampyra, a medication to improve walking in people with multiple sclerosis. See Pet ¶ 9. Alkermes was the owner of the now-expired patent, U.S. Patent No. 5,540,938 (the "'938 Patent"), "which covered the sustained release of dalfampridine, the active pharmaceutical ingredient in Ampyra." Pet ¶ 10. Pursuant to the Agreements, Alkermes agreed to license the '938 Patent to Acorda and manufacture Ampyra exclusively for Acorda. Pet ¶¶ 9, 10. In exchange, Acorda agreed to pay Alkermes a "specified royalty rate" of 18 percent and to "purchase a minimum percentage of Ampyra from Alkermes." Pet ¶ 9. The 18 percent royalty rate was split between the License Agreement, which provided for a 10 percent royalty, and the Supply Agreement, which provided for an 8 percent royalty. See Pet. Br. at 10.

After the '938 Patent expired in July 2018, Acorda contended that "the expiration of the '938 Patent, at the very least, altered

the Agreements' royalty provisions" and "therefore sought a reduction in the price it was paying to Alkermes for future orders of Ampyra." See Pet ¶ 11. Alkermes disagreed. See Pet. Br. at 10. However, Acorda never terminated the Agreements and continued to pay royalties to Alkermes without protest until July 2020. See id. at 8. At that point, Acorda formally objected to its ongoing royalty charges under the License Agreement on the basis that those payments violated Brulotte v. Thys Co., 379 U.S. 29 (1964), which held that post-expiry patent leveraging is improper. See id. at 6, 11; ECF No. 20 ("Resp. Opp.") at 7. Acorda's objection did not reference the Supply Agreement. See Resp. Opp. at 7.

### 2. The Arbitration

#### i. Pleadings

On July 28, 2020, Acorda commenced arbitration proceedings against Alkermes in the American Arbitration Association's ("AAA") International Centre for Dispute Resolution ("IDCR") Tribunal in New York, New York. See Pet. ¶¶ 16, 18. The Tribunal consisted of three distinguished, retired judges: the Honorable Robert S. Smith, the Honorable Arthur J. Gajarsa, and the Honorable Jose L. Linares. See id. ¶ 18; ECF No. 6-1 (the "Award") at 2; Resp. Opp. at 7.

Acorda asserted claims for: "(1) declaratory judgment as to whether Alkermes was entitled to patent-licensing royalties after the '938 Patent expired on July 30, 2018; (2) declaratory judgment

as to whether Alkermes was entitled to supply royalties above a fair market rate after July 30, 2018; (3) declaratory relief as to a return of overpayment; (4) unjust enrichment by retaining overpayment; (5) breach of the License Agreement; (6) monopolization in violation of Section 2 of the Sherman Act and the Donnelly Act; (7) attempted monopolization in violation of Section 2 of the Sherman Act and the Donnelly Act; and (8) breach of the implied covenant of good faith and fair dealing." Pet. ¶ 16. "Acorda sought a ruling from the Tribunal that Alkermes's ongoing royalty charges violated [Brulotte] . . . and that, as a result, Acorda is entitled to a refund of all royalties paid after the expiration of the '938 Patent." Pet. ¶ 16.

On August 17, 2020, Alkermes filed an answer, requesting that the Tribunal deny Acorda's claims. Pet. ¶ 17. Alkermes later filed an amended answer, in which it raised two counterclaims: "(1) correction of inventorship pursuant to 35 U.S.C. § 256; and (2) a declaratory judgment that the unexpired patents must be assigned to Alkermes." Id.

**ii. Motion Practice**

The parties engaged in extensive motion practice in advance of an evidentiary hearing. Acorda filed motions to dismiss Alkermes' counterclaims and for an order permitting all future royalty payments to be held in escrow. See Pet. ¶ 19; Award at 4. After those motions were fully briefed and oral argument was held,

the Tribunal granted Acorda's motion to dismiss Alkermes' counterclaims and denied Acorda's motion to hold future payments in escrow. See Award at 5. Subsequently, the parties engaged in discovery, which was completed on July 23, 2021. See Pet. ¶ 19. The parties then filed six motions for summary judgment, which were fully briefed on November 23, 2021. See Pet. ¶ 20.

Following oral argument, the Tribunal issued a decision on April 11, 2022 regarding the summary judgment motions, which "(1) dismissed Acorda's claims for breach of contract and breach of the implied covenant of good faith and fair dealing; (2) denied Alkermes's motion as to Acorda's unjust enrichment/restitution claims; (3) denied Acorda's affirmative motion as to its claims for monopolization and attempted monopolization; and (4) granted Alkermes's motion as to Acorda's claims for monopolization and attempted monopolization." Pet. ¶ 21; see also Award at 5-6. In their decision, the Tribunal held that any recovery obtained by Acorda in connection with their claims of unjust enrichment and restitution would be limited to the recovery of royalty payments made after Acorda formally raised its Brulotte objection to Alkermes. See Pet. ¶ 23; ECF No. 6-5 ("SJ Opinion") at 7. In so holding, the Tribunal pointed to a "no-refund" clause in the Agreements, and noted that, due to the existence of the clause, it need not address Alkermes' additional argument that the New York Voluntary Pay Doctrine ("NYVPD") prevents Acorda from seeking a

return on the payments it made between July 2018 and July 2020. See SJ Opinion at 11-14.

In pre-hearing briefing, Acorda argued that the Tribunal's limitation on its requested recovery was improper because, if the Tribunal found that a Brulotte violation occurred, then the Agreements would be rendered unenforceable and all improper royalty payments made after the '938 Patent expired would be recoverable. See Pet. ¶ 25. After Alkermes responded and Acorda filed a reply, see Pet. ¶ 26-27, the Tribunal rejected Acorda's argument on May 27, 2022, stating that the Tribunal "already reviewed and rendered a determination on this issue" and thus would "not entertain evidence regarding payments made prior to July 2020 as said payments are no longer pertinent to this Arbitration," ECF No. 6-9 at 2.

**iii. Evidentiary Hearing**

The Tribunal held a final evidentiary hearing from June 1, 2022 to June 7, 2022. See Pet. ¶ 29. After post-hearing briefs and findings of fact and conclusions of law were filed, closing arguments were held on September 7, 2022. See Award at 6.

**iv. The Award**

On October 13, 2022, the Tribunal issued the Award, which spanned 23 pages.[1] See Award. The Tribunal held that Alkermes'

[1] The Award was modified on November 7, 2022 to correct a clerical error. See Pet. at 1; Award.

royalty charges post-dating the expiration of the '938 Patent violated Brulotte, and that the Agreements providing for those payments were thus unenforceable. See id. at 9-11 ("[In Brulotte], the Supreme Court explicitly held that 'use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se' . . . [and] [t]he conduct that the Supreme Court prohibited in 1964 is precisely what took place in the transaction between the Parties here . . . [thus] these post-patent royalties charged by Alkermes are 'unlawful per se' and are not enforceable."); id. at 11-15 (finding no Brulotte exceptions apply).

However, the Tribunal limited Acorda's "ability to recover unjust enrichment/restitution damages [to] all payments it made under protest." Id. at 18. As such, it awarded Acorda $16,554,267, which constituted the royalty payments it made under the License Agreement, after it formally protested those payments. See id. at 19 ("[While] [a]ll of the payments Acorda made after the '938 Patent expired were improper as Alkermes was no longer to entitled to any royalty payments . . . [u]nder the NYVPD, payments that are made with full knowledge of the facts, even if made under mistake of law are not recoverable.") (internal citations and quotation marks omitted). The Tribunal did not award Acorda any damages under the Supply Agreement because, in its "July 2020 protest letter[,] Acorda explicitly only referenced the License Agreement" and "never formally protested the payments it made under the Supply

Agreement." Id. at 20. The Tribunal acknowledged that "while it is true that the Tribunal has concluded that the License and Supply Agreement are so intertwined that they must be treated as a single agreement for purposes of the unenforceability analysis above . . . New York's law requires the protest to be in writing and explicit as to the rights being asserted and/or preserved." Id.

Accordingly, the Tribunal awarded Acorda the $16,554,267 in royalty payments that it held Acorda was owed under the License Agreement with 9 percent pre-judgment interest of $1,689,528.49 and $13,219.67 in arbitration costs. See id. at 22-23. "Alkermes has paid the sums awarded in the Award." Pet. ¶ 40.

**B. Procedural History**

On January 10, 2023, Acorda filed this petition to: (1) "[m]odify[] the Award, in part, pursuant to 9 U.S.C. §§ 10-12, to rectify that portion of the Award in which the Tribunal manifestly disregarded applicable law by giving effect to the unlawful and unenforceable Agreements by allowing Acorda to recover the royalties paid under the License Agreement during the period July 2018 through July 2020, and the royalties paid under the Supply Agreement after July 2018"; (2) "[c]onfirm[] and recogniz[e] the Award, as modified pursuant to th[e] Petition, pursuant to 9 U.S.C. § 207"; and (3) "[e]nter[] judgment in Acorda's favor and against Alkermes in the amount of the Award, as modified pursuant to th[e] Petition to include the $65,629,716 in

damages . . . that the Tribunal improperly excluded from the Award, with pre- and post-award interest and costs as provided therein and as authorized by law, plus the costs of this proceeding." Pet. ¶ 52. On February 8, 2023, Alkermes filed an opposition to Acorda's petition, in which it asked the Court to "deny the petition, reject any modification, and confirm the Award." See Resp. Opp. at 7. Acorda filed a reply in support of its petition on February 22, 2023. See ECF No. 28 ("Pet. Reply").[2]

## LEGAL STANDARD

### A. The FAA and New York Convention

Both the FAA and the New York Convention are implicated in this case: the FAA because the Award was entered in the United States, and the New York Convention because one of the parties, Alkermes, is a foreign corporation. See Pet ¶¶ 1-4; ECF No. 5 at 2; Beijing Shougang Mining Inv. Co. v. Mongolia, 11 F.4th 144, 159 (2d Cir. 2021); Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60, 71 (2d Cir. 2012) (hereinafter "Scandinavian Re"); Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007).

### B. Standard of Review

"The role of a district court in reviewing an arbitration award is 'narrowly limited.'" Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F.3d 99, 103 (2d Cir.

[2] The Court granted the parties' requests for extensions on their respective deadlines to file their opposition and reply briefs. See ECF No. 11.

2013) (hereinafter "Kolel Beth") (quoting Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 19 (2d Cir. 1997)). Although the FAA empowers the Court to "confirm and/or vacate the award, either in whole or in part . . . a petition brought under the FAA is not an occasion for de novo review of an arbitral award," Scandinavian Re, 668 F.3d at 71 (internal quotation marks omitted), nor an occasion for the court to conduct a "reassessment of the evidentiary record," Wallace v. Buttar, 378 F.3d 182, 193 (2d Cir. 2004); see also Scinto v. Life Ins. Co. of North Am., 20 F. App'x 45, 47 (2d Cir. 2001) ("An arbitrator's error in fact finding does not provide a grounds for reversal").

Instead, "arbitration panel determinations are generally accorded great deference under the FAA." Tempo Shain, 120 F.3d at 19; see also Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 138 (2d Cir. 2007) ("This Court has repeatedly recognized the strong deference appropriately due [to] arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process."). The purpose of such deference is to vindicate the "twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation." Kolel Beth, 729 F.3d at 103 (quoting Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 405 (2d Cir. 2009)) (internal quotation marks omitted).

**C. Grounds to Confirm, Modify, or Vacate Under the FAA**

Under the FAA, "any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Generally, a district court may vacate an arbitral award "only upon finding a violation of one of the four statutory bases [enumerated in the FAA],[3] or, more rarely, if [the court] find[s] a panel has acted in manifest disregard of the law."[4] Porzig, 497 F.3d at 139; see also Kellner v. Amazon, No. 22-734, 2023 WL 2230288, at *1 (2d Cir. Feb. 27, 2023) (summary order); T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339–40 (2d Cir. 2010); Wallace, 378 F.3d at 189.

---

[3] The four statutory bases for vacatur are: "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a).

[4] The Supreme Court has cast doubt on the ongoing viability of the manifest disregard doctrine. See Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 584-91 (2008) (holding that §§ 10 and 11 of the FAA specify the exclusive grounds for vacating, modifying, or correcting an arbitration award); cf. Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp., 559 U.S. 662, 672 n. 3 (2010) ("We do not decide whether 'manifest disregard' survives our decision in [Hall Street Associates] as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10."). Nevertheless, the Second Circuit has concluded that the doctrine has survived. See Sutherland Glob. Servs., Inc. v. Adam Techs. Int'l SA de C.V., 639 F. App'x 697, 699 (2d Cir. 2016); T.Co, 592 F.3d at 340.

"A litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co., 57 F.4th 372, 383 (2d Cir. 2023) (quoting T.Co, 592 F.3d at 339); see also DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 821 (2d Cir. 1997) ("[T]he manifest disregard standard . . . gives extreme deference to arbitrators."). The party seeking vacatur must establish that: "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case." Smarter Tools Inc., 57 F.4th at 383 (quoting Porzig, 497 F.3d at 139).

"A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law." Wallace, 378 F.3d at 190. Indeed, "[o]nly a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award," D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006), even if the "court[] disagree[s] with it on the merits." Wallace, 378 F.3d at 190. "A 'barely colorable justification' exists so long as the arbitrators had reasoning on which they 'could have justifiably

rested their decision.'" Smarter Tools Inc., 57 F.4th at 383 (quoting Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 13–14 (2d Cir. 1997)) ("finding that an offered justification satisfied the 'barely colorable' standard because it presented no error 'that an average person qualified to serve as an arbitrator should have instantaneously perceived and corrected'"). However, "[t]he arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." D.H. Blair & Co., 462 F.3d at 110 (internal citations and quotation marks omitted).

Additionally, the court may only modify or correct an arbitral award: (1) "[w]here there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award; (2) "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted;" or (3) "[w]here the award is imperfect in matter of form not affecting the merits of the controversy." 9 U.S.C. § 11.

## DISCUSSION

### A. Modification of the Award

Acorda argues that the Award should be modified in part, but it does not assert any of the FAA's statutory bases for

modification. See 9 U.S.C. § 11. Rather, Acorda argues that the Tribunal "manifestly disregarded applicable and preemptive federal law." Pet. Br. at 6. However, since the Supreme Court cast doubt on the ongoing viability of the manifest disregard doctrine in Hall St. Assocs., L.L.C., 552 U.S. at 584-91, the doctrine has only been recognized by the Second Circuit as a basis for vacatur, not modification. See e.g., Sutherland Glob. Servs., Inc., 639 F. App'x at 699 ("[A]s judicial gloss on the specific grounds for vacatur of arbitration awards in the FAA, an arbitrator's manifest disregard of the law or of the terms of the arbitration agreement remains a valid ground for vacating arbitration awards.") (internal citations and quotation marks omitted); cf. Berkowitz v. Gould Paper Corp., No. 21 Civ. 6582 (VEC), 2022 WL 118232, at *2 (S.D.N.Y. Jan. 12, 2022) (finding petitioner's attempt to "confirm the arbitration award's finding of age discrimination but vacate damages through what he has termed a petition to modify" was "inappropriate" "gamesmanship"); Josephthal & Co. v. Cruttenden Roth Inc., 177 F. Supp. 2d 232, 239 (S.D.N.Y. 2001) ("'Manifest disregard of the law,' which JCI has asserted here, will simply never justify a request to modify an arbitration award, only as grounds to vacate."). In any event, the Court finds that the Tribunal did not manifestly disregard the law.

