SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

125 Broad Street
New York, New York 10004-2498

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

July 17, 2024

Jarrett B. Perlow
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place NW
Washington, DC 20439
(202) 275-8000

Re: *Acorda Therapeutics, Inc.* v. *Alkermes PLC*, No, 2023-2374

Dear Mr. Perlow:

We represent Acorda Therapeutics, Inc., and write to bring to the Court's attention a recent decision of the Seventh Circuit Court of Appeals—*Zimmer Biomet Holdings, Inc.* v. *Mary N. Insall*, No. 23-1888 (7th Cir. July 12, 2024).

*Zimmer* supports Acorda's position that this Court may reject an arbitral award that "'violate[s] some explicit public policy that is well defined and dominant,'" such as the policy against collecting post-expiration royalties set out in *Brulotte* and *Kimble*. Acorda Reply Br. 23-24 (quoting *United Paperworkers Int'l Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 43 (1987)).

The *Zimmer* court explained that courts may vacate an award that violates the public policy against payment and collection of post-expiration royalties. Relying on *United Paperworkers* and *W.R. Grace & Co.* v. *Loc. Union 759*, 461 U.S. 757 (1983), it explained that a court "must vacate an arbitration award if the remedy or relief violates an explicit, well-defined, and dominant public policy," and that the standard of review in such circumstances is *de novo*. Slip op. at 12, 5; *see also id.* at 7 (Where the "remedy or relief violate some explicit public policy, 'we are obliged to refrain from enforcing' the arbitration award.").

The *Zimmer* panel ultimately confirmed the arbitration award. The panel explained that contract interpretation was reserved for the arbitrators alone to decide. *Id*. at 12. Because the arbitrators "determined that the royalty payments in question were *not* grounded in any patent rights and, thus, did not offend *Brulotte* and *Kimble*," the panel did not reach whether payment actually violated public policy. *Id.* at 13. Here, the opposite is true: the Tribunal expressly held that Acorda's payments were received by Alkermes in violation of the public policy of *Brulotte*. Appx40. Thus, for the reasons set out in Acorda's briefs, the Tribunal's award limiting Acorda's recovery is contrary to the federal

policy set out in those precedents. Accordingly, *Zimmer* confirms that in the circumstances here, under *United Paperworkers* and *W.R. Grace*, the Court may review the arbitration award *de novo* and reject the portion of the Tribunal's award that violates public policy.

Sincerely,

*/s/ Garrard R. Beeney*
Garrard R. Beeney
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

*Attorney for Petitioner-Appellant Acorda Therapeutics, Inc.*

# ADDENDUM

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1888

ZIMMER BIOMET HOLDINGS, INC.,

*Plaintiff-Appellant*,

*v.*

MARY N. INSALL, as Executrix of the Estate of John N. Insall,

*Defendant-Appellee*.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.
No. 1:22-cv-02575 — **Lindsay C. Jenkins**, *Judge*.

ARGUED JANUARY 19, 2024 — DECIDED JULY 12, 2024

Before ST. EVE, LEE, and PRYOR, *Circuit Judges*.

LEE, *Circuit Judge*. Dr. John Insall, an orthopedic surgeon who specialized in knee reconstruction and replacement, developed and obtained a number of valuable foreign and domestic patents involving knee replacement devices and accoutrements that he licensed to Zimmer Biomet Holdings, Inc. In exchange, Zimmer agreed to pay substantial royalties to Insall (which, upon his death, Zimmer paid to his Estate). After Insall's last patent expired in 2018, Zimmer stopped all

royalty payments, asserting that its obligation under the royalty agreement had expired. The parties submitted the dispute to arbitration as required by the agreement, and the Estate prevailed. Zimmer then asked the district court to vacate the arbitration award, arguing that enforcement of the contract would violate public policy. The district court rejected this argument and confirmed the award. We agree and affirm.

**I. Factual Background**

As a medical device company, Zimmer manufactures a variety of products, including technology used for knee replacements. Zimmer joined forces with Insall in 1991 to develop certain knee replacement devices and related appurtenances ultimately sold under the brand name "NexGen." Under this plan, Insall would develop and secure patents for these devices, and Zimmer would pay royalties to Insall for the right to license, market, and sell them. This arrangement was memorialized in a written agreement in 1991. It required Zimmer to make royalty payments to Insall until "the expiration of the last to expire of the patents licensed hereunder or so long as Product is sold by ZIMMER, whichever is last to occur."