Acorda asserts two arguments in support of its claim that the manifest disregard standard has been met. First, Acorda argues

that "the Tribunal manifestly disregarded the law by invoking state law," which "allow[ed] Alkermes to retain illegal royalty payments that it demanded after expiration of its patent" and "upend[ed] the entire framework governing the Patent Act as set forth in Brulotte and its progeny." Pet. Br. at 8 (citing Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 152, 165 (1989)). Second, Acorda argues that "by allowing Alkermes to keep the tens of millions of dollars in royalty payments it demanded and collected after the expiration of its patent, the Award also gives effect to licensing agreements that the Tribunal (and Supreme Court) determined were illegal" and "therefore violates the fundamental rule that 'no court will lend its assistance in any way towards carrying out the terms of an illegal contract.'" Pet. Br. at 8-9 (citing Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 77 (1982); Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, No. 20 Civ. 5120 (LJL), 2022 WL 3536128, at *6 (S.D.N.Y. Aug. 17, 2022)). Neither argument meets the standard for manifest disregard.

In Brulotte, the defendants-petitioners were sued by plaintiff-respondent after they "refused to make royalty payments accruing both before and after the expiration of [plaintiff-respondent's] patents." 379 U.S. at 30. During the litigation, the defendants-petitioners asserted an affirmative defense of "misuse of the patents through extension of the license agreements beyond the expiration date of the patents." Id. The trial court

ruled in favor of the plaintiff-respondent, and the Supreme Court of Washington affirmed. Id. The Supreme Court "reversed [the judgment below] insofar as it allows royalties to be collected which accrued after the last of the patents incorporated into the machines had expired." Id. As a result, the defendants-petitioners did not owe the plaintiff-respondent its unpaid royalties from the period after the subject patent expired. Id.

This case presents a different set of facts. While the Agreements similarly provided for royalty payments after the expiration of the '938 Patent, Acorda -- unlike the defendants-petitioners in Brulotte -- continued to pay Alkermes over $80 million in royalties for years after the expiration of the '938 Patent. See Pet. Br. at 8. As a result, Alkermes does not seek to recover unpaid royalties, like the plaintiff-respondent in Brulotte had. Instead, Acorda commenced arbitration proceedings to obtain a refund of their payments. See Pet. ¶ 52.

Accordingly, the Tribunal held that Brulotte rendered the Agreements unenforceable but did not dictate whether the royalties that had already been paid by Acorda needed to be refunded. See Award at 19; SJ Opinion at 14. Indeed, Brulotte and its progeny do not provide clear guidance on whether royalties that have already been paid under offending contracts are recoverable. See Kimble v. Marvel Ent., LLC, 576 U.S. 446, 446 (2015) ("[Brulotte] held that the post-patent royalty provision was 'unlawful per

se.'"); Brulotte, 379 U.S. at 34 (holding that the parties' licensing agreement that provided for post-expiry royalties was "unenforceable"); Resp. Opp. at 24 ("Acorda has not cited any case law to this Court holding that Brulotte itself requires a refund of post-expiration royalties."). As such, this Court cannot conclude that the Tribunal refused to apply a clear legal principle on that issue.

Without a bright-line rule, it appears that the Tribunal looked elsewhere for guidance on whether Acorda's royalties should be refunded. In its summary judgment decision, the Tribunal focused on the language of the Agreements' "no-refund" clause and held that, under that clause, payments that were made voluntarily (i.e., not under protest) should not be refunded. See SJ Opinion at 13-15. The Tribunal further noted that the "NYVPD might [similarly] preclude any refund remedy for payments by Acorda that were made voluntarily," but it did not reach that argument given the "no-refund" provision alone "rendered such a refund unavailable."[5] Id. at 13-14. After receiving additional pre-hearing briefing from the parties on this issue, the Tribunal denied Acorda's request for reconsideration, holding that it "already reviewed and rendered a determination on this issue." ECF No. 6-9 at 2. In the Award, the Tribunal reiterated its

[5] Contrary to Acorda's suggestion, the Tribunal did not "squarely reject" Alkermes' attempt to rely on the NYVPD in its summary judgment decision. See Pet. Br. at 21; SJ Opinion at 13-14.

holding that payments made without protest would not be refunded by relying on the NYVPD. See Award at 19 ("Under the NYVPD, payments that are 'made with full knowledge of the facts, even if made under mistake of law' are not recoverable." (citing Dillon v. U-A Columbia Cablevision of Westchester, Inc., 292 A.D.2d 25, 26 (2d Dep't 2002)).

The Tribunal's reliance on these sources and ultimate decision to not award restitution for payments made without protest is further supported by some district courts' post-Brulotte holdings that that royalties paid after the expiration of a patent should not be refunded. See Resp. Br. at 23 (citing Zila, Inc. v. Tinnell, No. 2:00-cv-1345 (KJD), (D. Nev. Apr. 22, 2004), ECF No. 172, rev'd and remanded on other grounds, 502 F.3d 1014 (9th Cir. 2007), in which the district court found that royalties paid under an agreement rendered unenforceable by Brulotte should not be refunded because "a party has no claim in restitution for performance that he has rendered . . . in return for a promise that is unenforceable on grounds of public policy" (citing Restatement (Second) of Contracts § 197 (1981)), and Tessera, Inc. v. Toshiba Corp., 15 Civ. 2543 (BLF), 2019 WL 5395158, at *6 (N.D. Cal. Oct. 22, 2019), in which the district court rejected the defendant's "counterclaim for refund" of royalties under Brulotte because "Brulotte would only exclude [an] affirmative claim for unpaid royalties due after expiration of a patent"); cf. MedImmune,

LLC v. PDL BioPharma, Inc., No. 08-5590 (JF) (HRL), 2011 WL 61191, at *22-23 (N.D. Cal. Jan. 7, 2011) (holding petitioner was not entitled to restitution of royalty payments based on an invalidated patent).

Acorda's new argument that the NYVPD is pre-empted by federal patent law -- which was not specifically raised before the Tribunal and fails for that additional reason -- does not change this outcome, given Brulotte and its progeny have not clearly articulated a rule on the refund of royalties. See Resp. Opp. at 25-26; ECF Nos. 6-4, 6-6; Wallace, 378 F.3d at 197 ("[Because] the Panel had no argument before it to the effect that punitive damages could not be awarded . . . we find no basis for holding that this portion of the Award was based on a manifest disregard of the law."). Nor does Acorda's argument that the Tribunal manifestly disregarded the law by giving effect to an illegal contract hold weight. As noted, the Tribunal held that Brulotte did, in fact, render the Agreements unenforceable. See Award at 18. The Tribunal's decision to limit restitution to payments made under protest is not equivalent to upholding the Agreements. Therefore, Acorda's petition to modify the Award in part is denied.

**B. Confirmation of the Award**

Acorda "has not asserted any separate arguments in opposition to the confirmation order, and an arbitration award should be confirmed where, as here, there are no grounds for modification or

vacatur." Kellner, 2023 WL 2230288, at *3 (citing 9 U.S.C. § 9). Thus, the Award is confirmed in its entirety.

**CONCLUSION**

In sum, Acorda has failed to establish that the Tribunal manifestly disregarded the law in rendering the Award. Accordingly, Acorda's petition to modify the Award in part is denied and the Award is confirmed in its entirety. The Clerk of Court is respectfully instructed to enter judgment for respondent and close the case.

**SO ORDERED.**

Dated: New York, New York
August 4, 2023

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

ACORDA THERAPEUTICS, INC,

Petitioner,

-against-

ALKERMES PLC,

Respondent.

-----------------------------------------------------------------X

23 **CIVIL** 223 (NRB)

**JUDGMENT**

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum and Order dated August 4, 2023, Acorda has failed to establish that the Tribunal manifestly disregarded the law in rendering the Award. Acorda's petition to modify the Award in part is denied and the Award is confirmed in its entirety. Judgment is entered for Respondent; accordingly, the case is closed.

**Dated:** New York, New York

August 7, 2023

**RUBY J. KRAJICK**

**Clerk of Court**

**BY:** K. Mango

**Deputy Clerk**

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**

International Centre for Dispute Resolution

| | |
|---|---|
| ACORDA THERAPEUTICS, INC.,<br>Claimant,<br>v.<br>ALKERMES PLC,<br>Defendants. | ICDR Arbitration No. 01-20-0010-8421<br><br>**AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL REASONED AWARD** |

The Hon. Jose L. Linares, Hon. Arthur J. Gajarsa, and Hon. Robert S. Smith presiding over an Arbitration proceeding pursuant to and under the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules"). The process was commenced by Acorda Therapeutics, Inc.s' ("Acorda") Demand for Arbitration dated July 28, 2020. The Parties exchanged the appropriate discovery and, after motion practice was concluded, the Tribunal held an Evidentiary Hearing from June 1, 2022 to June 7, 2022. After post-Hearing Briefs were filed by the parties, on September 7, 2022, the Parties presented their legal closing arguments. The Tribunal has reviewed the parties' respective legal arguments, the relevant evidence, associated briefing, the parties' proposed findings of facts and conclusions of law, and conferred. For the reasons set forth below, the Tribunal issues the following Reasoned Award.

## I. INTRODUCTION[1]

This Arbitration involves the Parties' License and Supply Agreements for the multiple sclerosis ("MS") drug Ampyra® ("Ampyra"). The subject agreements were entered into in 2003, although a predecessor agreement was executed by and between the Parties in the late 1990s. Pursuant to the agreements, Alkermes PLC ("Alkermes") would manufacture Ampyra exclusively for Acorda. In return, Acorda would pay Alkermes a specified royalty rate and purchase a minimum percentage of its total supply of Ampyra from Alkermes.

Before these agreements were executed, Alkermes owned certain patents. One patent in particular, U.S. Patent No. 5,540,938 (the " '938 Patent"), is at the heart of this dispute. According to Acorda, the expiration of the '938 Patent in July of 2018 caused the Parties' relationship to change.

As discussed in detail below, Acorda communicated to Alkermes that Acorda believed the expiration of the '938 Patent, at the very least, altered the License and Supply Agreements' royalty provisions. Based on this belief, Acorda sought a reduction in the price it was paying to Alkermes for future orders of Ampyra. Alkermes disagreed with Acorda's position and maintained that the License and Supply Agreements were unaffected by the expiration of the '938 Patent. This Arbitration followed.

## II. BACKGROUND & PROCEDURAL POSTURE[2]

Acorda instituted this Arbitration against Alkermes by way of Demand for Arbitration on July 28, 2020. (*See* July 28, 2020 Demand for Arbitration). Therein, Acorda asserted the following claims for relief: 1) Declaratory Relief as to Whether Alkermes is Entitled to Patent-

---

[1] This Introduction is not to be deemed part of the Findings of Fact or Conclusions of Law. It is merely an introductory statement of the case as background.

[2] This Background and Procedural Posture is derived from the Parties' pleadings, motions, and the Tribunal's prior Opinions and Orders.

Licensing Royalties After July 30, 2018; 2) Declaratory Relief as to Whether Alkermes is Entitled to Supply Royalties Above a Fair Market Rate After July 30, 2018; 3) Declaratory Relief as to Overpayment; 4) Unjust Enrichment by Retaining Overpayment; 5) Breach of Amended and Restated License Agreement; 6) Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Donnelly Act, NY Gen. Bus. Law § 340; ) Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Donnelly Act, NY Gen. Bus. Law § 340; and 8) Breach of the Implied Covenant of Good Faith and Fair Dealing.

On August 17, 2020, Alkermes served its Answering Statement to the Demand for Arbitration denying any alleged wrongdoing and requesting that the Tribunal rule in Alkermes' favor. (*See* Alkermes' Answering Statement dated August 17, 2020). Thereafter, Alkermes filed an Amended Answering Statement, which included the following counterclaims: 1) Correction of Inventorship Pursuant to 35 U.S.C. § 256; and 2) Declaratory Judgment that the Unexpired Patents Must Be Assigned to Alkermes. (*See* Alkermes' Amended Answering Statement and Counterclaims dated October 1, 2020).

The Tribunal held a preliminary conference with the parties on January 8, 2021. (*See* Order #1). At that time, the Parties confirmed "that New York substantive law, supplemented by Federal Patent law, [would] govern this Arbitration." (*Id.* at 2). Additionally, the Parties were instructed on how to submit their requests to file any Rule 12-type motions for the Tribunal's consideration. (*Id.*). After said submissions and consideration, the Tribunal permitted the filing of the following motions: 1) Acorda's Motion to Dismiss Alkermes' Counterclaims; and 2) Acorda's Motion for an Order Permitting All Future Royalty Payments to be Paid into Escrow.

(*See* Order #7).[3] After the above motions were fully briefed, and after hearing oral argument, the Tribunal denied Acorda's Motion to Deposit Future Royalty Payments into Escrow (Order #9), but granted Acorda's Motion to Dismiss Alkermes' Counterclaims. (Order #13).

Discovery in this matter proceeded and was completed on July 23, 2021. While the Parties did request several extensions of time to complete discovery and to prepare for the filing of Rule 56-type motions (*see*, *e.g.*, Order #20, Order #21), the Tribunal rarely intervened on a substantive level in connection with any discovery disputes.

The Parties subsequently filed a total of six competing Rule 56-type motions which were fully briefed on November 23, 2021. (*See* Opinion and Order # 23). Specifically, Acorda filed one combined Motion for Summary Judgment seeking the following relief: 1) judgment that Alkermes is liable for Unlawful Monopolization; and 2) a ruling that contract and/or quasi-contract damages remain available to Acorda. (*Id.* at 1). Alkermes filed two separate Motions for Summary Judgment, wherein it combined similar issues. (*Id.*). Alkermes' first Motion for Summary Judgment related to Acorda's antitrust claims and sought dismissal of Acorda's Counts VI and VII. (*Id.*). Additionally, Alkermes filed a separate Motion for Summary Judgment as to all of Acorda's non-antitrust claims, seeking the following relief: 1) judgment that Acorda is not entitled to a refund of payments made pursuant to the License Agreement; 2) dismissal of Acorda's breach of contract claim; 3) dismissal of Acorda's breach of the implied covenant of good faith and fair dealing claim; and 4) dismissal of Acorda's unjust enrichment claim. (*Id.* at 1-2).

On March 4, 2022, the Tribunal held oral argument on the above Rule 56-type Motions. (*See generally Id.*). And, on April 1, 2022, the Tribunal issued their Opinion and Order on said

[3] The Tribunal later permitted additional non-dispositive motion practice. None of those Motions or the corresponding Orders are pertinent to this Reasoned Award. (*See* Orders #14, 15).

Motions. The Tribunal subsequently entered the following judgements and rulings: 1) dismissal of Acorda's breach of contract and breach of the implied covenant of good faith and fair dealing claims; 2) denial of Alkermes' Rule 56-type motion regarding Acorda's unjust enrichment/restitution claims; 3) denial of Acorda's affirmative motion as to its claims for Monopolization and Attempted Monopolization; and 4) dismissal of Acorda's claims for Monopolization and Attempted Monopolization (Alkermes' competing Rule 56-type motion on this issue was granted).