The parties amended the agreement in 1994. Among other things, Insall promised to work exclusively for Zimmer through January 1, 2011. The parties also agreed to expand the scope of the agreement from the particular knee replacement system identified in the 1991 agreement to "the design and development of all components of any future knee system that is developed in whole or in part in the United States and offered as a standard line product for Zimmer." As for the royalty payments, they were to encompass Insall's work on "future knee systems" until "the expiration of the last to expire of the Patents licensed hereunder or on January 1, 2011,

whichever is last to occur." The parties also added an arbitration provision that required all disputes arising out of or related to the agreement to be submitted for binding arbitration.

Portions of the agreement were amended again in 1998. Relevant here, the amended agreement provided:

> The parties acknowledge that … royalties shall be paid at the rate of 1% of Net Sales Price on all sales of the NexGen Knee and all subsequently developed articles, devices or components marketed by Zimmer as part of the NexGen Knee family of knee components and not at the rate provided for sales of "future knee systems."

In a previous arbitration between the parties (referred to as the Persona Arbitration, named after the technology at issue in that dispute), Zimmer's counsel explained that the 1998 amendments changed the method by which royalties were to be calculated. Rather than being based on the sale of products containing the patented technology, the royalties under the 1998 agreement were based on the sale of items that Zimmer marketed under its "NexGen Knee" family of products. The arbitration provision remained unchanged.

Insall's last patent expired on March 10, 2018, and Zimmer's chief patent counsel informed the Estate a few months later that the company would no longer pay royalties to the Estate. By way of explanation, Zimmer asserted that under the Supreme Court decisions *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), and *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015), a licensor may not collect royalties based on an expired patent. In its view, the payment of ongoing royalties under

the amended agreement ran "counter to the policy and purpose of patent laws."

Unsurprisingly, the Estate disagreed, and the parties submitted the dispute for arbitration in late 2019. In a detailed decision, the arbitration panel concluded that *Brulotte* did not render the royalty provision in the 1998 agreement void and unenforceable. As such, the panel found that Zimmer had breached its obligations to pay royalties to the Estate, ordered Zimmer to pay past-due royalties, and affirmed Zimmer's obligation to pay royalties to the Estate in accordance with the 1998 agreement.

Zimmer then initiated this lawsuit and asked the district court to vacate the award. The Estate responded with a motion to dismiss and moved the district court to confirm the arbitration award. The district court agreed with the Estate and confirmed the arbitration award. This appeal followed.

## II. Scope of Review

### A. Standard of Review

We review a district court's decision on a motion to vacate or confirm an arbitration award under the Federal Arbitration Act (FAA) *de novo*. *Webster v. A.T. Kearney, Inc.*, 507 F.3d 568, 571 (7th Cir. 2007). Factual findings are reviewed for clear error. *Kinsella v. Baker Hughes Oilfield Operations, LLC*, 66 F.4th 1099, 1103 (7th Cir. 2023).

We begin by emphasizing that the FAA and Supreme Court precedent establish that "arbitration awards are largely immune from … scrutiny in court." *Nano Gas Techs., Inc. v. Roe*, 31 F.4th 1028, 1031 (7th Cir. 2022) (cleaned up). The breadth of our review is "extremely limited." *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 959

F.2d 685, 687 (7th Cir. 1992). We may not reconsider the merits of an award even when a party argues that the arbitrators made a factual error or even a legal one when interpreting a contract. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987).

There is, however, a narrow exception to our tightly proscribed review. As discussed more below, "[t]he public policy doctrine allows this court to decide *de novo* whether [the award at issue] violates public policy." *Chrysler Motors*, 959 F.2d at 687 (cleaned up).

**B. The Federal Arbitration Act**

Arbitration aims to resolve disputes more efficiently and at a lower cost than traditional litigation. *See* Sarah Rudolph Cole, *Curbing the Runaway Arbitrator in Commercial Arbitration: Making Exceeding the Powers Count*, 68 Ala. L. Rev. 179, 184 (2016). In exchange for expediency and finality, however, parties trade the right to challenge the substance of the decision-maker's ruling; as a result, judicial review of arbitral awards is extremely limited and highly deferential. *See Affymax, Inc. v. Ortho-McNeil-Janssen Pharms., Inc.*, 660 F.3d 281, 285 (7th Cir. 2011) (citing *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504 (2001)).

The FAA authorizes a court to vacate an award for only four reasons:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Congress statutorily constrained the grounds for vacatur to these reasons, and courts may not expand them. *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584–89 (2008) (noting also that limited judicial review of arbitration awards is "needed to maintain arbitration's essential virtue of resolving disputes straightaway"). Furthermore, Section 10(a) has been understood to reflect a congressional focus on procedural protections rather than ensuring the correct outcome. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985) ("The legislative history of the Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate."); *see Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1194–95 (7th Cir. 1987) (the question before us "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract").