The Tribunal scheduled the final Evidentiary Hearing for June 1, 2022. (*See* Order #25). The Evidentiary Hearing concluded on June 7, 2022 and the Tribunal provided the Parties with a Post-Hearing briefing schedule, and tentatively scheduled closing arguments for September 7, 2022. (*See* Order #28). The Parties timely submitted their Post-Hearing Briefs and proposed Findings of Fact and Conclusions of Law. Accordingly, closing arguments were held on September 7, 2022. The Hearing was officially closed by the Tribunal on September 13, 2022.

## III. FINDINGS OF FACT & CONCLUSIONS OF LAW

The Tribunal must resolve the following questions: 1) whether Alkermes' conduct violated the *Brulotte* doctrine; 2) if so, whether Alkermes' conduct falls within one of the legal exceptions to the *Brulotte* doctrine; 3) if not, whether both the License and Supply Agreements are covered by the violation (*i.e.*, did Alkermes leverage its position with respect to both Agreements); 4) whether Alkermes was unjustly enriched; 5) if so, what relief is Acorda entitled to; and 6) what pre-judgment interest rate should be assessed. Each of these topics are discussed and analyzed below.

### A. The Parties' Relationship

Prior to the underlying business relationship (*i.e.*, the License and Supply Agreements), Acorda was a company in somewhat dire straits. Its founder, Dr. Ron Cohen explained that Acorda entered into the relationship with Alkermes because Acorda "needed it" due to its small size and financial health. (Evidentiary Hearing Tr.[4] 153:16-155:6). Acorda "needed" Alkermes primarily because Alkermes owned the patent rights to the now-expired U.S. Patent No. 5,540,938 (" '938 Patent"), which covered the sustained release of dalfampridine. (C9[5]; *see* Ron Cohen Declaration ("Cohen Decl.") ¶¶ 15-16; Evidentiary Hearing Tr. 135:5-11). Acorda needed to obtain a license under the '938 Patent in order for it to develop and market the pharmaceutical that eventually became known as Ampyra®. (C54; *see also Acorda Therapeutics, v. Roxanne Labs., Inc.*, 903 F.3d 1310, 1340 (Fed. Cir. 2018) (explaining that the '938 Patent "blocked all others who might have wanted to pursue commercial opportunities like Ampyra."). Acorda did in fact obtain other patent coverage for its improvement, but those patents were subsequently invalidated by the Federal Circuit. *See generally Acorda Therapeutics*, 903 F.3d 1310.

In 1998, the Parties entered into a joint venture agreement. (U10 (citing J-11 and Cohen Decl. ¶ 13)). While that agreement is long and rife with provisions covering different topics, only a few are pertinent to the analysis herein. First, Alkermes agreed to give Acorda a license to the '938 Patent. (*See* J-015[6] at 12, Appendix A). In return, Acorda agreed to make certain upfront payments. (*Id.* at 32-36). For example, Acorda agreed to make a $15,000,000 payment

---

[4] Transcripts from the Evidentiary hearing shall be cited as "Evidentiary Hearing Tr." followed by the corresponding page and line numbers.
[5] When the Tribunal accepts and adopts the Parties' Proposed Findings of Fact it shall cite them by either a "C" (for Acorda, as the Claimant), or an "R" (for Alkermes, as the Respondent) followed immediately by the relevant statement number. In adopting these statements, the Tribunal also accepts and incorporates the evidence cited in support thereof.
[6] Joint Exhibits shall be cited as "J-" followed by the corresponding exhibit and page numbers.

upon the execution of the 1998 agreement. Additionally, Acorda agreed to pay 18% NSP (or net sale price) for any drug that was approved and sold as a result of the joint venture. (*Id.* at 36).

The terms of the joint venture agreement had to be amended in 2003 because of some concerns expressed by the Securities and Exchange Commission. (C57). Accordingly, the Parties entered into two separate agreements which allowed them to continue their business relationship in a different form. (C14-C15; *see also* Cohen Decl. ¶¶ 13-14; Evidentiary Hearing Tr. 357:11-359:9, 402:1-17). The first was the "Amended and Restated License Agreement." (*See generally* J-001). Here, Alkermes continued providing Acorda with, *inter alia*, a license to the '938 Patent in exchange for a 10% NSP royalty. (J-001 at Art. 5.6). The second agreement, called the "Supply Agreement," assured that Alkermes would manufacture and supply at least 75% of the Ampyra product Acorda needed. (*See generally* J-002). In return Acorda agreed to pay an additional 8% NSP. (J-002 at Cl. 9.3) Thus, when the terms and conditions of the License and Supply Agreements were viewed together, they provided each party with the same benefits as the original 1998 joint venture agreement. Acorda received access to the '938 Patent and Alkermes was compensated at 18% NSP. That compensation, by the terms of the agreements, would continue to be payable on all sales of Ampyra, regardless of patent expiration, with exceptions (described in footnote 8 below) not applicable to the facts of this case.

Ampyra received FDA approval in 2010. (Richie Paul Declaration ("Paul Decl.") ¶¶ 11-12; Cohen Decl. ¶ 25)). Upon its launch, Ampyra enjoyed great commercial success. (*See*, *e.g.*, C80, C-1012 at 914 (providing summary of Ampyra's pre-expiration sales from 2017 to 2019)).

The '938 Patent was set to expire in 2013, but, because of a patent term extension, the life of the patent was extended through July 2018. (Paul Decl. ¶ 19; *see also* R6). This was no surprise to either Party. Indeed, as early as 2009, Alkermes began researching the implications

expiration of the ’938 Patent would have on their ability to collect royalties on Ampyra. (C160 (citing R-337); *see also* Evidentiary Hearing Tr. 317:10-318:7 (Richie Paul testimony regarding his 2009 memorandum to Alkermes regarding patent protection over Ampyra)). Similarly, Acorda, uncertain of what the future had in store, agreed to a five year extension of the License Agreement. (R85; R 101). Thus, it is clear that the expiration of the ’938 Patent, and what came with said expiration, was considered by both entities.

Ultimately, Acorda approached Alkermes to ascertain if Alkermes would be willing to renegotiate the terms of the royalties being paid for Ampyra under the License and Supply Agreements. (U33-U34, C106). After some conversations, Alkermes declined to modify the terms. Thus, Acorda continued to, and to this day does, pay a combined 18% on Ampyra. (C115). Shortly after these discussions fell through, Acorda began making its payments under the License Agreement under protest on the grounds that Alkermes was collecting an illegal royalty on an expired patent. (C118).

**B. Alkermes Violated *Brulotte***

In 1964, the Supreme Court decided that post-expiry patent leveraging was inappropriate and against public policy. *See generally Brulotte v. Thys Co.*, 379 U.S. 29 (1964). There, the Supreme Court explicitly held that “use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*.” *Id.* at 32. The conduct that the Supreme Court prohibited in 1964 is precisely what took place in the transaction between the Parties here.

There is no dispute that the ’938 Patent expired in July 2018. (*See* R130; *see also* Pre-Hearing Statement of Undisputed Facts ¶ 7). There is also no dispute that Acorda was paying Alkermes 18% NSP since the inception of the relationship, albeit divided between and under the individual License and Supply Agreements from 2003. (J-011 at -578; C202 (citing Order #23 at

5, 8; Order #27 at 8) *see also generally* J-001; J-002). More importantly, both the pre- and post-2003 agreements clearly outline that the price being charged is a patent royalty. (*Id.*; *id.*). This became clear after 2003 when the Parties executed the separate License and Supply Agreements. (J-001; J-002).

The License Agreement is clear that, since 2003, Acorda was to pay a 10% patent royalty on Ampyra. Article 5.6, titled "Royalty on Sales," and specifically Article. 5.6.1, sets forth that "in consideration of the rights and *license granted to the Elan Patent Rights*[, *i.e., the '938 Patent*] *while there is a Valid Claim thereunder,* … Acorda shall pay Elan a royalty of ten per cent (10%) of the NSP of the Product." (J-001 at Art. 5.6, Art. 5.6.1). Thus, this provision of the License Agreement itself contemplates that the royalty on the '938 Patent would end when all of the claims therein became invalid. However, in other places the License Agreement essentially contemplates that the royalties would continue be charged so long as Ampyra is sold. (*See*, *e.g.*, Art. 5.6.2 (describing how Alkermes is entitled to royalties in countries where the Elan Patents were not in operation), Art. 5.6.3 (providing an offset royalty payment Acorda must pay if it utilizes a non-Alkermes manufacturer), Art. 12.5.1.1 (setting forth different milestones for terminating the License Agreement)).

Instead, in July of 2018, the '938 Patent expired. The expiration of the patent inherently rendered all the claims therein unenforceable. However, in contravention of *Brulotte*, Alkermes maintained it was entitled to collect this patent royalty after the '938 Patent expired. (*See* C110-C120; *see also* Evidentiary Hearing Tr. 690:6-691:12, 695:20-697:11, 700:14-701:15)

Acorda raised this issue with Alkermes over the course of several discussions. (C110-C-120; R186-R191, R196). And while it took Acorda almost two years to formally assert its rights – a period which has been carved out of this case – Acorda ultimately began making payments

under protest in July 2020 for precisely this reason. (R196; C224). In other words, albeit somewhat untimely, Acorda correctly protested further royalty payments on the grounds that Alkermes was leveraging its patent to illegally obtain royalties beyond the life of the '938 Patent. Simply put, this is precisely the conduct that was outlawed under *Brulotte*.

Hence, Alkermes violated the *Brulotte* doctrine because the License Agreement and the royalties being charged were not coterminous with the life of the '938 Patent. *Brulotte*, 379 U.S. at 33-34. The Supreme Court in *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 452 (2015) reaffirmed this principle and noted that "all patent-related benefits must end when the patent term expires." But Alkermes continued to charge the same exact royalty after the '938 Patent expired. Thus, as *Kimble* explained, these post-patent royalties charged by Alkermes are "unlawful *per se*" and are not enforceable. *Kimble,* 576 U.S. at 452.

**C. No Exception to *Brulotte* Saves the Charged Conduct**

Having found that Alkermes violated *Brulotte*, the Tribunal must now resolve whether an exception to the *Brulotte* doctrine is applicable, which could save the License Agreement from being declared unenforceable. The Supreme Court set forth the following limited exceptions to the *Brulotte* rule: 1) "defer[ring] payments for pre-expiration use of a patent into the post-expiration period"; 2) when the license includes a step-down provision such that the post-expiration royalty payment is for clearly defined non-patent rights; and 3) when the parties are engaged in certain types of non-royalty based business arrangements, *e.g.*, a joint venture, "that enables [the] parties to share the risks and rewards of commercializing an invention." *Kimble*, 576 U.S. at 454.

Alkermes has argued that, regardless of whether Alkermes has technically committed a *Brulotte* violation, it still is entitled to a ruling in its favor because two out of the three *Kimble*

exceptions (step-down and collaborative business relationship), for different reasons, are applicable. (*See* Alkermes' Pre-Hearing Brief at 5-12; Alkermes' Post-Hearing Brief at 5-12)[7]. For the following reasons, the Tribunal concludes that none of the *Kimble* exceptions support an outcome in favor of Alkermes.

1. <u>No Evidence of a Step-Down</u>

Alkermes asserts that the License Agreement contains a step-down because it is comprised of "both lump-sum royalty payments of approximately $25 million (Arts. 5.2 &5.3) and running royalty payments of 10% AMPYRA®'s NSP (Art 5.6.1)." (Alkermes Pre-Hearing Brief at 9 (emphasis removed)). Alkermes further claims that "the know-how royalty is comprised only of a 10% running royalty, which is reduced to 4.25% under certain conditions." (*Id.* (citing Arts. 5.6.1 & 5.6.2) (emphasis removed)). Thus, Alkermes concludes that "[t]he lump-sum patent royalties must be taken into account in the *Brulotte* analysis because lump-sum royalties are often used to "buy down" the percentage rate used in the running royalty component." (*Id.*).

This argument is unpersuasive, in light of the evidence. First, a comparison of the original 1998 agreement with the License and Supply Agreements reveals that the combined royalty rate was unchanged. Indeed, as discussed above, Acorda was required to pay 18% NSP for the '938 Patent license under the 1998 agreement and pays a combined 18% under the License and Supply Agreements. (J-011 at -578; C202 (citing Order #23 at 5, 8; Order #27 at 8) *see also generally* J-001; J-002). This conclusion is supported by Alkermes' own admission that Acorda and Alkermes negotiated over how to allocate the total 18% when they were contemplating and entering into the License and Supply Agreements in 2003. (*See*, *e.g.*, R39;

---

[7] Alkermes has not argued that the running royalty in the License Agreement is a deferred patent payment that survived the expiration of the '938 Patent.

*see also* R-330 at -919). Thus, it is obvious that the rate itself was not changed at any time – it was merely a split and reallocation of the 18% royalty rate via two separate documents.

More importantly, the plain language of the License Agreement makes no mention of a step-down based on patent expiration, except in circumstances that never occurred.[8] (*See generally* J-001). Alkermes was free to, and fully capable of, including step-down language based solely on patent-expiration in the License Agreement if it desired this effect. As Acorda correctly points out, Alkermes previously included a properly structured step-down in its 1999 agreement with Janssen. (*See* C-011[9]). This further supports the conclusion that Alkermes itself did not believe a proper step-down clause was ever part of the License Agreement.

2. <u>No Joint Venture or Other Comparable Collaborative Business Relationship</u>

Alkermes has also argued that its relationship with Acorda is collaborative in such a way that it should be afforded the same exception as a joint venture under *Kimble*. In making this argument, Alkermes begins by looking at the history of the Parties' relationship, noting that they originally entered into a formal joint venture in 1998, which created a new entity – Newco. (Alkermes Pre-Hearing Brief at 6 (citing J-011)). Alkermes notes that the only reason for the 2003 License and Supply Agreements was to appease the United States Securities and Exchange Commission's concerns. (*Id.* (citing J-251)). Hence, Alkermes asserts that its relationship began as a joint venture and the post-2003 relationship is a collaborative relationship that is akin to a joint venture. (*Id.*).

[8] The License Agreement does make mention of step-downs for scenarios other than patent-expiration alone. For example, as noted above, Article 5.6.2 reduces the running royalty to 4.25% in countries where there are no Valid Claims under the patents, Alkermes is not manufacturing the product, and there is no competition in such country. (J-001 at Art. 5.6.2). Another example of a non-patent-expiration step-down can be found in Article. 5.9.7, which essentially allows the royalty in the License Agreement to be adjusted to downward to match any legal restrictions imposed by a country on patent royalties. (*Id.* At 5.9.7). However, as discussed, none of the step-down provisions in the License Agreement are triggered simply by the expiration of the pertinent patents.

[9] Acorda's Evidentiary Hearing Exhibits shall be cited as "C-" followed by the pertinent exhibit number.

To support its position, Alkermes asserts that it made substantial contributions to the development and supply of Ampyra. (*Id.*). Alkermes also claims it provided Acorda with "its proprietary methods of analyzing and manufacturing" the drug which was needed for FDA approval. (*Id.*). Additionally, "Alkermes [argues that it] supplied the work for the chemistry, manufacturing, and controls ("CMC") section of the AMPYRA® NDA and provided support in addressing CMC questions raised by the FDA. (*Id.* at 6 (citing License Agreement, Art. 3.8)). For these reasons, Alkermes concludes that *Brulotte* is inapplicable to this matter because the relationship was so collaborative in nature it should be treated as a joint venture.