### C. Public Policy Exception

That said, the power of federal courts to enforce contracts is at all times "subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents." *Hurd v. Hodge*, 334 U.S. 24, 35 (1948). And where enforcement of private agreements would violate public policy, "it is the obligation of courts to refrain from such exertions of judicial power." *Id.* The Supreme Court has explicitly applied this principle to agreements to arbitrate. In doing so, the Court has been clear that if a contract—as interpreted by the arbitrators—and the accompanying remedy or relief violate some explicit public policy, "we are obliged to refrain from enforcing" the arbitration award. *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983). Not any policy will do, however. To trigger this exception, a policy "must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Chrysler Moto*rs, 959 F.2d at 687 (cleaned up).

Despite our limited authority to review arbitration awards, then, "[t]he question of public policy is ultimately one for resolution by the courts." *W.R. Grace*, 461 U.S. at 766. Here, Zimmer invokes this exception, arguing that the arbitration panel's interpretation of the agreement and resulting award of royalties must be voided as a matter of public policy.

Before proceeding, however, we need to address the Estate's threshold contention that the public policy exception to the enforcement of arbitration awards is limited to disputes involving collective bargaining agreements. While this issue

certainly arises regularly in those types of cases, we have never cabined the doctrine to the arbitration of labor disputes. Indeed, we have considered the public policy exception to the enforcement of arbitration awards in other contexts. *See, e.g.*, *In re Harshaw*, 26 F.4th 768, 775 (7th Cir. 2022). And this makes sense given that the doctrine "derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act." *United Paperworkers Int'l Union*, 484 U.S. at 42; *see also W.R. Grace*, 461 U.S. at 766 ("As with *any contract*, however, a court may not enforce a collective bargaining agreement that is contrary to public policy.") (emphasis added). Thus, neither precedent nor the FAA supports the Estate's view that the public policy exception can apply only to arbitration awards in labor disputes. With that, we proceed to the main topic at hand.

## III. Analysis

### A. The Arbitration Award

On appeal, Zimmer urges us to vacate the arbitration award because it violates the public policy the Supreme Court laid out in *Brulotte* and *Kimble*. In evaluating whether an arbitration award violates public policy, we are bound by the arbitrators' interpretation of the contract. *W.R. Grace*, 461 U.S. at 766. As such, we examine the interpretive questions put to the arbitration panel and the panel's conclusions. We then ask whether the contract—as interpreted by the arbitration panel—and the arbitration award violate public policy. But first we examine *Brulotte* and *Kimble*.

In *Brulotte*, the plaintiff owned several patents for certain hop-picking machines. 379 U.S. 29, 29–30 (1964). He manufactured the machines and sold them to farmers, along with

licenses to use them. In return, the farmers agreed to pay the plaintiff royalties from the crops they harvested during the life of the license agreements. The patents, however, expired before the end date of the agreements, and the farmers refused to make any royalty payments on the grounds that the plaintiff had misused the patents by requiring royalties after their expiration. In the end, the Supreme Court agreed, holding that the license agreements were unenforceable and "unlawful per se" to the extent they provided for the payment of royalties "accru[ing] after the last of the patents incorporated into the machines had expired." *Id.* at 30, 32.

Over the years, the reasoning in *Brulotte* has faced much criticism from courts and academics alike. *See Scheiber v. Dolby Lab'ys, Inc.*, 293 F.3d 1014, 1017–18 (7th Cir. 2002) (reviewing the cases and academic writings critical of *Brulotte*). And we took part in the growing chorus. *Id.* at 1017 (noting that *Brulotte* has been "severely, and as it seems to us, with all due respect, justly, criticized"). This was the landscape the Supreme Court encountered when it contemplated overruling *Brulotte* in *Kimble*.

In that case, the inventor Kimble had obtained a patent on a toy that children used to shoot web-like foam string to role-play as "a spider-person" (this is the word the patent used). Not surprisingly, Marvel Entertainment, LLC (the publisher of the Spider-Man graphic novels and owner of the mark) was none too happy. It sued Kimble, and the parties eventually entered into a settlement agreement. In it, Marvel agreed to purchase the patent from Kimble in exchange for a lump sum and a three percent royalty on future sales of the toy, with no termination date.

As the patent's expiration approached, Marvel sought a declaratory judgment that it could stop making the royalty payments to Kimble once the patent became inviable, relying on *Brulotte*. In response, citing the criticism of *Brulotte*, Kimble asked that *Brulotte* be overruled. The Supreme Court, however, did not find Kimble's criticism of *Brulotte* on economic efficiency grounds particularly persuasive, noting that contracting parties "can often find ways around *Brulotte* to achieve those same ends." *Kimble*, 576 U.S. at 453. On the other hand, the Court stated, the important aims of *stare decisis* counseled upholding *Brulotte*, and to the extent that Kimble disagreed with its holding as a matter of policy, he was better off addressing his complaints to Congress.