The Tribunal finds that the joint venture exception to *Brulotte* is not applicable. While Alkermes has advanced some unique arguments, the reality is the necessary elements of a joint venture are simply not present. First, the plain language of the License Agreement makes this conclusion apparent. Specifically, Article 12.7 states "[n]othing in this Agreement is intended or is to be construed to constitute Elan and Acorda as *partners or joint venturers* or either Party as an employee of the other." (*See* J-001 at Art. 12.7 (emphasis added)). Similarly, as Alkermes concedes, the 2003 License and Supply Agreements expressly dissolved any formal joint venture. (*See* J-001, J-002; *see also* C18, C33-34, C56-57, R22).

Tellingly, Alkermes' presentation on this issue failed to show that the Parties' relationship had any of the typical elements of a partnership or joint venture. Indeed, Alkermes shared none of the risks in the project nor did it share in the profits and losses. Rather, Alkermes simply collected a royalty every time Acorda sold Ampyra. Alkermes also did not have joint control over the business. Acorda was the entity responsible for obtaining FDA approval and marketing the drug. (R47; J-001 at Art. 6.2, Cohen Decl. ¶¶22-23, 25). A party "seeking to evidence the existence of a joint venture must establish [these] elements." *Cosy Goose Hellas v.*

*Cosy Goose USA, Ltd.,* 581 F. Supp. 2d 606, 620 (S.D.N.Y. 2008); *see also Kidz Cloz, Inc. v. Officially For Kidz, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (setting forth the above as required elements for proving a joint venture exists).

To summarize, Alkermes has not made any showing, let alone a convincing one, that the Parties are currently in any sort of business relationship that resembles a joint venture or partnership. The plain language of the operative agreements contradicts this position. Moreover, the conduct and interactions between the Parties since 2003 does not fall within the purview of such a relationship. Accordingly, the joint venture/partnership exception to *Brulotte* does is inapplicable.

**D. No Meaningful Know-How**

Even if the Tribunal were to conclude that License Agreement contained an appropriate step-down clause, Alkermes would still not be entitled to any ongoing royalty as it has not shown that there is any valuable Know-How. For a variety of reasons, Alkermes asserts that it is entitled to collect an ongoing royalty (potentially at a reduced rate) because it provided Acorda with significant proprietary Know-How. (Alkermes' Pre-Hearing Br. at 10-12; Alkermes' Post-Hearing Br. at 8-12). In part, Alkermes makes this argument to support its position that it should be allowed to collect, at the very least, a reduced Know-How royalty on Ampyra. (*Id.*; *id.*).

First, Alkermes claims that valuable Know-How is defined in the License Agreement. (Alkermes' Post-Hearing Br. at 8). Specifically, Alkermes asserts that "Acorda's obligation to pay [the ongoing royalty] stems from the license to the Elan Know-How it negotiated, which it needed for FDA approval and continues to use in the commercial manufacture of AMPYRA®." (*Id.*). "That Know-How includes methods and data establishing that the AMPYRA® product

has acceptable and controllable levels of impurities, and measuring and controlling the moisture content in the AMPYRA® tablets." (*Id.*).

The Tribunal finds that there is little meaningful Know-How that is proprietary to Alkermes warranting any further royalty. This is because, as Acorda proved during the Evidentiary Hearing, all of the purported proprietary Know-How Alkermes claims ownership of is, and has been for quite some time, in the public domain.

Through credible evidence, Acorda successfully showed that all of Alkermes' purported Know-How regarding tablet hardness, moisture control and impurities is generally known and routine in the drug manufacturing industry. (C163-C166, C179). For example, "the basic formulation of MXDAS sustained-released 4-AP was complete by mid-1995." (C166 (citing Evidentiary Hearing Tr. 537:1-17)). Similarly, all of Ampyra's 20-plus impurities have been identified and publicly disclosed in Ampyra's NDA. (C176 (citing Evidentiary Hearing Tr. 449:22-452:7; Appel Decl. ¶¶60-62; C-826; C-858) (additional citations omitted)). Even "[t]he milling and blending equipment used by Alkermes is standard and commercially available." (C188 (citing Evidentiary Hearing Tr. 622:11-14)).

This is also true with regard to the CMC. Once again, Alkermes claims proprietary Know-How in the information contained in the CMC. (Alkermes Post-Hearing Br. at 8-9). The evidence simply does not support this narrative. First, as noted above, the contents of the CMC are known to multiple regulatory agencies around the world. (C182-185). Moreover, this same information was disclosed in multiple peer reviewed articles and during the related Hatch-Waxman litigation. (*Id.*). More importantly, Acorda paid for, and owns, both the NDA and the CMC. (C156). One need not search far to reach this conclusion, as the information disclosed in

the NDA and the CMC is explicitly referred to as "Acorda Know-How" in the License Agreement (*Id.* (quoting J-001 at Art. 1)).

Thus, it is apparent to the Tribunal that Alkermes possesses no valuable Know-How for purposes of this Arbitration. Alkermes simply did not present any evidence that tends to show that Alkermes is currently contributing something of value that it should be receiving a royalty on. The technology, formulation, and tablet manufacturing process for Ampyra are within the public domain and generally known to the drug manufacturing industry. Hence, Alkermes' Know-How argument also fails.

**E. Declaratory Relief**

Having concluded that Alkermes committed a *Brulotte* violation, and that no *Kimble* exception is applicable, it is obvious that the Tribunal must declare the running royalties in the License Agreement unenforceable. This is precisely what *Brulotte* requires. *Brulotte*, 379 U.S. at 33; *see also Sandford Redmond, Inc v. Mid-America Dairymen, Inc.*, 1992 U.S. Dist. LEXIS 2376, at *17-18 (S.D.N.Y. 1992) (finding the entire contract unenforceable for *Brulotte* violations). But the Tribunal must first decide whether the License and Supply Agreements are, for all intents and purposes, one agreement. The Tribunal answers this question in the affirmative.

First, the Supply Agreement's term is directly tied to the life of the License Agreement. (J-002 Cl. 11.1 ("This [Supply] Agreement shall be deemed to have come into force on the Effective Date and *will expire upon expiry or termination of the License Agreement, howsoever arising*.") (emphasis added)). Next, as explained, the combined royalty rate of the License (10%) and Supply (8%) Agreements is identical to the pre-2003 1998 joint venture agreement of 18%. (*Compare* J-001 at Art. 5.6 and J-002 at Cl. 9.3 *with* J-015 at 12).

Moreover, the Supply Agreement inherently triggered obligations under the License Agreement because the Supply Agreement prohibited Acorda from obtaining more than 25% of its supply of Ampyra from any other entity other than Alkermes. (J-002 at Cl. 7.2.1). Thus, Acorda inherently needed to obtain at least 75% of its Ampyra supply directly from Alkermes. This, in effect, worked to assure that the running royalty in the License Agreement would also be triggered. In other words, despite being labeled two separate agreements, the License and Supply Agreement are so tied together they operate as a single unified business agreement.

Because of this the Tribunal must also declare the Supply Agreement unenforceable for the same reasons it has declared the License Agreement unenforceable. Said differently, the Tribunal must declare the License Agreement unenforceable under *Brulotte*. And, because the Supply Agreement is merely an extension of the License Agreement, the Tribunal must also declare the Supply Agreement unenforceable. Accordingly, it is the ruling of this Tribunal that both the License and Supply Agreements are **UNENFORCEABLE**.

**F. Monetary Relief for Unjust Enrichment/Restitution**

As the Parties are aware, Acorda retains the ability to recover unjust enrichment/restitution damages for all payments it made under protest. (*See generally* Order #23). This section addresses that monetary award and resolves the following questions: 1) how much is Acorda entitled to in connection with its payments under the License Agreement; 2) whether its July 2020 protest letter is applicable to payments it made pursuant to the Supply Agreement; 3) whether the payment is made after the July 2020 protest letter on an invoice generated before said letter is recoverable; and 4) what prejudgment interest rate should be applied, if any.

1. *Overpayment Under the License Agreement*

Having resolved that the License Agreement is invalid due to the *Brulotte* violation, the Tribunal must now determine how much of its payments under the License Agreement Acorda is entitled to recover. All of the payments Acorda made after the '938 Patent expired were improper as Alkermes was no longer to entitled to any royalty payments. However, as this Tribunal has acknowledged, the New York Voluntary Pay Doctrine[10] ("NYVPD") changes this calculus. Under the NYVPD, payments that are "made with full knowledge of the facts, even if made under mistake of law" are not recoverable. *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 740 N.Y.S.2d 396, 397 (App. Div. 2002).

Based on this, the Tribunal has already concluded that the NYVPD has precluded any recovery by Acorda up until it made its formal protest in July 2020. (Order #23). Hence, Acorda may only recover payments it remitted after the July 2020 protest. The parties do not dispute that the aggregate of these payments is $16,554,267[11]. (*See* U61[12]; *see also* October 21, 2022 emails). Thus, the Tribunal hereby **AWARDS** Acorda $16,554,267 for the overpayment it made under the now unenforceable License Agreement since it formally protested said royalty payments in July 2020. This includes the payment that Acorda made after the July 2020 protest that was for an invoice generated earlier than the protest letter.[13]

2. *No Overpayment Under the Supply Agreement*

[10] The Arbitration Clause in the License Agreement sets forth that New York law governs this Arbitration. The Parties have conceded this fact. (*See* Order #3).

[11] This figure includes an additional licensing payment made by Acorda to Alkermes on August 15, 2022—after submission of the Undisputed Facts—in the amount of $1,595,439.

[12] Undisputed Statements of Facts submitted by the parties shall be cited as "U" immediately followed by the relevant statement number.

[13] Despite Alkermes' objections, the Tribunal's award includes the one payment that was made by Acorda on an invoice generated before July 2020, but remitted thereafter. This is because once Acorda sent the July 2020 protest, it explicitly was asserting that all future payments under the License Agreement were unenforceable. Thus, logic dictates that, even though the invoice was generated before Acorda protested, Acorda clearly did not believe it owed any additional royalty payment under the License Agreement going forward. Hence, the protest attaches to all payments made from July 2020 forward.

The Tribunal reaches the opposite conclusion regarding Acorda's payments under the Supply Agreement. This is because in the July 2020 protest letter Acorda explicitly only referenced the License Agreement. (*See* R-315 (July 2020 purchase order stating "Acorda will be making payment on this order *as per the royalty rate state in the **License Agreement***.")). That July 2020 purchase order also made reference to Acorda's April 22, 2020 letter to provide a more complete background. (*Id.*).

A review of the April 22, 2020 Acorda letter further confirms that Acorda was only protesting the royalties under the License Agreement. (*See generally* J-210). Indeed, the first sentence of the letter begins by noting that it is a follow-up to a conversation "regarding the *royalty rate paid by Acorda under our **amended and restated license agreement*** relating to Ampyra®." (*Id.* (emphasis added)). It does not end there. Acorda then states that it has analyzed the agreement and has concluded that "the continuation of the ***10% royalty rate** in the agreement* for U.S. sales is unenforceable following the expiration of" the '938 Patent. (*Id.* (emphasis added)). Thus, it is clear that Acorda never formally protested the payments it made under the Supply Agreement.

And, while it is true that the Tribunal has concluded that the License and Supply Agreement are so intertwined that they must be treated as a single agreement for purposes of the unenforceability analysis above, the same is not true here. This is because New York's law requires the protest to be in writing and explicit as to the rights being asserted and/or preserved. *See Overbay, LLC v. Henoch, Peterson, Peddy, & Fenchel, P.C.*, 128 N.Y.S.3d 56, 58 (App. Div. 2020) ("in order for a protest of payment to be characterized as appropriate, it must be in writing and made at the time of the payment."); *Turner Network Sales, Inc. v. DISH Network, L.L.C.*, 413 F. Supp. 3d 329, 340-41 (S.D.N.Y. 2019) ("Where, as here, a sophisticated party has for

years remitted voluntary payments pursuant to an understanding of its legal obligations (and there is no indication that such understanding was fraudulently induced), courts have consistently held that such party's lack of diligence in determining what its contractual rights were precludes recoupment of voluntarily remitted funds.") (internal quotations and citations omitted)).

Here, Acorda was clearly well aware of the fact that Alkermes was seeking to extract an illegal royalty. However, for whatever reason, it chose to protest only the License Agreement royalty. Hence, Acorda is not entitled to recover any payments under the Supply Agreement as such recovery is barred by the NYVPD. The Tribunal will enter an award in favor of Alkermes on these payments.

3. _Pre-Judgment Interest_

The last item for this Tribunal to resolve is the matter of pre-judgment interest. Acorda has argued for the full amount permitted under New York law – *e.g.*, 9%. (*See* Acorda Post-Hearing Br. at 25 (citing N.Y.C.P.L.R. § 5001)). Alkermes opposes this request explaining that Acorda's only remaining theory of recovery is unjust enrichment. (Alkermes Post-Hearing Br. at 24). Hence, Alkermes claims that the pre-judgment for equitable matters under New York law is discretionary and should be lower than 9% and should be based on the "risk-free rate" and current bond market interest rates. (*Id.* at 24-25).

The Tribunal concludes that Acorda is entitled to the full 9% pre-judgment interest rate as set forth in the CPLR. While it is true that this Tribunal has discretion to choose a lower rate, Alkermes has given the Tribunal no compelling reason to do so. Moreover, it is not lost on the Tribunal that if the roles were reversed and Alkermes had brought this action to enforce the License Agreement, this action would sound in contract and Alkermes, had it succeeded, would be entitled to the full 9%.

Accordingly, the 9% pre-judgment interest rate is appropriate here. The CPLR permits the Tribunal to select a "single reasonable intermediate date." N.Y.C.P.L.R. § 5001(B). The Tribunal has conferred and has determined that the prejudgment interest shall run from August 26, 2021. This date is the exact mid-point between when the first protest letter was sent by Acorda and the date of this Final Reasoned Award and conclusion of this matter.

Thus, the total amount of interest due by Alkermes to Acorda is $1,689,528.49. This amount was derived by multiplying the judgment amount of $16,554,267 by 9% and then multiplying that result by 1.134, which is the decimal representation of the time that has elapsed from August 26, 2021 to October 13, 2022.

4. *Arbitration Cost*

Rule R-47(d) of the AAA Rules provide that the award may include an award of attorney's fees if all parties have requested an award or it is authorized by law or their arbitration agreement. The arbitration clause in the License Agreement matter provides that "the costs of the arbitration, including administrative and arbitrators' fees, shall be share equally by the Parties and each Party shall bear its own costs and attorneys' and witness' fees incurred in connection with the arbitration." (J-001 at Art. 12.14).

Consequently, the administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling $80,339.35 shall be borne in **equal shares** by the parties. Therefore, Alkermes shall reimburse Acorda the sum of $13,219.67, representing that portion of said fees in excess of the apportioned costs previously incurred by Acorda, upon demonstration that these incurred costs have been paid. The compensation and expenses of the arbitrators shall be borne by **in equal shares** by the parties in this matter.