Significantly, however, the Supreme Court took the opportunity to clarify *Brulotte*'s scope. First, it observed that "all the decision [*i.e., Brulotte*] bars are royalties for using an invention after it has moved into the public domain." *Id.* at 453–54. Second, it explained that, even under *Brulotte*, "post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent." *Id.* at 454.

What does this mean for our case? In the arbitration, Zimmer argued that it need not pay any royalties to Insall's Estate because the basis for the royalties—the patents—had expired. But this argument presupposes that the royalties were, in fact, based on the rights the patents bestowed and not some "non-patent right" that is "closely related to" the patents. Thus, the main question the arbitration panel had to decide is whether the royalties Zimmer promised in the agreement and its amendments were based on the patents themselves or a closely related non-patent right.

Tackling this head-on, the arbitrators examined and interpreted each iteration of the contract. The panel first agreed with Zimmer that *Brulotte* applied to the royalty provision in the 1991 agreement. But the panel went on to find that the 1998 amendments created a different royalty regime:

> What the parties contemplated in 1991 and Dr. Insall's imputed leverage were superseded by events and a new basis for determining royalties in 1998, as Zimmer strenuously and successfully maintained in the Persona Arbitration. Article IV's Royalties provision from 1991 was not deleted (cf., 1998 Secs. 3 and 11). Under 1998 Sec. 3, however, it became vestigial, replaced by a new royalty provision *untied and no longer dependent on Insall's patents, products, or technology*. The 1998 Agreement text separates Insall's royalty rights from anything based on patents or technology. Zimmer obtained the new royalty provision it sought superseding the 1991 "hybrid" license. Nothing remained that mixed patent/non-patent royalties.

(emphasis provided).

Along the way, it relied on statements by Zimmer's own witnesses in the Persona Arbitration as well as Zimmer's counsel, who stated in his closing argument that the 1998 amendment "changed the structure, changed the royalty payment determination from one based on products having Insall's technology in them as it was in '91 and '94 to a[n] [sic] is it marketed based as [sic] NexGen determination." The royalty in the 1998 amendments, counsel continued, became "a marketing and branding based determination" and gave

Insall "royalty on components he doesn't have any technology in or any involvement in."

On appeal, Zimmer disagrees with the arbitration panel's conclusions and argues that, although the parties changed *how* the royalties were calculated, they never changed *why* they were paid in the first place. But we are not here to judge whether the panel's determination was correct. As we have recently emphasized, "[a]n arbitration clause delegates interpretive power to the arbitrators. We do not ask whether they read the contractual language *correctly*; it is enough that they tried to apply the contract that the parties signed." *Am. Zurich Ins. Co. v. Sun Holdings, Inc.*, 103 F.4th 475, 477 (7th Cir. 2024). Here, whether the 1998 amendment untethered the royalties from the patents was a question of interpretation reserved for the arbitrators. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). And, after examining the agreement and its amendments, the arbitration panel's conclusion was clear—the 1998 amendments controlled, and the royalty terms were no longer premised on the patents or the technology they covered.

Our only remaining task, then, is to decide whether the royalty provision in the 1998 agreement, as the arbitration panel construed it, violates a well-defined and dominant public policy.

### B. Well-Defined and Dominant Public Policy

Despite the deference arbitral decisions demand, we nevertheless must vacate an arbitration award if the remedy or relief violates an explicit, well-defined, and dominant public policy. *W.R. Grace*, 461 U.S. at 766. Whether a policy meets those criteria must be decided based on "laws and legal

precedents and not from general considerations of supposed public interests." *Muschany v. United States*, 324 U.S. 49, 66 (1945). An arbitral award most clearly violates public policy when it creates an explicit conflict with statutory laws or well-established and easily discernible precedent. *Titan Tire Corp. of Freeport v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 734 F.3d 708, 716 (7th Cir. 2013) ("A violation of a statute or some other positive law is the clearest example of a violation of public policy and no arbitrator is entitled to direct a violation of positive law.") (cleaned up).

Zimmer contends that *Brulotte* and *Kimble* established a dominant and well-defined public policy that a party may not be compensated for patent rights after the patent's expiration. But we need not decide this question, because the arbitration award here must be confirmed even if Zimmer's assessment is correct.

Assuming, for argument's sake, that *Brulotte* and *Kimble* announced a clear public policy that royalties tied to patent rights are unenforceable after the patent's expiration, Zimmer has no path to victory. After interpreting the parties' license agreement and its amendments, the panel determined that the royalty payments in question were *not* grounded in any patent rights and, thus, did not offend *Brulotte* and *Kimble*. We have no power to unwind that holding here.

## IV. Conclusion

For these reasons, we AFFIRM the district court and confirm the arbitration award in favor of Insall's Estate.