## IV. ORDER AND FINAL JUDGMENT

**IT IS** on this 7th day of November, 2022,

**ADJUDGED** that the 2003 License Agreement and Supply Agreement are hereby **DECLARED UNENFORCEABLE** for violations of the *Brulotte* doctrine; and it is further

**ORDERED** that Alkermes return to Acorda all royalty payments made under the License Agreement ($16,554,267) within 30 days of this Reasoned Award and Final Judgment; and it is further

**ORDERED** that Alkermes shall also pay Acorda $1,689,528.49 in pre-judgment interest, plus interest on the full amount of the Award, including the pre-judgment interest, up to the date of payment; and it is further

**ADJUDGED** that Acorda is not entitled to any recovery under the Supply Agreement; and it is further

**ORDERED** that Alkermes shall pay Acorda $13,219.67 in administrative fees for this Arbitration; and it is further

**ORDERED** that this award is the full resolution of all claims and counterclaims submitted to this Arbitration; and it is further

**ORDERED** that this Final Reasoned Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument; and it is further

**ORDERED** that the Tribunal retains jurisdiction over the enforcement of this Reasoned Award and Final Judgment.

**SO ORDERED**.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

_/s/*Jose L. Linares*________________________
Hon. Jose L. Linares, U.S.D.J. (ret.)

_/s/ *Arthur J. Gajarsa*_____________________
Hon. Arthur J. Gajarsa, U.S.C.J. (ret.)

_/s/ *Robert S. Smith*______________________
Hon. Robert S. Smith, A.J. N.Y. Ct. App. (ret.)

US005540938A

# United States Patent [19]

Masterson et al.

[11] Patent Number: 5,540,938

[45] Date of Patent: Jul. 30, 1996

[54] **FORMULATIONS AND THEIR USE IN THE TREATMENT OF NEUROLOGICAL DISEASES**

[75] Inventors: **Joseph G. Masterson**, London, United Kingdom; **Michael Myers**, Athlone, Ireland

[73] Assignee: **Elan Corporation, plc**, Athlone, Ireland

[21] Appl. No.: **328,165**

[22] Filed: **Oct. 24, 1994**

**Related U.S. Application Data**

[62] Division of Ser. No. 786,400, Nov. 1, 1991, abandoned, and a division of Ser. No. 73,651, Jun. 7, 1993, Pat. No. 5,370,879.

[51] **Int. Cl.**[6] ............................... **A61K 9/16**; A61K 9/50; A61K 9/62; A61K 9/70

[52] **U.S. Cl.** .......................... **424/490**; 424/445; 424/449; 424/451; 424/452; 424/458; 424/460; 424/461; 424/464; 424/465; 424/474; 424/475; 424/480; 424/484; 424/489; 424/494; 424/495; 424/497; 424/498; 424/499

[58] **Field of Search** .................................... 424/445, 449, 424/451, 452, 458, 460, 461, 464, 465, 474, 475, 480, 484, 489, 494, 495, 497, 498, 499

[56] **References Cited**

PUBLICATIONS

Davis et al., "D. of the Rush Multiple Sclerosis Center".

Bever et al., Ann. Neurol. 27(4), pp. 421–427 (Apr. 1990).

Wesseling et al., N. Eng. J. of Med., 310(15), pp. 988–989 (Apr. 1984).

*Primary Examiner*—Thurman Page
*Assistant Examiner*—Carlos Azpuru
*Attorney, Agent, or Firm*—Marla J. Church

[57] **ABSTRACT**

Pharmaceutical formulations comprise a mono- or di-aminopyridine active agent for administration on a once- or twice-daily basis for use in the treatment of neurological diseases, in particular multiple sclerosis and Alzheimer's disease. The formulations, which are suitable for oral or percutaneous administration of the active agent, include the active agent in a carrier effective to permit release of the mono- or di-aminopyridine at a rate allowing controlled absorption thereof over, on the average, not less than a 12 hour period and at a rate sufficient to achieve therapeutically effective blood levels over a period of 12–24 hours following administration.

**8 Claims, 1 Drawing Sheet**




4—AP % RELEASE




4—AP % RELEASE

# FORMULATIONS AND THEIR USE IN THE TREATMENT OF NEUROLOGICAL DISEASES

This is a divisional Ser. No. 07/786,400 filed on Nov. 1, 1991now abandoned, and Ser. No. 08,073,651 filed Jun. 7, 1993, now U.S. Pat. No. 5,370,879.

## FIELD OF THE INVENTION

This invention relates to preparations for use in the treatment of neurological diseases. More particularly, the invention relates to preparations for the controlled administration of mono- or diaminopyridine active agents and to the use of such preparations in the treatment of neurological diseases characterised by a slowing of nerve impulse transmission, more especially multiple sclerosis and Alzheimer's disease.

## BACKGROUND AND PRIOR ART

Multiple sclerosis (MS) is a degenerative and inflammatory neurological disease which affects the central nervous system, more specifically the myelin sheath. MS causes demyelination of nerve fibres resulting in short-circuiting of nerve impulses and thus a slowing or blocking of transmission along the nerve fibres, with associated disabling symptoms.

Alzheimer's disease is a major cause of dementia in the elderly. It may be described as a progressive pathological deterioration in personality, memory and intellect consistent with a generalised atrophy of corresponding brain centres. The emotional state, behaviour, cognitive function and thought processes of sufferers are all adversely affected. A minor disimprovement in memory which gradually becomes more apparent is the first indication of the onset of the disease.

The incidence of the condition is slightly less than 1% of the general population of the U.K. but rises to 5% in the over-65's and to 20% in the over-80's.

The biochemical basis and neuropathology of the disease are better understood than its aetiology. The possibility of a genetic link is being investigated, as are suggestions that aluminium is a causative factor.

Treatments available to date are of, at best, limited value and the progression of the disease is irreversible. Death normally occurs less than a decade after the illness first presents itself (Barker, S. and Branford, D.;Pharm. Journal Jan. 26, 1991, pp 116–118).

4-Aminopyridine (4-AP) has been found to improve the conduction of nerve impulses, thereby, alleviating symptoms in MS patients. 4-AP has been found to slow the potassium ion flow in nerve impulse transmission and, thereby, is effective in restoring conduction in blocked demyelinated nerves. In clinical trials carried out by Davis, F. A. and Stefoski, D. of The Rush Multiple Sclerosis Centre, U.S.A., 4-AP has been administered orally in multiple daily doses over 2–5 days to MS patients with mild to marked improvements being noted and minimal side effects.

3,4-Di-aminopyridine (3,4-DAP) has also been found to improve specific neurological deficits and visual evoked response latencies in MS patients when administered orally in multiple daily doses. Bever, C. T. JR; Leslie, J.; Camenga, D. L.; Panitch, H. S.; and Johnson, K. P., Ann. Neurol. 27(4), pp. 421–427 (Apr. 1990).



4-AP has also been found to improve the mental functions in patients with Alzheimer's disease. This effect is believed to be related to the potassium channel blocking action of 4-AP which in turn enhances calcium influx into the neuron thus prolonging nerve action potential and increasing transmitter release. Wesseling et at., N. Eng. J. of Med. 310 (15), pp. 988–989 (Apr. 1984).

In the use of a drag for long-term therapy it is desirable that the drug be formulated so that it is suitable for once- or twice-daily administration to aid patient compliance. Further, in view of the nature of neurological diseases, it can be appreciated that there is a need for an improved dosage form. However, such a formulation must result in a controlled release of drug to the systemic circulation and therapeutically effective blood levels throughout a given treatment period.

Another problem with long-term therapy is the requirement of determining an optimum dose which can be tolerated by the patient. If such a dose is not determined this can lead to a diminution in the effectiveness of the drag being administered.

It is an object of the present invention to provide preparations suitable for the long-term administration of a mono- or di-aminopyridine active agent.

It is a further object of the present invention to provide the use of a mono- or di-aminopyridine active agent in a manner which enables one to achieve a tolerable state for said drag in a subject being treated therewith.

## SUMMARY OF THE INVENTION

According to the invention there is provided a pharmaceutical formulation comprising a mono- or di-aminopyridine for administration on a once- or twice-daily basis, said formulation including said mono- or di-aminopyridine active agent in a carrier effective to permit release of said mono- or di-aminopyridine at a rate allowing controlled absorption thereof over, on the average, not less than a 12 hour period and at a rate sufficient to achieve therapeutically effective blood levels over a period of 12–24 hours following administration.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of release of 4-AP (%) versus time (hours) for a patch as prepared in Example 11.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The pharmaceutical formulations according to the invention include pharmaceutical formulations for oral administration and pharmaceutical formulations for administration by the percutaneous route.

According to one aspect of the invention them is provided a pharmaceutical formulation which comprises a pellet for oral administration, said pellet comprising a core of a mono- or di-aminopyridine or a pharmaceutically acceptable salt thereof in association with one or more pharmaceutically acceptable excipient(s), the mono- or di-aminopyridine component and the pharmaceutically acceptable excipient(s) being present in a ratio of from 10:1 to 1:20, and a multilayer membrane surrounding said core and containing a major proportion of a pharmaceutically acceptable film-forming, water insoluble polymer and optionally a minor proportion of a pharmaceutically acceptable film-forming, water soluble polymer, the number of layers in said mem-

brane and the ratio of said water soluble to water insoluble polymer, when said water soluble polymer is present, being effective to permit release of said mono- or di-aminopyridine from said pellet at a rate allowing controlled absorption thereof over, on the average, not less than a 12 hour period following oral administration, said rate being measured in vitro as a dissolution rate of said pellet, which when measured in a type II dissolution apparatus according to U.S. Pharmacopoeia XXII in water at 50 r.p.m. substantially corresponds to the following:

a) no more than 50% of the total mono- or di-aminopyridine is released after 1 hour of measurement in said apparatus;

b) no more than 75% of the total mono- or di-aminopyridine is released after 4 hours of measurement in said apparatus; and

c) 100% of the mono- or di-aminopyridine is released no earlier than after 8 hours of measurement in said apparatus.

Thus the pharmaceutical formulations according to the invention for oral administration can be administered on a once- or twice-daily basis.

Preferred pharmaceutical formulations according to the invention for oral administration are in a multi-particulate form, from which the active agent is released at a rate to maintain therapeutically effective blood levels over a 12 hour period or a 24 hour period, as required.

According to one embodiment, the release of active agent from the pellet is at a rate allowing controlled absorption thereof over a 24 hour period following oral administration, said rate being measured in a type II dissolution apparatus according to U.S. Pharmacopoeia XXII in water at 50 r.p.m. which substantially corresponds to the following dissolution pattern:

a) from 0 to 40% of the total mono- or di-aminopyridine is released after 1 hour of measurement in said apparatus;

b) from 20 to 60% of the total mono- or di-aminopyridine is released after 4 hours of measurement in said apparatus;

c) from 30 to 80% of the total mono- or di-aminopyridine is released after 8 hours of measurement in said apparatus;

d) from 50 to 90% of the total mono- or di-aminopyridine is released after 12 hours of measurement in said apparatus; and

e) not less than 75% of the total mono- or di-aminopyridine is released after 24 hours of measurement in said apparatus.

The formulation for once-daily administration can include an amount of a rapid release form of the active agent as hereinafter described, so as to obtain a relatively immediate therapeutic response.

Pharmaceutical formulations according to the invention for once-daily administration can maintain therapeutically effective blood levels substantially over 24 hours with peak plasma levels occurring between 2 and 16 hours, more especially between 4 and 10 hours.

The desired time to peak plasma level is defined as the Tmax of the formulation.

According to a second embodiment, the release of active agent from the pellet is at a rate allowing controlled absorption thereof over a 12 hour period following oral administration, said rate being measured in a type II dissolution apparatus according to U.S. Pharmacopoeia XXII in water at 50 r.p.m. which substantially corresponds to the following dissolution pattern:

a) from 0 to 40% of the total mono- or di-aminopyridine is released after 1 hour of measurement in said apparatus;

b) from 20 to 60% of the total mono- or di-aminopyridine is released after 4 hours of measurement in said apparatus;

c) from 30 to 80% of the total mono- or di-aminopyridine is released after 8 hours of measurement in said apparatus; and

d) not less than 75% of the total is released after 12 hours of measurement in said apparatus.

The formulation for twice-daily administration can also include an amount of a rapid release form of the active agent as hereinafter described, so as to obtain a relatively immediate therapeutic response.

Pharmaceutical formulations according to the invention for twice-daily administration can maintain therapeutically effective blood levels substantially over 12 hours with peak plasma levels occurring between 1 and 10 hours, more especially between 2 and 8 hours.

The core of the pellet formulations according to the invention preferably comprises:

a) a powder mixture containing a mono- or di-aminopyridine or a pharmaceutically acceptable salt thereof and a pharmaceutically acceptable excipient, and

b) a polymeric material containing a major proportion of a pharmaceutically acceptable water soluble polymer and a minor proportion of a pharmaceutically acceptable water insoluble polymer,

said core comprising layers of said powder mixture and said polymeric material superimposed one upon the other and said polymeric material being present in an amount effective to ensure that all of said powder mixture is coated into said core.

The term water soluble polymer as used herein includes polymers which are freely permeable to water, whilst the term water insoluble polymer as used herein includes polymers which are slightly permeable to water, as hereinafter indicated.

Preferably the water soluble polymer in the core or membrane is the same or different and is selected from polyvinyl alcohol, polyvinylpyrrolidone, methyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, agar, carrageenan, xanthan or polyethylene glycol or a mixture thereof.

Alternatively, the water soluble polymer in the core or membrane can be replaced by a polymeric material which is freely permeable to mono- or di-aminopyridine and water and comprises a copolymer of acrylic and methacrylic acid esters.

A suitable polymer which is freely permeable to mono- or di-aminopyridine and water is a polymer sold under the Trade Mark EUDRAGIT RL.

Preferably, the water insoluble polymer in the core or membrane is selected from ethylcellulose, cellulose acetate, cellulose propionate (lower, medium or higher molecular weight), cellulose acetate propionate, cellulose acetate butyrate, cellulose acetate phthalate, cellulose triacetate, poly(methyl methacrylate), poly(ethyl methacrylate), poly-(butyl methacrylate), poly(isobutyl methacrylate), poly-(hexyl methacrylate), poly(isodecyl methacrylate), poly(lauryl methacrylate), poly(phenyl methacrylate), poly(methyl acrylate), poly(isopropyl acrylate), poly(isobutyl acrylate), poly(octadecyl acrylate), poly(ethylene), poly(ethylene) low density, poly(ethylene) high density, poly(propylene), poly-(ethylene oxide), poly(ethylene terephtalate), poly(vinyl

isobutyl ether), poly(vinyl acetate), poly(vinyl chloride) or polyurethane or a mixture thereof.

The water insoluble polymer of the core or membrane may also comprise naturally occurring polymers or resins.

Thus other preferred water insoluble polymers are selected from a naturally occurring polymer selected from shellac, chitosan, gum juniper or a mixture thereof.

Alternatively, the water insoluble polymer in the core or membrane can be replaced by a polymeric material which is slightly permeable to mono- or di-aminopyridine and water and comprises a copolymer of acrylic and methacrylic acid esters.

A suitable polymer which is slightly permeable to mono- or di-aminopyridine and water is a polymer sold under the Trade Mark EUDRAGIT RS or a polymer whose permeability is pH dependent and sold under the Trade Mark EUDRAGIT L, EUDRAGIT S or EUDRAGIT E. Especially preferred polymers in this category are EUDRAGIT S.

EUDRAGIT polymers are polymeric lacquer substances based on acrylates and/or methacrylates. The polymeric materials sold under the Trade Mark EUDRAGIT RL and EUDRAGIT RS are acrylic resins comprising copolymers of acrylic and methacrylic acid esters with a low content of quaternary ammonium groups and are described in the "EUDRAGIT" brochure of Messrs. Rohm Pharma GmbH (1984) wherein derailed physical-chemical data of these products is given. The ammonium groups am present as salts and give rise to the permeability of the lacquer films. EUDRAGIT RL and RS are freely permeable (RL) or slightly permeable (RS), respectively, independent of pH.

EUDRAGIT S is an anionic polymer synthesized from methacrylic acid and methacrylic acid methyl ester. It is insoluble in acids and pure water. It becomes soluble in a neutral to weakly alkaline milieu by forming salts with alkalis. The permeability of EUDRAGIT S is pH dependent. Above pH 6.0 the polymer becomes increasingly permeable. EUDRAGIT S is described in the "EUDRAGIT S" brochure of Messrs. Rohm Pharma GmbH (1986) wherein detailed physical-chemical data of the product is given.

The core suitably has a number of layers of the core-forming materials and is built up in a manner known per se.

The active agent, pharmaceutically acceptable excipient(s) and the polymeric material can be built up on an inert core. The inert core is preferably a non-pareil seed of sugar/starch having an average diameter in the range 0.2–1.4 mm, more especially, 0.3–0.8 mm.

The mono- or di-aminopyridine and pharmaceutically acceptable excipient(s) are blended to form a homogeneous powder. The mono- or di-aminopyridine component and pharmaceutically acceptable excipient(s) are preferably present in a ratio of from 4:1 to 1:5, more especially 1:3 to 1:1.

The blend is suitably passed through an appropriate mesh screen using a milling machine. In the case of coating in a conventional coating pan, alternate layers of a coating solution/suspension of the polymeric material and the powder are applied to the central inert core to build up the multi-layer arrangement of the core. In the case of an automatic coating system, the coating solution/suspension of the polymeric material and the powder are applied, simultaneously, in conventional manner.

The coating solution/suspension of the polymeric material comprises one or more polymer(s) dissolved/suspended in a suitable solvent or mixture of solvents. The concentration of the polymeric material in the coating solution/suspension is determined by the viscosity of the final solution/suspension. Preferably, between 5 and 50 parts of the central inert cores are used relative to the homogeneous powder. The addition of a plasticizing agent to the polymeric solution/suspension may be necessary depending on the formulation to improve the elasticity and also the stability of the polymer film and to prevent changes in the polymer permeability over prolonged storage.

Such changes could affect the drug release rate. Suitable plasticizing agents include polyethylene glycol, propylene glycol, glycerol, triacetin, dimethyl phthalate, diethyl phthalate, dibutyl phthalate, dibutyl sebacate, triethyl citrate, tributyl citrate, triethyl acetyl citrate, castor oil and varying percentages of acetylated monoglycerides.

Alternatively, the active agent, pharmaceutically acceptable excipient(s) and polymeric material can be built up on a central active core. The active core is suitably formed by blending the mono- or diaminopyridine, pharmaceutically acceptable excipient(s) and polymeric material to form a homogeneous powder, shaping a portion of said blend to form a central core and applying the remainder of said blend alternately or simultaneously with a polymer binding solution to form a layered structure on said central core.

The completed active cores preferably have an average diameter in the range 0.4–1.6 mm, more especially, 0.6–1.2 mm.

The active core is formed by blending mono- or di-aminopyridine, pharmaceutically acceptable excipient(s) and polymeric material to form a homogeneous powder. A portion of the blend is shaped to form a central core. A multi-layer arrangement is then built up by a successive layering and binding process wherein the remainder of the blend and a polymer binding solution are applied to the active core in alternate layers in a conventional coating pan. Alternatively, an automatic coating system may be used wherein the remainder of the blend and polymer binding solution is applied to the active core, simultaneously. Conventional automated coating systems include for example a CF granulator or a Glatt fluidized bed. The cores are formed to assure a uniform distribution of mono- or di-aminopyridine and excipient ingredients throughout the cores.

As indicated above, the pellet formulations for oral administration in accordance with the invention can include an amount of a rapid release form of active agent so as to obtain a relatively immediate therapeutic response, together with the prolonged effects hereinabove described.

Thus according to a third embodiment of the invention there is provided a controlled absorption mono- or di-aminopyridine formulation for oral administration, comprising pellets as hereinbefore defined and including a sufficient quantity of a rapid release form of mono- or di-aminopyridine to ensure prompt achievement of therapeutically effective blood levels together with therapeutically effective blood levels over a 12 to 24 hour period following each oral administration.

A preferred such controlled absorption formulation in accordance with the invention has a dissolution rate which when measured in a type II dissolution apparatus according to U.S. Pharmacopoeia XXII in water at 50 r.p.m. substantially corresponds to the following dissolution pattern:

a) from 20 to 60% of the total mono- or di-aminopyridine is released after 2 hours of measurement in said apparatus;

b) from 30 to 70% of the total mono- or di-aminopyridine is released after 4 hours of measurement in said apparatus;

c) from 50 to 90% of the total mono- or di-aminopyridine is released after 8 hours of measurement in said apparatus; and

d) not less than 75% of the total mono- or di-aminopyridine is released after 12 hours of measurement in said apparatus.

A preferred controlled absorption formulation in accordance with the invention for once-daily administration has a dissolution rate which when measured in a type II dissolution apparatus according to U.S. Pharmacopoeia XXII in water and at 50 r.p.m. substantially corresponds to the following dissolution pattern:

a) from 10 to 40% of the total mono- or di-aminopyridine is released after 1 hour of measurement in said apparatus;

b) from 25 to 65% of the total mono- or di-aminopyridine is released after 4 hours of measurement in said apparatus;

c) from 40 to 80% of the total mono- or di-aminopyridine is released after 8 hours of measurement in said apparatus;

d) from 50 to 90% of the total mono- or di-aminopyridine is released after 12 hours of measurement in said apparatus; and

e) not less than 75% of the total mono- or di-aminopyridine is released after 24 hours of measurement in said apparatus.

A preferred controlled absorption formulation in accordance with the invention for twice-daily administration has a dissolution rate which when measured in a type II dissolution apparatus according to U.S. Pharmacopoeia XXII in water and at 50 r.p.m. substantially corresponds to the following dissolution pattern:

a) from 20 to 50% of the total mono- or di-aminopyridine is released after 1 hour of measurement in said apparatus;

b) from 30 to 70% of the total mono- or di-aminopyridine is released after 4 hours of measurement in said apparatus;

c) from 40 to 80% of the total mono- or di-aminopyridine is released after 8 hours of measurement in said apparatus; and

d) not less than 75% of the total mono- or di-aminopyridine is released after 12 hours in said apparatus.

The controlled absorption formulation according to the invention can comprise a blend of pellets as hereinbefore defined, together with up to 60% by weight of said rapid release form of mono- or diaminopyridine, more especially 10–40% by weight in the case of a once-daily formulation and 20–50% by weight in the case of a twice-daily formulation.

The rapid release form of the active agent can comprise rapid release pellets or granulates.

Preferably, the rapid release pellets comprise a core of mono- or di-aminopyridine active agent or a pharmaceutically acceptable salt thereof in association with one or more pharmaceutically acceptable excipient(s), the mono- or di-aminopyridine component and the pharmaceutically acceptable excipient(s) being present in a ratio of from 0:1 to 1:20 and a multi-layer membrane surrounding said core and containing a major proportion of a pharmaceutically acceptable film-forming, water soluble polymer and optionally a minor proportion of a pharmaceutically acceptable film-forming, water insoluble polymer, the number of layers in said membrane and the ratio of said water soluble to water insoluble polymer being effective to allow relatively immediate release of the active agent from said pellet.

Further, preferably, the pellets have a dissolution rate, which when measured in vitro in a type II dissolution apparatus according to US Pharmacopoeia XXII in water at 50 r.p.m. substantially corresponds to the following dissolution pattern:

(a) not less than 70% of the total mono- or di-aminopyridine is released after 1 hour of measurement in said apparatus; and

(b) not less than 85% of the total mono- or di-aminopyridine is released after 2 hours of measurement in said apparatus.

Depending on the function of the pellets, the polymeric material of the core or membrane will consist solely of a water insoluble polymer or a polymer which is slightly permeable to water and aqueous solutions of mono- or di-aminopyridine. However, the polymeric material of the core or membrane may also consist solely of a water soluble polymer or a polymer which is freely permeably to aqueous solutions of mono- or di-aminopyridine in water, especially in the case of the rapid release pellets.

The polymeric material of the core preferably consists solely of a water insoluble polymer or a polymer which is slightly permeable to water and aqueous solutions of mono- or di-aminopyridine. Alternatively, the polymeric material of the core may consist solely of a water soluble polymer or a polymer which is freely permeable to aqueous solutions of mono- or di-aminopyridine and water as indicated above. The polymeric material of the core may include a combination of a water insoluble polymer with a water soluble polymer. The ratio of water soluble/freely permeable to water insoluble/slightly permeable polymer is determined by the particular combination of polymers selected.

The term pharmaceutically acceptable excipient is used herein to define material(s) which is/are homogeneously mixed with the mono- or di-aminopyridine to form the pellet. These materials may also include ingredients known to act as lubricants. Representative excipients include: microcrystalline cellulose (such as that sold under the Trade Mark AVICEL); colloidal silicon dioxide (such as that sold under the Trade Mark AEROSIL); lactose; talc; starch; sorbitol; and cyclodextrin. These may be used singly or in combination with each other. Especially preferred excipients are talc and lactose.

Preferred coating materials include-solutions/suspensions of the polymers cited for use in the application of the powder blend to the central cores in a suitable organic/aqueous carrier medium.

The membrane of the film-forming polymer or mixture of polymers surrounding the core preferably has a proportion of a polymer which is slightly permeable to mono- or di-aminopyridine and water and optionally a proportion of a water permeable polymer, the ratio of water slightly permeable to water permeable polymer being determined by the inherent permeability characteristics of the polymer(s) selected.

As indicated above, the membrane may also be composed of a proportion of a polymer which is water insoluble and a proportion of a polymer which is water soluble, the ratio of water insoluble to water soluble polymer being determined by the inherent permeability characteristics of the respective polymers.

Normally the ratio of water insoluble/slightly permeable polymers to water soluble/permeable polymers lies between 1:5 and 50:1, more especially 1:2 and 20:1. Examples of each of these types of polymer are described above. Especially suitable water soluble/permeable polymers include polyvinylpyrrolidone, polyvinyl alcohol and EUDRAGIT RL, whilst suitable water insoluble/slightly permeable polymers include ethyl cellulose, cellulose acetate, EUDRAGIT

RS, EUDRAGIT L, EUDRAGIT E and EUDRAGIT S. Commercially available ready-made polymeric solutions/suspensions may also be used. These ready-made solutions/suspensions may optionally contain plasticizing agents to improve the polymer film as hereinbefore described. Examples of ready-made solutions/suspensions of polymeric material with or without plasticizing agent include EUDRAGIT RL 30D, EUDRAGIT NE 30D, EUDRAGIT E 12.5, EUDRAGIT L 12.5 P, EUDRAGIT E 12.5, EUDRAGIT S 12.5 P, EUDRAGIT RL 12.5, EUDRAGIT RS 300, EUDRAGIT RS 12.5, AQUACOAT (a Trade Mark of FMC Corporation) and SURE-LEASE (a Trade Mark of Colorcon Inc.).

The water insoluble polymer of the membrane may also comprise naturally occurring polymers or resins. Especially suitable water insoluble, naturally occurring polymers include shellac, chitosan, gum juniper or a mixture thereof.

The membrane may be built up by applying a plurality of coats of membrane polymer solution or suspension to the core as hereinafter described. The membrane solution or suspension contains the polymer(s) dissolved or suspended, respectively, in a suitable aqueous or organic solvent or mixture of solvents, optionally in the presence of a lubricant. Suitable lubricants are talc, stearic acid, magnesium stearate and sodium stearate. A particularly preferred lubricant is talc. The membrane, polymer or mixture of polymers may optionally include a plasticizing agent, the function and choice of which has been previously described.

The dissolution rate achieved is proportionally slower as the amount of membrane applied is increased.

The membrane solution or suspension may be applied to the active cores in a conventional coating pan as indicated or, alternatively, using an automated system such as a CF granulator, for example, a FREUND CF granulator, a GLATT fluidised bed processor, an AEROMATIC, a modified ACCELA-COTA or any other suitably automated bead coating equipment (FREUND, GLATT, AEROMATIC and ACCELA-COTA are all Trade Marks).

Preferably 2–75 ml of membrane solution/suspension is applied per application per kilogram of cores. In an automated system the total amount of membrane solution/suspension applied to the cores is the same as that applied in a conventional coating pan, except that the membrane solution/suspension may be applied continuously.

Preferably, when a coating pan is used the membrane is applied at a rate of 5–30 applications/day until all of the applications have been applied. Between days the pellets are dried for a suitable period of time at a controlled temperature.

The type II dissolution apparatus referred to above is a paddle-type apparatus for carrying out method II according to U.S. Pharmacopoeia XXII.

The pellets or granulates may be compressed into tablets using a binder and/or hardening agent commonly employed in tabletting such as microcrystalline cellulose sold under the Trade Mark "AVICEL" or a co-crystallised powder of highly modified dextrins (3% by weight) and sucrose sold under the Trade Mark "DI-PAC" in such a way that the specific dissolution rate of the pellets is maintained.

Pellets or a combination of pellets in accordance with the invention may also be filled into hard or soft gelatine capsules.

The mono- or di-aminopyridine active agent can form quaternary ammonium-type salts. However, given the solubility of mono- or di-aminopyridines, the formation of pharmaceutically acceptable salts would not normally be required.



According to a further aspect of the invention there is provided a preparation for the once-daily, percutaneous administration of a mono- or di-aminopyridine active agent, which formulation comprises said mono- or di-aminopyridine uniformly distributed in a solid, semi-solid or mucilaginous medium which can be placed in intimate contact with the skin, the release of said mono- or di-aminopyridine from said formulation being at a rate sufficient to achieve therapeutically effective blood levels over a period of 12 to 24 hours following topical application of said preparation.

The invention also provides a preparation for the once-daily, percutaneous administration of a mono- or di-aminopyridine active agent, which formulation comprises said mono- or di-aminopyridine uniformly distributed in a solid, semi-solid or mucilaginous medium which can be placed in intimate contact with the skin, the release of said mono- or di-aminopyridine from said formulation being at a rate allowing controlled absorption thereof over a 24 hour period following topical application of said preparation, said rate being measured in vivo and having a Tmax between 2 and 16 hours.

The formulation for percutaneous administration preferably contains 10–100mg of active agent, more especially 25–75mg of active agent.

The term solidifying agent as used herein also embraces thickening, hardening, setting, suspending or like agents.

Suitable materials for use as the solidifying or gel-forming agent in the preparations according to the invention include, for example, plant extracts, vegetable oils, gums, synthetic or natural polysaccharides, polypeptides, alginates, hydrocarbons, synthetic polymers, minerals and silicon compounds and mixtures thereof.

Suitable plant extracts include agar, ispaghula, psyllium, cydonia and ceratonia or a mixture thereof.

A suitable vegetable oil is hydrogenated castor oil.

Examples of suitable gums include guar gum, acacia gum, ghatti gum, karaya gum, tragacanth gum and xanthan gum or a mixture thereof. Such gums are especially suited for use in accordance with the invention.

Suitable synthetic and natural polysaccharides include alkylcelluloses, hydroxalkylcelluloses, cellulose ethers, cellulose esters, nitrocelluloses, dextrin, agar, carrageenan, pectin, furcellaran and starch or starch derivatives and mixtures thereof. An example of a preferred starch derivative is sodium starch glycolate. Especially preferred polysaccharides include agar and carrageenan.

Suitable polypeptides include zein, gelatin, collagen or polygeline or a mixture thereof.

Suitable alginates include alginic acid, propylene glycol alginate or sodium alginate or a mixture thereof.

Preferred hydrocarbons include soft paraffin and hard paraffin, especially white petrolatum.

An especially preferred synthetic polymer is a carboxyvinyl polymer sold under the Trade Mark CARBOMER.

Suitable minerals include bentonite, hectorite, aluminum magnesium silicate and magnesium silicate or a mixture thereof.

Suitable compounds based on silicon include colloidal silicon dioxide, silicones, polysiloxanes and silica gels or a mixture thereof.

The term "agar" as used herein is synonymous with "agar-agar".

The formulation for percutaneous administration is preferably formed by adding a given amount of the active agent to a solution of a solidifying or gel-forming agent or a mixture thereof in a suitable solvent or mixture of solvents and mixing or heating the mixture thereby obtained so as to form said solid, semi-solid or mucilaginous medium.

The solvent used is preferably water. However, the solvent used may also suitably be an alcohol such as ethanol or stearyl alcohol, glycerol, propylene glycol, polyethlene glycol or a silicone or a mixture thereof, including a mixture with water.

The formulation for percutaneous administration when in the form of a solid or semi-solid preferably has a surface area in the range 2 to 15 $cm^2$, more especially 5 to 10 $cm^2$.

The thickness of the formulation for percutaneous administration is preferably in the range 0.5 to 3 mm, more especially in the range 1 to 2mm.

The formulation for percutaneous administration according to the invention may also include one or more auxilary agent(s) selected from an antimicrobial agent, a preservative, an antioxidant, a pH-controlling agent, a plasticizer, a surfactant, a penetration enhancer, a humectant, a local anaesthetic, an anti-irritant agent or a rubefacient or a mixture thereof.

Suitable antimicrobial agents/preservatives include benzalkonium chloride, cetrimide (cetyltrimethylammonium bromide), benzoic acid, benzyl alcohol, Parabens (Trade Mark for the methyl-, ethyl-, propyl- and butyl-esters of para-hydroxybenzoic acid) chlorhexidine, chlorobutanol, phenylmercuric acetate, borate and nitrate, potassium sorbate, sodium benzoate, sorbic acid and thiomersal (mercurithiosalicylate) or a mixture thereof.

Preferred antioxidants, when used in the formulations for percutaneous administration according to the invention, include sodium metabisulphite, sodium sulphite, butylated hydroxyanisole and butylated hydroxytoluene or a mixture thereof.

Preferred pH-controlling agents, when used in the formulations for percutaneous administration according to the invention, include citric acid and sodium citrate.

Preferred plasticizers, when used in the formulations for percutaneous administration according to the invention, include diethylphthalate, dibutylphthalate and tributylcitrate or a mixture thereof.

Suitable surfactants, when used in the formulations for percutaneous administration according to the invention, include sodium lauryl sulphate, diethylene glycol monostearate, propylene glycol monostearate, polyethylene glycols as sold under the Trade Mark MACROGOL, polysorbates and polyvinyl alcohol or a mixture thereof.

Suitable penetration enhancers, when used in the formulations for percutaneous administration according to the invention, include dimethylsulphoxide, N,N-dimethylacetamide, N,N-dimethylformamide, 2-pyrrolidone, N-methyl-2-pyrrolidone and 1-dodecyl azacyclo-heptan-2-one or a mixture thereof.

A particularly preferred humectant, when used in the formulations for percutaneous administration according to the invention, is glycerol. As indicated above glycerol may also be used as a solvent in forming the formulations for percutaneous administration according to the invention and when used as such will confer humectant properties on said formulation.

Suitable local anaesthetics, when used in the formulations for percutaneous administration according to the invention, include lidocaine, benzocaine, lignocaine, methocaine, butylaminobenzoate and procaine or a mixture thereof. A local anaesthetic would mainly be included to suppress the effects of irritation caused at the site of application of a preparation according to the invention. Suitable anti-irritant agents may also be used such as allantoin, corticosteroids, antihistamines and combinations thereof.

Particularly preferred rubifacients, when used in the formulations for percutaneous administration according to the invention, include camphor and menthol or a mixture thereof and other locally acting peripheral vasodilators.

The formulations for percutaneous administration according to the invention are preferably applied to the flexor surface of the forearm, including the wrist, and also the ankle. Such sites of application show the greatest consistency from individual to individual in terms of drug absorption relative to other sites for administration because of the amount of tissue at such sites. Blood vessels are found close to the surface of the skin at such sites, which facilitates the uptake of active agent into the systemic circulation.

On contact of a formulation for percutaneous administration according to the invention with the skin, the active agent starts to migrate rapidly from the formulation to the humid interface at the point of contact and thence through the skin into the bloodstream. The rate and extent of this percutaneous absorption is dependent on several factors including: the amount of active agent in the formulation; and the surface area of the formulation.

As it is the skin itself that forms the rate controlling barrier and not the dosage form comprising the formulation, the effect of active agent loading will only be observed in terms of systemic active agent levels below a threshold loading level. Below this threshold the amount of active agent in the dosage form is the factor which determines the concentration gradient that in turn controls the rate of absorption. Above this threshold increasing drag loading has no effect on absorption as the ability of the skin to absorb the active agent is saturated. However, such drag loading does have the effect of prolonging the time course of drug delivery by providing a larger drug depot. In order to increase the extent of absorption above the threshold it is necessary to increase the area of absorption by increasing the surface area of the dosage form so that a larger area of the skin is in contact with the active agent.

The formulations for percutaneous administration according to the invention can be presented in a number of devices and dosage forms for the percutaneous administration of the active agent. These devices and dosage forms optionally contain an active agent impermeable layer so as to cause undirectional administration of the active agent through the skin from the surface of the formulation in the device or dosage form exposed to the skin. Such devices and dosage forms include, but are not limited to, a device known under the name DERMAFLEX and which is the subject of our EP-B-0 133 562, devices of the type wherein the drug is contained in a drug reservoir which is separated from the skin by a rate-limiting membrane, self adhesive patches, bandages and plasters, creams, gels, jellies, mucilages, ointments and pastes. The term mucilaginous medium as used herein embraces creams, gels, jellies, ointments and pastes.

The formulations for percutaneous administration according to the invention may be adapted for reception in a receptacle of a device which can be held in contact with the skin.

Means for securing transdermal patches to the body include, apart from adhesive means, straps, bracelets and like securing devices.

The present invention is also designed to provide, through percutaneous administration by way of the said devices and dosage forms, a highly cosmetically and aesthetically acceptable method of easily and discretely administering the active agent to a patient.

In certain cases such as: when the patient is applying a formulation for percutaneous administration according to the invention for the first time or when an individual, who has a particularly high requirement for the active agent is

replacing the existing dose, an initial 'burst' or priming dose of active agent may be required to achieve rapid effective plasma levels. The priming dose can be supplied by applying a device or dosage form in which an amount of active agent is included in a layer of adhesive which is used to affix said device or dosage form to the skin. A priming dose of active agent may be included in a layer of adhesive material defining the skin contacting surface of the preparation and which layer is freely permeable to the active agent contained in the solid, semi-solid or mucilaginous agar medium of said preparation. Alternatively, the priming dose of active agent may be included in a peripheral layer of adhesive defining part of the skin-contacting surface of the formulation.

In order to form the formulation for percutaneous administration according to the invention the thickening, hardening, setting, gelling, suspending or solidifying agent or a mixture of such agents is added to the solvent(s) at a concentration that will result in a suitably mucilaginous, semi-solid or solid mass. The mixture is mixed and/or heated, depending on the agent used, so as to produce a uniform medium. The active agent is added in the required amount so as achieve an amount of active agent in the formulation formed which is preferably 10–100 mg, more especially 25–75 mg. Any other inactive ingredients and auxiliary agents as hereinbefore specified are then added and the entire mixture is mixed to uniformity. This mixture is used to form the final dosage form which may be any of the following:

(a) a solid or semi-solid disc or patch formed by moulding, cutting, punching or slicing of the mixture.

(b) a cream.

(c) a mucilage.

(d) a gel.

(e) a paste.

(f) a jelly.

(g) an ointment.

The dosage form may be incorporated into any suitable device for attachment to the skin as indicated above.

When the active agent is a mono-aminopyridine, a particularly preferred mono-aminopyridine is 4-aminopyridine. When the active agent is a di-aminopyridine, a particularly preferred di-aminopyridine is 3,4-DAP.

As stated above, it is believed that 4-AP and 3,4-DAP slow or block the potassium ion flow in nerve impulse transmission. The active agent, therefore, may also be any one of the group of compounds classified as potassium channel blockers, including but not limited to phencyclidine, tetraethylammonium bromide, tetraethylammonium chloride, procaine, quinidine, apamin, amantadine and edrophonium chloride.

The invention also provides a method for the treatment of a neurological disease characterised by a slowing of nerve impulse transmission, which comprises administering to a patient a medicament containing a mono- or di-aminopyridine active agent, said medicament being effective to permit release of said active agent in a manner which achieves therapeutically effective blood levels over a 12–24 hour period when administered on a once- or twice-daily basis.

The mono- or di-aminopyridine active agent is particularly suitable for use in the treatment of a neurological disease which is characterised by demyelination of the central nervous system, more especially multiple sclerosis.

The mono- or di-aminopyridine active agent in accordance with the invention is also suitable for the treatment of Alzheimer's disease.

In one embodiment the medicament is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of said active agent at selected intervals of time until a therapeutic dose is achieved.

In this embodiment of the invention at the commencement of treatment the active agent is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. Suitably when said tolerable state is reached, the dose administered is increased by amounts of at least 5–15 mg/day until said therapeutic dose is reached.

The active agent is preferably 4-aminopyridine or 3,4-diaminopyridine.

The medicament is suitably formulated as a pharmaceutical formulation as hereinbefore specified.

In certain circumstances, the attending physician may consider it appropriate to administer the active agent both orally and percutaneously either simultaneously, separately or sequentially to achieve maximum therapeutic blood levels of said active agent.

The invention will be further illustrated by the following Examples.

## EXAMPLES 1

4-AP (8.0 Kg), talc (12.0 Kg) and lactose (36.0 Kg) were blended and milled through a mill equipped with a 50 mesh screen so as to obtain a homogeneous powder. The powder was applied to starch/sugar seeds (0.4–5.0 ram) (12.0 Kg) using a Freund CF granulator and a coating solution of 3.5% polyvinylpyrrolidone in isopropanol to form the cores.

A membrane was then applied to the cores by spraying on a solution consisting of:

| | |
|---|---|
| 12.5% EUDRAGIT S in acetone/ isopropanol 40:60 | 100 parts by weight |
| Isopropanol | 100 parts by weight |

while at the same time but separately dusting on talc (100 parts by weight) in conventional manner. The ratio of membrane solution to talc applied was 0.62 g of talc per gram of membrane solution. A sufficient amount of membrane solution and talc was applied to 68.0 Kg of cores to achieve the dissolution profile given below.

The finished pellets were dried to evaporate all solvents prior to performing the dissolution profile.

The dissolution rate of the pellets was tested by method II for the U.S. Pharmacopoeia XXII in water at 50 r.p.m. The dissolution rate was as follows:

| Time | % Release |
|---|---|
| 1 | 0.4 |
| 4 | 34.9 |
| 8 | 68.7 |
| 12 | 85.4 |
| 24 | 99.4 |

The coated beads were blended with active (rapid release) beads in a ratio of 15:85 of active:coated beads by content of 4-AP to generate the following in vitro dissolution profile:

| Time | % Release |
|---|---|
| 1 | 14.9 |
| 4 | 42.7 |
| 8 | 73.6 |
| 12 | 89.3 |
| 24 | 100.2 |

EXAMPLE 2

4-AP (4.0 Kg), talc (6.0 Kg) and lactose (18.0 Kg) were blended and milled through a mill equipped with a 50 mesh screen so as to obtain a homogeneous powder. This powder blend was layered into spherical cores using a Freund CF granulator and a coating solution of 3.5% polyvinylpyrrolidone in isopropanol.

A membrane was then applied to the cores by spraying on a solution consisting of:

| | |
|---|---|
| 12.5% EUDRAGIT RS in acetone/isopropanol 40:60 | 50 parts by weight |
| 12.5% EUDRAGIT S in acetone/isopropanol 40:60 | 50 parts by weight |
| Isopropanol | 100 parts by weight |

while at the same time but separately dusting on talc (100 parts by weight) in conventional manner. The ratio of membrane solution to talc applied was 0.62 g of talc per gram of membrane solution. A sufficient amount of membrane solution and talc was applied to 28.0 Kg of cores to achieve the dissolution profile given below.

The finished pellets were dried to evaporate all solvents prior to performing the dissolution profile.

The dissolution rate of the pellets was tested by method II for the U.S. Pharmacopoeia in water at 50 r.p.m. The dissolution rate was as follows:

| Time | % Release |
|---|---|
| 1 | 1.6 |
| 4 | 25.5 |
| 8 | 58.5 |
| 12 | 79.6 |
| 24 | 97.0 |

On blending with 20% of active beads based on total content of 4AP the following dissolution profile resulted:

| Time | % Release |
|---|---|
| 1 | 19.7 |
| 4 | 40.9 |
| 8 | 64.9 |
| 12 | 81.2 |
| 24 | 96.8 |

EXAMPLE 3

The procedure used was the same as that outlined in Example 2 with the exception that the active beads were formed in a Glatt fluidised coating apparatus.

The active pellets were coated on the Glatt apparatus with a mixture of polymers comprising EUDRAGIT RS:EUDRAGIT S in the ratio 1:2 to achieve the following release profile:

| Time | % Release |
|---|---|
| 1 | 2.5 |
| 4 | 29.9 |
| 8 | 69.5 |
| 12 | 96.2 |

These pellets were combined with rapid release pellets in a ratio of 30:70 to generate the following release rates:

| Time | % Release |
|---|---|
| 1 | 30.9 |
| 4 | 49.7 |
| 8 | 77.6 |
| 12 | 97.4 |

EXAMPLE 4

The active pellets from Example 3 were coated in a Glatt fluidised bed apparatus using a dispersion of EUDRAGIT polymers in water and containing talc and triacetin. The EUDRAGIT polymers consisted of a ratio of 19:1 of EUDRAGIT RS 30D to EUDRAGIT RL D by weight of polymer and the total solid content of the polymer dispersion, including the lubricant (talc) and plasticizer (triacetin) was 23.5%. Following coating and drying, the dissolution rate of the beads according to type II USP apparatus was as follows:

| Time | % Release |
|---|---|
| 1 | 4.6 |
| 4 | 39.5 |
| 8 | 61.2 |
| 12 | 76.6 |
| 24 | 86.2 |

When blended with active beads in a ratio of 25:75 of active:coated beads by total content of 4-AP the following dissolution profile in the same apparatus was achieved:

| Time | % Release |
|---|---|
| 1 | 28.6 |
| 4 | 54.6 |
| 8 | 70.9 |
| 12 | 82.5 |
| 24 | 91.4 |

EXAMPLE 5

Active 4-AP beads/pellets were formulated according to the procedure set out in Example 1. These active pellets were coated according to the procedure set out in Example 2, however, the application of coats was such as to provide a form of 4-AP suitable for twice daily administration. The dissolution profile of the coated beads was as follows:

| Time | % Release |
|---|---|
| 1 | 23.6 |
| 4 | 45.2 |
| 8 | 76.4 |
| 12 | 96.2 |

EXAMPLE 6

Pellets obtained in Example 2 were further coated to the following dissolution rate:

| Time | % Release |
|---|---|
| 1 | 1.9 |
| 4 | 21.3 |

-continued

| Time | % Release |
|---|---|
| 8 | 53.7 |
| 12 | 83.4 |

On blending with active 4-AP beads in a ratio of 30:70 of active:coated by content of 4-AP, the following dissolution profile resulted:

| Time | % Release |
|---|---|
| 1 | 31.6 |
| 4 | 44.2 |
| 8 | 66.8 |
| 12 | 89.1 |

EXAMPLE 7

4-AP (12.0 Kg), talc (8.0 Kg) and lactose (24.0 Kg) were blended and milled through a mill equipped with a 50 mesh screen so as to obtain a homogeneous powder. The powder was applied to starch/sugar seeds (0.5–0.6 mm) (16.0 Kg) using a Freund CF granulator and a coating solution of 3.5% polyvinylpyrrolidone in isopropanol to form the cores.

A membrane was then applied to the cores by spraying on a solution consisting of:

| | |
|---|---|
| 12.5% EUDRAGIT RS in acetone/ isopropanol 40:60 | 100 parts by weight |
| Isopropanol | 50 parts by weight |

while at the same time but separately dusting on talc (50 parts by weight) in conventional manner. The ratio of membrane solution to talc applied was 0.41 g of talc per gram of membrane solution. A sufficient amount of membrane solution and talc was applied to 60.0 Kg of cores to achieve the dissolution profile given below.

The finished pellets were dried to evaporate all solvents prior to performing the dissolution profile.

The dissolution rate of the pellets was tested by method II for the U.S. Pharmacopoeia XXII in water at 50 r.p.m. The dissolution rate was as follows:

| Time | % Release |
|---|---|
| 1 | 1.6 |
| 4 | 29.8 |
| 8 | 59.4 |
| 12 | 77.7 |
| 24 | 92.8 |

The coated beads were blended with active (rapid release) beads in a ratio of 20:80 of active:coated beads by content of 4-AP to generate the following in vitro dissolution profile:

| Time | % Release |
|---|---|
| 1 | 21.3 |
| 4 | 43.9 |
| 8 | 66.5 |
| 12 | 82.4 |
| 24 | 93.7 |

EXAMPLE 8

3,4-DAP (8.0 Kg), talc (12.0 Kg) and lactose (36.0 Kg) were blended and milled through a mill equipped with a 50 mesh screen so as to obtain a homogeneous powder. This powder blend was layered into spherical cores using a Freund CF granulator and a coating solution of 3.5% polyvinylpyrrolidone in isopropanol.

A membrane was then applied to the cores by spraying on a solution consisting of:

| | |
|---|---|
| 12.5% EUDRAGIT RS in acetone/ isopropanol 40:60 | 50 parts by weight |
| 12.5% EUDRAGIT S in acetone/ isopropanol 40:60 | 50 parts by weight |
| Isopropanol | 100 parts by weight |

while at the same time but separately dusting on talc (100 pans by weight) in conventional manner. The ratio of membrane solution to talc applied was 0.62 g of talc per gram of membrane solution. A sufficient amount of membrane solution and talc was applied to 56.0 Kg of cores to achieve the dissolution profile given below.

The finished pellets were dried to evaporate all solvents prior to performing the dissolution profile.

The dissolution rate of the pellets was tested by method II for the U.S. Pharmacopoeia XXII in water at 50 r.p.m. The dissolution rate was as follows:

| Time | % Release |
|---|---|
| 1 | 3.7 |
| 4 | 29.6 |
| 8 | 51.4 |
| 12 | 72.6 |
| 24 | 98.4 |

On blending with 25% of active beads based on total content of 3,4-DAP the following dissolution profile resulted:

| Time | % Release |
|---|---|
| 1 | 28.2 |
| 4 | 44.3 |
| 8 | 64.2 |
| 12 | 77.1 |
| 24 | 99.3 |

EXAMPLE 9

The procedure used was the same as that outlined in Example 2 with the exception that the active beads were formed in a Glatt fluidised coating apparatus.

The active beads were coated on the Glatt apparatus with a mixture of polymers comprising EUDRAGIT RS:EUDRAGIT S in the ratio 1:2 to achieve the following release profile:

| Time | % Release |
|---|---|
| 1 | 3.6 |
| 4 | 28.6 |
| 8 | 60.9 |
| 12 | 88.8 |

These pellets were combined with rapid release pellets in a ratio of 30:70 to generate the following release rates:

| Time | % Release |
|---|---|
| 1 | 29.7 |
| 4 | 50.1 |
| 8 | 69.3 |
| 12 | 90.4 |

EXAMPLE 10

The active beads from Example 3 were coated in a Glatt fluidised bed apparatus using a dispersion of EUDRAGIT polymers in water and containing talc and triacetin. The EUDRAGIT polymers consisted of a ratio of 9:1 of EUDRAGIT RS 30D to EUDRAGIT RL 30D by weight of polymer and the total solid content of the polymer dispersion, including the lubricant (talc) and plasticizer (triacetin) was 18.5%.

Following coating and drying, the dissolution rate of the beads according to type II USP apparatus was as follows:

| Time | % Release |
|---|---|
| 1 | 7.6 |
| 4 | 41.4 |
| 8 | 65.2 |
| 12 | 77.4 |
| 24 | 92.6 |

When blended with active beads in a ratio of 15.8 of active:coated beads by total content of 4-AP the following dissolution profile in the same apparatus was achieved:

| Time | % Release |
|---|---|
| 1 | 22.5 |
| 4 | 50.7 |
| 8 | 72.6 |
| 12 | 79.3 |
| 24 | 93.7 |

EXAMPLE 11

To 18.3 g of water was added 0.7 g of carrageenan. This mixture was heated to boiling and then allowed to cool gradually. While still in its liquid state 1.0 g of 4-AP was added and the mixture was agitated to ensure uniformity. 1.0 g portions of the gel, equivalent to 50 mg of 4-AP, were weighed into a preformed circular device of internal diameter 3.2 cm giving a surface area of 8 $cm^2$.

EXAMPLE 12

Patches were prepared as per Example 11 except that 0.5 g of gel was weighed into a preformed circular device of internal diameter 2.3 cm giving a surface area of 4 $cm^2$.

EXAMPLES 13

Patches were prepared as per Example 11 except that 1.5 g of gel was weighed into a preformed circular device of internal diameter 3.9 cm giving a surface area of 12 $cm^2$.

EXAMPLE 14

To 100 g of water was added 10 g of powdered gelatin and 10 g of dextrin. The mixture was heated to boiling. While mixing, the following were also added, 0.01 g of benzalkonium chloride, 0.1 g of sodium metabisulphite, 4.8 g of 4-AP. The hot liquid was poured onto preformed circular discs. Each disc weighed 0.65 g with a surface area of 8 $cm^2$ and each containing 25 mg of 4-AP.

EXAMPLE 15

A product was made as per Example 11 with 0.05 g of methylparaben added to the hot water/carrageenan mixture.

EXAMPLE 16

50 g of stearyl alcohol and 50 g of white petrolatum were melted by heating to 75° C. 0.05 g of methylparaben, 0.3 g of propylparaben, 2 g of sodium lauryl sulphate, 24 g of propylene glycol and 8 g of 4-AP were dissolved in 84 g of water. The aqueous solution was heated to 75° C. and added to the melted stearyl alcohol/petrolatum mixture. The entire mixture was allowed to cool with constant stirring and congealed into a uniform cream. 0.5 g portions of the cream, equivalent to 20 mg of 4-AP, were weighed into circular transdermal delivery devices of internal diameter 2.75 cm giving a surface area of 6 $cm^2$.

EXAMPLE 17

A product was made as per Example 11 except that 1.4 g of 4-AP was added to the water/carrageenan mixture and the patch was cut into rectangular patches measuring 3×4 cm, each weighing 0.9 g with a surface area of 12 $cm^2$.

EXAMPLE 18

To 20 g of water was added 0.8 g of agar. This mixture was heated and allowed to cool gradually, while still in its liquid state 1.1 g of 3,4-diaminopyridine was added and the mixture was agitated to ensure uniformity. The liquid mixture was then poured onto several 20 cm×20 cm glass plates equipped with TEFLON (TEFLON is a Trade Mark) dividers approximately 1.31 mm in height. A second similar glass plate was placed over the liquid supported by the TEFLON dividers. The liquid was allowed to cool to room temperature and solidified into a sheet of uniform thickness (approximately 1.31 mm in thickness). The sheet was then cut into discs, each weighing approximately 0.76 g with a surface area of 5.3 $cm^2$ and each containing 50 mg of 3,4-diaminopyridine. The patches were wrapped in aluminium foil to prevent dehydration.

EXAMPLE 19

To 20 g of water was added 0.8 g of agar. This mixture was heated and allowed to cool gradually, while still in its liquid state 1.11 g of 4-AP was added and the liquid agitated to ensure uniformity. The mixture, while still in the liquid state, was poured into a formed coated aluminium die resulting in a disc of gel of 1.31 mm in thickness and surface area of 5.3 $cm^2$ following solidification and edged around the circumference by 1 cm of aluminium foil. The disc so prepared was then sealed by a coated foil circular seal edged by 1 cm of adhesive. On removal of the seal the disc selectively adhered to the adhesive side of the device, and the aluminium die in which the disc was formed was

discarded. The device so prepared provides excellent skin contact in use.

EXAMPLE 20

A product was made according to Example 19 except that the 0.8 g of agar was added to a 20 g 15:5 (w/w) mixture of water and glycerol.

EXAMPLE 21

A product was made according to Example 19 except that the 0.8 g of agar was added to a 20 g 90:10 (w/w) water:ethanol mixture.

EXAMPLE 22

A device was prepared as in Example 19 having a 3,4-diaminopyridine concentration of 60 mg/g with a surface area of 7.64 $cm^2$ and thickness of 1.31 mm.

EXAMPLE 23

A device was prepared as in Example 19 with 0.05 g of methylparaben added to the hot water: agar mixture.

EXAMPLE 24

A device was prepared as in Example 19 with a 15:5 (w/w) mixture of water: PEG (polyethylene glycol) 400 in place of water.

EXAMPLE 25

500 g of water was heated to boiling. 25 g of carrageenan was added and the mixture was boiled for approximately 5–10 minutes. The solution was allowed to cool to between 50 and 60° C. 66 g of 4-AP was added and allowed to dissolve. The solution was diluted to 1,000 g with water. The mixture while still in its liquid state was poured (0.9091 g) into a formed coated aluminium die. The resulting solidified disc had a thickness of 1.30 mm, a surface area of 7.0 $cm^2$ and contained 60 mg of 4-AP. The formed disc was sealed by a circle of aluminium coated with an impervious membrane and a coat of gelatin. On removal of the seal, the disc selectively adhered to the gelatin side of the aluminium seal. Adhesive tape is used to secure the disc to the skin.

EXAMPLE 26

Patches were prepared as in Example 25 except that 55 g of 4-AP was added yielding finished patches of 50 mg/disc.

EXAMPLE 27

Patches were prepared as in Example 25 except that 12.5 g of agar was added instead of 25 g of carrageenan.

EXAMPLE 28

Patches were prepared as in Example 27 except that water: ethanol, 90: 10, was used in place of water.

IN VITRO STUDY

The rate of transfer of 4-AP across skin from a disc of the type as prepared in Example 11 was determined in a Franz Cell (Franz, T. J., (1975); J. Invest Dermatol. 64,190) using hairless mouse skin at 37° C and a phosphate buffer at pH 7.4. The 4-AP transported through the skin was assayed by HPLC. The results are shown in the accompanying Figure.

We claim:

**1**. A method for the treatment of a neurological disease where the disease is characterised by a slowing of nerve impulse transmission, which comprises administering to a patient in need thereof a medicament containing a mono- or di-aminopyridine active agent, said medicament being effective to permit sustained release of said mono- or di-aminopyridine active agent at a rate allowing controlled absorption thereof which achieves therapeutically effective blood levels over a 12–24 hour period when administered on a once- or twice-daily basis.

**2**. A method according to claim **1**, wherein the neurological disease is characterised by demyelination of the central nervous system.

**3**. A method according to claim **1** or **2**, wherein the neurological disease is multiple sclerosis.

**4**. A method according to claim **1**, wherein the neurological disease is Alzheimer's disease.

**5**. A method according to claim **1**, wherein the medicament is administered to a subject at a dose and for a period sufficient to allow said subject to reach a tolerable state such that said subject is able to tolerate said dose without showing any adverse effects and thereafter increasing the dose of said mono- or di-aminopyridine active agent at selected intervals of time until a therapeutic dose is achieved.

**6**. A method according to claim **5**, wherein at the commencement of treatment the mono- or di-aminopyridine active agent is administered at a dose of less than 15 mg/day until a tolerable state is reached.

**7**. A method according to claim **5**, wherein at the commencement of treatment the mono- or di-aminopyridine active agent is administered at a dose of less than 15 mg/day until a tolerable state is reached and when said tolerable state is reached, the dose administered is increased by amounts of at least 5–15 mg/day until said therapeutic dose is reached.

**8**. A method according to claim **1**, wherein the active agent is 4-aminopyridine.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 5,540,938
APPLICATION NO. : 08/328165
DATED : July 30, 1996
INVENTOR(S) : Joseph G. Masterson and Michael Myers

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page, in the Related U.S. Application Data section (item [62]), cancel the text reading "Division of Ser. No. 786,400, Nov. 1, 1991, abandoned, and a division of Ser. No. 73,651, Jun. 7, 1993, Pat. No. 5,370,879" and insert the following text:

--Division of Ser. No. 73,651, Jun. 7, 1993, Pat. No. 5,370,879, which is a continuation of Ser. No. 786,400, Nov. 1, 1991, abandoned.--

Title Page, after the Related U.S. Application Data section (item [62]), a new section should be added as follows:

--[30] Foreign Application Priority Data

Nov. 2, 1990 [IE] Ireland ......... 3952/90--

Column 1, line 5, cancel the text beginning with "This is a divisional" to and ending "U.S. Pat. No. 5,370,879." in column 1, line 7, and insert the following text:

--This is a divisional of Ser. No. 08/073,651, filed Jun. 7, 1993, now U.S. Pat. No. 5,370,879, which is a continuation of Ser. No. 07/786,400, filed Nov. 1, 1991, now abandoned.--

Signed and Sealed this
Eighth Day of May, 2012

David J. Kappos
*Director of the United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), it contains 13,425 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point Times New Roman, a proportionally spaced typeface.

Dated: New York, New York
March 18, 2024

*/s/ Garrard R. Beeney*