

Brian T. Burgess
+1 202 346 4215
BBurgess@goodwinlaw.com

Goodwin Procter LLP
1900 N Street NW
Washington, DC 20036

goodwinlaw.com
+1 202 346 4000

February 5, 2025


<u>**SUBMITTED VIA ECF**</u>

Jarrett B. Perlow
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439
(202) 275-8000


Re:  *Acorda Therapeutics, Inc. v. Alkermes PLC*, **Case No. 2023-2374**

Dear Mr. Perlow:

Appellee Alkermes writes to submit *Lavery v. Pursuant Health*, No. 24-1329 (6th Circuit Jan. 24, 2025) and *C.R. Bard, Inc. v. Atrium Medical Corp.*, No. 23-16020 (9th Cir. Aug. 23, 2024), two additional decisions holding that issues arising under *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), cannot support Federal Circuit jurisdiction.  These decisions are the latest in an unbroken line of circuit precedent confirming that Acorda's appeal properly lies in the Second Circuit.

*Lavery* involved whether a "contract improperly sought post-expiration royalties" where it did not indicate that "the royalty covered anything other than [the] patent."  Ex. A at 8.  Before reaching the merits, the Sixth Circuit confirmed that it had jurisdiction, explaining that the patentee's "contract claim does not arise under federal patent law," but instead "turns on state law and requires the courts to decide only whether the relevant contracts create a royalty that extends beyond the 20-year expiration date."  *Id.* at 4.  The court continued:  "Although the contract claim concerns the business value of a patent, it does not turn on its validity, infringement of it, or any other patent-law centric dispute … Because [the patentee's] claims involve state law from start to finish and because they do not turn on the meaning of patent law, they do not arise under patent law."  *Id.*

*C.R. Bard* is of a piece.  The Ninth Circuit addressed whether an agreement violated *Brulotte* by requiring certain minimum royalty payments after patent expiration.  Ex. B at 1.  The court first held that it had jurisdiction, explaining that the claims arose "under state law, not federal patent law," meaning "appellate jurisdiction does not lie with the Federal Circuit."  *Id.* at 7 n.3.

These decisions further confirm that a *Brulotte* challenge does not raise a substantial question of patent law.  Indeed, as Alkermes explained in a prior Rule 28(j) submission (ECF No. 56), Acorda has an even weaker claim to Federal Circuit jurisdiction here given the arbitral overlay because the question presented—whether the Tribunal's arbitral decision is minimally reasonable—is further attenuated from a substantial question of patent law.



Respectfully submitted,

_/s/ Brian T. Burgess_
Brian T. Burgess

# EXHIBIT A

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KEVIN T. LAVERY,

                      *Plaintiff-Appellant*,

      *v.*

PURSUANT HEALTH, INC.,

                  *Defendant-Appellee*.

No. 24-1329

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:22-cv-10613—Jonathan J.C. Grey, District Judge.

Argued: December 12, 2024

Decided and Filed: January 24, 2025

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

---

## COUNSEL

**ARGUED:** Bradley L. Smith, ENDURANCE LAW GROUP PLC, Jackson, Michigan, for Appellant. Adam H. Charnes, KILPATRICK TOWNSEND & STOCKTON LLP, Dallas, Texas, for Appellee. **ON BRIEF:** Bradley L. Smith, ENDURANCE LAW GROUP PLC, Jackson, Michigan, for Appellant. Adam H. Charnes, KILPATRICK TOWNSEND & STOCKTON LLP, Dallas, Texas, Joel D. Bush, II, Bennett T. Richardson, KILPATRICK TOWNSEND & STOCKTON LLP, Atlanta, Georgia, for Appellee.

---

## OPINION

---

SUTTON, Chief Judge. Kevin Lavery invented a vision screening device and contracted with Pursuant Health, a company that makes vision screening kiosks, to sell it. He transferred



his patent to the company in exchange for royalties on its kiosk sales.  When Lavery's patent expired and Pursuant Health stopped paying him, he sued.  The district court ruled that the expiration of his patent made the royalty unenforceable and granted summary judgment to Pursuant Health.  We affirm.

I.

Kevin Lavery, M.D., ophthalmologist, added inventor to his name in 2001.  He created an "automatic medical test apparatus" that could perform vision tests on patients and transmit the results to offsite doctors.  R.30-5 at 2.  He obtained a patent for the device.

Meanwhile, Bart Foster had been working with his employer, a Novartis subsidiary, to develop EyeSite, a kiosk that would allow people to test their vision at Walmart and other big-box stores around the country.  In 2004, Foster applied for, and eventually received, a patent for his kiosk concept and sought to create a new company to pursue the project.  Because his employer (Novartis) owned the rights to his patent application, Foster looked for a way to encourage Novartis to transfer the pending patent rights to him and his venture.

Enter Lavery and his patented device.  Novartis's attorney told Foster about Lavery's patent after conducting due diligence on its kiosk plans.  Foster hoped that, if he could acquire the rights to Lavery's issued patent, Novartis would agree to transfer to him the rights to his own pending patent.

Foster was right.  Foster and Lavery signed a letter of intent in June 2007 indicating that they had reached an agreement for Lavery to transfer his patent to a new company that Foster intended to form.  Novartis eventually sold Foster the patent rights to the kiosk, and Foster set up his venture, eventually called Pursuant Health, on October 1, 2007.  That prompted Foster and his venture to finalize an agreement with Lavery.

On October 11, 2007, Lavery formally agreed to transfer his patent rights to Pursuant Health.  Lavery signed three agreements in total:  (1) a Letter of Intent with Pursuant Health that memorialized the terms of their exchange, including transfer of stock in Pursuant Health to Lavery; (2) a Contribution Agreement that gave Pursuant Health rights to his "Intellectual

Property" in exchange for a 1% cut on domestic sales of its "vision screening kiosks and any derivative or complementary applications," to be bumped to 3% if Pursuant Health sold kiosks with retinal cameras, R.30-8 at 3 (§ 1.2(a), (e)); and (3) a Consulting Agreement that made Lavery the Chief Medical Officer of Pursuant Health and permitted him to supply services for a fee.

The arrangement apparently worked for several years. In 2008, the new company set up the first kiosk in a Walmart in Georgia. More kiosks followed. As Pursuant Health sold kiosks around the country, it paid Lavery his promised royalty. Through 2021, Lavery received around $708,000 in royalties.

Patents do not last forever, however. When Lavery's 20-year patent expired in May 2021, Pursuant Health stopped paying the royalty. Lavery filed this state-law diversity action in federal court, seeking a declaration that the 1% royalty did not have a time limit, damages for breach of the Contribution Agreement, and damages for unjust enrichment. As relevant here, Pursuant Health raised two defenses. The first was that the Contribution Agreement provided for royalties only during the 20-year lifespan of Lavery's patent under the defined "Term" of the Agreement. The second was that, even if the Agreement provided for royalties after the patent's expiration, the patent's expiration rendered the royalty agreement void and unenforceable. Pursuant Health moved for summary judgment on the second ground. The district court granted Pursuant Health's motion. Lavery appeals, challenging only the grant of summary judgment on his claim that Pursuant Health breached the Contribution Agreement.

II.

Congress has made jurisdiction over patent disputes doubly exclusive. It permits them to be heard only at the outset in federal district court, not state court. "[D]istrict courts," Congress has directed, "shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents," and "[n]o State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a). Congress permits appeals from those district court decisions only to the Federal Circuit. Even though we ordinarily may review a district court's final order granting summary judgment in a diversity

action, *see id.* §§ 1291, 1332, that is not true of appeals in "any civil action arising under . . . any Act of Congress relating to patents" or an action involving a "compulsory counterclaim arising under" the same, *id.* § 1295(a)(1). In such cases, appellate jurisdiction lies exclusively with the Federal Circuit. *Id.*

In this instance, Pursuant Health does not raise any counterclaims. That leaves just one question: Does Lavery's state-law contract claim arise under federal patent law? *See id.* Two possibilities for arising-under jurisdiction exist. The most obvious occurs when patent law creates the plaintiff's cause of action. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808–09 (1988). The other possibility occurs when state law creates the cause of action but the claim, as pleaded by the plaintiff, turns on a disputed and substantial patent issue. *Id.* at 809; *see Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Lavery's contract claim does not arise under federal patent law. The claim turns on state law and requires the courts to decide only whether the relevant contracts create a royalty that extends beyond the 20-year expiration date. *See Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024). Although the contract claim concerns the business value of a patent, it does not turn on its validity, infringement of it, or any other patent-law-centric dispute. *See Lab'y Corp. of Am. Holdings v. Metabolite Lab'ys, Inc.*, 599 F.3d 1277, 1284 (Fed. Cir. 2010); *see also Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 37 F.4th 1357, 1362 n.2 (8th Cir. 2022). The same is true for Lavery's unjust enrichment claim. It asks only whether a contract controls the parties' relationship and, if not, whether Pursuant Health unjustly retained benefits owed to Lavery. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009). Because Lavery's claims involve state law from start to finish and because they do not turn on the meaning of patent law, they do not arise under patent law.

Pursuant Health's invocation of the 20-year patent bar raises an affirmative defense that does not eliminate our jurisdiction. While Congress vests exclusive jurisdiction in the Federal Circuit over cases with compulsory patent counterclaims, 28 U.S.C. § 1295(a)(1), it has not done the same for affirmative defenses, *see* Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 19(b), 125 Stat. 284, 331–32 (2011). We cannot lightly assume that Congress "silently abrogated," *Kelly v. Robinson*, 479 U.S. 36, 47 (1986), the century-old rule that defenses do not

generate "arising under" jurisdiction, *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152–53 (1908); *see also Wesley Corp. v. Zoom T.V. Prods.*, 749 F. App'x 449, 450 (6th Cir. 2019) (order).  The Ninth and Federal Circuits agree that 28 U.S.C. § 1295(a) applies only to patent counterclaims, not affirmative defenses.  *C.R. Bard, Inc. v. Atrium Med. Corp.*, 112 F.4th 1182, 1188 n.3 (9th Cir. 2024) (per curiam); *Xitronix Corp. v. KLA-Tencor Corp.*, 882 F.3d 1075, 1076 (Fed. Cir. 2018).  No circuit has ruled to the contrary to our knowledge.

That leaves Lavery, the claimant, largely in charge of whether to invite or "avoid . . . jurisdiction" in this case.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913).  Lavery chose to bring state law claims, neither of which turns on patent law.

The two key Supreme Court cases at issue in this case reinforce our conclusion that we have jurisdiction over this dispute.  *Brulotte v. Thys Co.* involved an appeal from the Washington Supreme Court, not from a federal court.  379 U.S. 29, 30 (1964).  By 1964, Congress's prohibition on state courts handling patent disputes had been in place for around 90 years.  Title XIII, Rev. Stat. § 711 (1874); *see also* Pub. L. No. 80-773, § 1338, 62 Stat. 869, 931 (1948).  And *Kimble v. Marvel Entertainment, LLC*, involved an appeal from the Ninth Circuit, not from the Federal Circuit.  576 U.S. 446, 450–51 (2015).  By 2015, Congress's vesting of exclusive jurisdiction over patent appeals in the Federal Circuit had been in place for 33 years.  Pub. L. No. 97-164, § 127(a), 96 Stat. 25, 37 (1982).  Neither party to today's case disputes this conclusion.  We have jurisdiction over this appeal.

III.

At stake on the merits is whether the 20-year limit on this patent rendered the parties' royalty provision unenforceable in 2021.  As the proponent of this defense, Pursuant Health bears the burden of proving it.  *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008).  We give fresh review to the district court's summary judgment decision and draw all reasonable factual inferences in Lavery's favor.  *See Peffer v. Stephens*, 880 F.3d 256, 260, 262 (6th Cir. 2018).

A.

Patents give their holders certain rights over the patented invention. They may make, use, or sell the invention and exclude others from doing the same. And they may sell or license those rights for royalty payments. At the same time that the Constitution and Congress create these rights, they also limit them. The Constitution empowers Congress to grant inventors exclusivity only for a "limited Time[]," U.S. Const. art. I, § 8, cl. 8, which Congress currently sets at 20 years, 35 U.S.C. § 154(a)(2). When that time runs out, the patent expires, and the public may freely use the invention. Any attempt by the inventor to extend his monopoly after the limited term of exclusivity "runs counter to the policy and purposes of the patent laws." *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945).

*Brulotte* and *Kimble* illustrate how this principle works. In *Brulotte*, an inventor licensed his patented hop-picking machine to farmers in exchange for "a minimum royalty of $500 for each hop-picking season or $3.33 1/3 per 200 pounds of dried hops harvested by the machine, whichever is greater." 379 U.S. at 29. The machine incorporated seven of the inventor's patents, all of which expired before the licenses. *Id.* at 30. When the farmers refused to pay the required royalties, the inventor sued. *Id.* The Court declined to enforce the royalty provision after the patents expired. *Id.* By requiring the same payment "for use during [the post-expiration] period," the Court explained, the inventor impermissibly "project[ed] [his] monopoly beyond the patent period." *Id.* at 31–32, 34. That, the Court held, was "unlawful per se." *Id.* at 32.

In *Kimble*, the Court rejected an effort to overrule *Brulotte* and clarified how the underlying principle works in practice. As to the limit on royalties, *Kimble* explained, a "court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." 576 U.S. at 459. In applying this rule, *Kimble* offered several legitimate ways in which contracting parties retain flexibility to arrange their post-expiration affairs. *Id.* at 453. Licensees might "defer payments for pre-expiration use of a patent into the post-expiration period." *Id.* Or they might embrace "business arrangements other than royalties," such as sales with respect to trade secrets or other non-patent property. *Id.* at 454. If inventors contributed non-patent rights, they could ask for, say, "a 5% royalty during the patent

period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." *Id.* And if the inventors contributed multiple patents, royalties might "run until the latest-running patent covered in the parties' agreement expires." *Id.*

### B.

In applying this test, we start with the most relevant contract: the Contribution Agreement. On one side of the deal, Lavery contributed to the company "Intellectual Property" as described in Exhibit B. R.30-8 at 2 (Contribution Agreement Recital A). In full, Exhibit B refers to Lavery's "U.S. Patent No. 6,594,607 (the '<u>Patent</u>')," and "All proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent." R.30-8 at Ex. B.

On the other side of the deal, Lavery received an equity interest in the company and a royalty. Here's what the royalty provision says about Pursuant Health's obligations:

> [It] agree[d] to pay Lavery, or his assignee, a perpetual royalty (the "<u>Royalty</u>"), on a quarterly basis, of one percent (1%) (the "<u>Royalty Percentage</u>") of the Company's Net Domestic Sales of Products for the prior quarter; <u>provided</u>, that at the time that the Company first receives Net Domestic Sales from Retinal Camera Products, the Royalty Percentage shall be increased to three percent (3%) for the remainder of the Term[] . . . .

R.30-8 at 3 (Contribution Agreement § 1.2(a)). "Products," defined a few subsections down, are "vision screening kiosks and any derivative or complementary applications." R.30-8 at 3 (§ 1.2(e)).

A few features of this language and the arrangement between the parties stand out. The Contribution Agreement calls this a "perpetual royalty," and the parties on appeal do not identify any language in this contract or any other between the parties that contains an end date for this royalty payment. By its terms, the key contract thus extends well beyond the 20-year expiration date of Lavery's patent.

At the same time, the relevant contracts do not specifically identify any non-patent contributions, whether trade secrets or something else, that this royalty covers. From the Letter of Intent to the Contribution Agreement, the only specific form of intellectual property that

Lavery contributed to the company at the time of the Contribution Agreement was the patent. While inventors remain free to seek compensation for non-patent rights that extend beyond a patent's expiration date, *see Kimble*, 576 U.S. at 454, they must identify them in the contract. In this instance, however, the contract does not contain any cognizable indication that the royalty covered anything other than Lavery's patent.

The royalty base confirms this conclusion. It turns on the number of kiosks sold, each of which incorporated Lavery's patent. The patent sets Lavery's invention in broad terms. It "is an apparatus and method for conducting a medical screening test on a user patient," R.30-5 at 5, including retinal, glucose, blood pressure, and pulmonary tests. The patent covers twelve different types of claims concerning the "medical screening apparatus," which the patent provides can be housed in a "kiosk," run "fully automated test[s]" when prompted by patients, and "transmit[] the test" for offsite analysis. R.30-5 at 5–7. And it covers six different claims concerning methods "for executing a medical test on a user patient" with the apparatus. R.30-5 at 7. By making clear that the coin of the realm was a vision screening kiosk, by calculating the royalty based on the number of kiosks sold, by providing for the sale of kiosks that all incorporated the patent, and by permitting the royalty to extend beyond the patent's expiration date, the contract improperly sought post-expiration royalties.

The royalty's tiered structure points in the same direction. The 1% and 3% royalty rates both turn on patented rights. The contract sets the lower royalty rate as the default and jumps to 3% if Pursuant Health equips its kiosks with retinal cameras, one of the many features of Lavery's patent. Because both royalties turn on sales of kiosks that use the patent, they do not fall within the exception for offering a second rate for non-patented intellectual property—say a lower rate after the patent expires. *Kimble*, 576 U.S. at 454.

By every measure that counts, Pursuant Health and Lavery agreed to a 1% and 3% royalty for use of Lavery's patent. Now that Lavery's patent has ended, he may no longer receive either cut.

Lavery resists this conclusion from multiple directions. He claims that the 1% royalty survives because it amounts to deferred compensation or is part of a joint venture. The first

problem with these contentions is that Lavery did not raise them below. The second problem is that there is no evidence in the three agreements that supports this claim. In particular, the Contribution Agreement says nothing about the royalty amounting to a form of deferred compensation or serving the interests of a joint venture. And, notably, it conveys all of the intellectual property that prompted the contract. To repeat, it says: "U.S. Patent No. 6,594,607 (the '<u>Patent</u>')" and "All proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent." R.30-8 at Ex. B. While *Kimble* leaves inventors with plenty of options to defer compensation or to compensate an inventor for non-patent property, it does not permit courts to re-write a contract to create a form of compensation not identified in it.

Lavery points out that the Contribution Agreement covers "trade secrets" as well as the patent. In the abstract and in the context of a different contract, that might well be a powerful argument. *See Kimble*, 576 U.S. at 454 ("[P]ost-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent."). But Lavery does not identify any trade secret in the relevant contracts separate from the patented intellectual property, thereby depriving this argument of any traction.

Lavery turns to three cases from our sister circuits for support. But none of them advances his claim. One of them, *Zimmer Biomet Holdings, Inc. v. Insall*, concerned an arbitration award that upheld post-expiration compensation. 108 F.4th 512, 519–20 (7th Cir. 2024). But as the Seventh Circuit correctly observed, it had "no power to unwind" the arbitration panel's decision because it turned on "a question of interpretation" of the contract "reserved for the arbitrators." *Id.*

*C.R. Bard, Inc. v. Atrium Medical Corp.* does not advance Lavery's position either. 112 F.4th 1182 (9th Cir. 2024). It involved a contract that "unambiguously" provided for royalties on sales of patented products only until the patent expired. *Id.* at 1192. The Ninth Circuit thus had no occasion to explain what should happen to Pursuant Health's distinct contract.

A similar conclusion applies to *Ares Trading S.A. v. Dyax Corp.* 114 F.4th 123 (3d Cir. 2024). In upholding that royalty, the Third Circuit reasoned that the royalty was "not calculated based on activity requiring postexpiration use of" the patents. *Id.* at 143. The contract in that case confirmed, and the licensee conceded, that "the definition of what products the royalty is owed on does not depend in any way on using" the patents and that any use of the patents occurred "entirely before expiration." *Id.* (quotation omitted). The *Ares* royalty, then, did not turn on use of the patents after their expiration. That simply is not the case here. Pursuant Health promised to pay Lavery a royalty on sales of "vision screening kiosks" that both parties agree use his patent. R.30-8 at 3 (§ 1.2(e)).

Lavery contends for the first time on appeal that the "record is silent on whether the parties believed any or all of [Pursuant Health's] early kiosks or later kiosks read on ('infringed') [his] patent claims." Reply Br. 14. But our inquiry turns on the objective meaning of the contract, not on what the parties subjectively believed after they signed the papers. At all events, Lavery's positions in the district court belie the ones he professes today. He stated several times that Pursuant Health is "currently using" his patent, R.31 at 4–5, 20, and that the royalty base "relates to [his] Patent rights," R.48 at 10. Pursuant Health, too, acknowledged that the royalty base is for "products covered by or related to" Lavery's patent. R.49 at 8.

We affirm.

# EXHIBIT B

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| C.R. BARD, INC., | No. 23-16020 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-00284-DGC |
| v. | |
| ATRIUM MEDICAL CORPORATION, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted July 9, 2024
San Francisco, California

Filed August 23, 2024

Before: Michelle T. Friedland, Salvador Mendoza, Jr., and
Roopali H. Desai, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

### Patent Law

The panel reversed the district court's judgment following a bench trial in favor of Atrium Medical Corporation on C.R. Bard, Inc.'s claim that Atrium breached its contract with Bard by failing to make certain minimum royalty payments due under a licensing agreement.

In *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), the Supreme Court held that patent holders may not contract for royalties on any use of a patented invention that occurs after the patent has expired. Clarifying the proper application of *Brulotte*, the panel held that a court must first use state law tools of contract interpretation to determine the parties' contractual obligations. Then, the court must separately ask whether those contractual obligations are permissible under *Brulotte*. To do so, the court asks only whether the contract provides for royalties on the use of a patented invention that occurs after the expiration of the patent.

Applying *Brulotte* to the parties' agreement, the panel held that the district court erred in concluding that a portion of the parties' agreement violated *Brulotte* in light of the subjective motivations of the parties during the course of their negotiations. The parties' agreement provides for U.S. royalties only through the expiration of the U.S. patent, so it does not constitute patent misuse under *Brulotte*. Accordingly, the panel reversed the district court's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

entry of judgment for Atrium on Bard's breach of contract claim.

The panel addressed the remaining issues in a concurrently filed memorandum disposition.

## COUNSEL

Brian R. Matsui (argued), Seth W. Lloyd, and Deanne E. Maynard, Morrison & Foerster LLP, Washington, D.C.; Diana L. Kim, Morrison & Foerster LLP, Palo Alto, California; Andrew Federhar and Jessica Gale, Spencer Fane LLP, Phoenix, Arizona; Steven C. Cherny, Quinn Emanuel Urquhart & Sullivan LLP, Boston, Massachusetts; Matthew A. Traupman, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; for Plaintiff-Appellant.

Christopher McArdle (argued), Wade G. Perrin, and Paul Tanck, Alston & Bird LLP, New York, New York; Charles W. Cox II, Alston & Bird LLP, Los Angeles, California; for Defendant-Appellee.

## OPINION

PER CURIAM:

Under the Supreme Court's decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), patent holders may not contract for royalties on any use of a patented invention that occurs after the patent has expired. The Court has declined to overrule *Brulotte*, explaining that the "decision is simplicity itself to apply" and that parties may "find ways around" its

prohibition. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 453, 459 (2015).

We now clarify the proper application of *Brulotte*. A court must first use the familiar state law tools of contract interpretation to determine the parties' contractual obligations. Factfinding may be required to determine the meaning of any ambiguous terms. Then, the court must separately ask whether those contractual obligations are permissible under *Brulotte*. To do so, the court asks only whether the contract provides for royalties on the use of a patented invention that occurs after the expiration of that patent. That question of law is a formal inquiry that does not depend on the parties' motivations, the course of their negotiations, or the consideration received by either party in exchange for the inclusion of a particular contractual term.

Here, the district court concluded that a portion of a licensing agreement violated *Brulotte* in light of the subjective motivations of the parties during the course of their negotiations. We conclude that the agreement at issue does not provide for royalties on post-expiration use of a patented invention, so we reverse.[1]

**I.**

C.R. Bard, Inc. ("Bard"), is a medical device company. Through a subsidiary, it held two patents on a type of vascular graft: one U.S. patent and one Canadian patent. Bard sued Atrium Medical Corporation ("Atrium") for patent infringement, and the two companies settled the suit in 2011 by entering into a licensing agreement. The terms of the agreement provided that Atrium would pay Bard a

---

[1] We address the other issues presented by this appeal in a concurrently filed memorandum disposition.

15% per-unit royalty on covered U.S. sales until the U.S. patent expired in 2019 and a 15% per-unit royalty on covered Canadian sales until the Canadian patent expired in 2024. The agreement also provided that "in no event will royalties for any calendar quarter of the Term[2] be less than" $3.75 million (equivalent to $15 million per year).

Sales of Atrium's "iCast" stent, which occurred only in the United States, were not initially subject to the per-unit royalties. The Food and Drug Administration ("FDA") had approved the iCast stent only for use in a patient's airway. But nearly all iCast sales were for off-label vascular uses. When the parties entered the license agreement, Atrium was preparing to seek FDA approval for vascular iCast uses, which it predicted would dramatically increase sales. The parties' agreement provided that, once such FDA approval was granted, the iCast stent would become subject to the 15% per-unit royalty, and the minimum royalty payments would terminate. The agreement also provided that the minimum royalty payments would terminate if the FDA were to "rescind[] its approval to market or sell" the iCast stent "for any and all indications previously approved."

Contrary to the parties' expectations, the FDA did not grant approval for vascular iCast uses until 2023, well after the U.S. patent expired in 2019. Because the per-unit royalties never exceeded the quarterly minimum royalty payments, Atrium only ever paid the minimum due under the agreement. Atrium stopped making the minimum royalty payments to Bard when the U.S. patent expired. Atrium

---

[2] The definition of "Term" stated: "This Agreement shall be effective as of the Effective Date and shall remain in full force and effect until the last to expire of all the patents included within the Licensed Patents, unless earlier terminated in accordance with its terms."

then paid only the per-unit royalties on Canadian sales, which were substantially smaller than the minimum royalties, for about two years. As the parties' dispute over the payments unfolded, Atrium ceased paying those per-unit royalties as well.

Bard sued Atrium in 2021. It alleged, as relevant here, that Atrium's failure to make the minimum royalty payments between the expiration of the U.S. patent in 2019 and the FDA's approval of iCast for vascular use in 2023 was a breach of contract. After discovery, the parties filed cross-motions for summary judgment. Atrium asserted that the minimum royalty provision was unenforceable after the expiration of the U.S. patent because it constituted patent misuse under *Brulotte*. The district court concluded that there was a factual dispute as to "the extent to which minimum royalties after August 2019 include[d] payments for use of the [U.S.] patent," precluding summary judgment on Bard's breach-of-contract claim.

The district court held a two-day bench trial. Five witnesses testified, largely about the negotiations between Bard and Atrium that led to their licensing agreement. The district court then issued findings of fact and conclusions of law. The district court found that the "clear and primary purpose of the minimum royalty provision was to compensate Bard for iCast sales" in the United States. In light of that purpose, the district court held that the minimum royalty provision constituted patent misuse after the expiration of the U.S. patent.

Bard timely appealed.

## II.

The district court exercised jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1291.**³**

We review de novo a district court's legal conclusions. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1061 (9th Cir. 2015).

## III.

We conclude that the minimum royalty provision does not constitute patent misuse under *Brulotte*. We first explain the controlling precedents. We then explain why application of the *Brulotte* rule is a question of law that we review de novo. Finally, we apply *Brulotte* to the parties' agreement.

## A.

The Constitution empowers Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Patent Act specifies the period after which a patent expires. 35 U.S.C. § 154(a)(2).

In *Brulotte*, the Supreme Court held that patent holders may not contract for royalties on the use of a patented invention that occurs after the patent has expired. 379 U.S.

---

³ The claims at issue in this case arise under state law, not federal patent law, so appellate jurisdiction does not lie with the Federal Circuit. *See* 28 U.S.C. § 1295(a)(1) (providing for exclusive Federal Circuit jurisdiction over appeals in "any civil action arising under . . . any Act of Congress relating to patents"). Atrium's patent-misuse defense does not affect the jurisdictional analysis. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (describing the well-pleaded complaint rule).

at 32. There, purchasers had each acquired a hop-picking machine in exchange for both a "flat sum" and a seasonal "license for its use." *Id.* at 29. The seasonal license payment was calculated as the greater of either "a minimum royalty of $500 for each hop-picking season or $3.33 1/3 per 200 pounds of dried hops harvested by the machine." *Id.* The licenses referred to twelve patents, seven of which "were incorporated into the machines." *Id.* at 30. "Of those seven all expired on or before 1957. But the licenses . . . continued for terms beyond that date." *Id.* The purchasers "refused to make royalty payments accruing . . . after the expiration of the patents." *Id.*

The Supreme Court held that "any attempted reservation or continuation in the patentee . . . after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Id.* at 31 (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)). The agreement was therefore invalid "insofar as it allow[ed] royalties to be collected which accrued after the last of the patents incorporated into the machines had expired." *Id.* The Court reasoned that "there is intrinsic evidence that the agreements were not designed" merely to "spread the payments for the use of the patent" over "a reasonable amount of time." *Id.* at 31 (quotation marks omitted). The Court explained that, because the licenses drew "no line between the term of the patent and the post-expiration period," the "contracts [were] . . . on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired" as for the period before the patents expired. *Id.* at 32.

The Court revisited the *Brulotte* rule in *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015). Acknowledging a "broad scholarly consensus" against the economic

assumptions made in *Brulotte*, *id.* at 461 (citing judicial and academic criticism), the Court nevertheless concluded that overruling *Brulotte* was not justified as a matter of *stare decisis*, *id.* at 465. The Court in *Kimble* explained in part that *Brulotte* "is simplicity itself to apply": "A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 459.

The Court in *Kimble* also emphasized the limits of the *Brulotte* rule, noting that "parties can often find ways around *Brulotte*." *Id.* at 453. Parties may, for example, "defer payments for pre-expiration use of a patent into the post-expiration period," because "all the decision bars are royalties for using an invention after it has moved into the public domain." *Id.* at 453–54. For instance, parties may agree to royalties "equal to 10% of sales during the 20-year patent term," paid over 40 years. *Id.* at 454. "[P]arties have still more options when a licensing agreement covers either multiple patents or additional non-patent rights. Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires." *Id.* And parties may agree to continuing royalties on non-patent rights that are "closely related to a patent," such as "a license involving both a patent and a trade secret" that sets "a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." *Id.*

We have applied *Brulotte* in two published opinions.**[4]**

---

[4] We cited *Brulotte* in an additional opinion, issued mere weeks after *Brulotte* was decided, but we simply noted that it was not applicable. *Atlas-Pac. Eng'g Co. v. Geo. W. Ashlock Co.*, 339 F.2d 288, 289 n.1 (9th Cir. 1964).

10 C.R. BARD, INC. V. ATRIUM MED. CORP.

  The first decision, *Zila, Inc. v. Tinnell*, 502 F.3d 1014 (9th Cir. 2007), concerned a licensing agreement for a herpes treatment. After applying for a patent, an inventor transferred his intellectual property to Zila in exchange for stock and a 5% perpetual royalty. *Id.* at 1017. Zila then secured several U.S. patents and one Canadian patent. *Id.* Zila ultimately stopped paying royalties to the inventor, invoking the *Brulotte* rule. *Id.* at 1018.

  We noted the "unconvincing" economic basis of *Brulotte* and stated that "our task is not to expand *Brulotte*'s holding." *Id.* at 1019–20. We first held that *Brulotte* had no effect on Zila's obligation to pay royalties for use of the Canadian patent because *Brulotte* does not "extend its royalty-canceling powers to contracts for foreign patents." *Id.* at 1023. We then held that *Brulotte* prohibited U.S. royalties after the expiration of the final U.S. patent, and we remanded for the district court to resolve a factual dispute related to whether the final U.S. patent had already expired. *Id.* at 1025–27.

  We again applied *Brulotte* in *Kimble v. Marvel Enterprises Inc.*, 727 F.3d 856 (9th Cir. 2013), *aff'd sub nom. Kimble*, 576 U.S. at 465.[5] We considered a licensing agreement for a toy that allowed a user to "mimic[] Spider-Man's web-shooting abilities with foam string." *Id.* at 857–

---

[5] In reviewing our court's judgment in *Kimble*, the Supreme Court considered only whether to overrule *Brulotte*. 576 U.S. at 449. The Supreme Court declined to do so and therefore affirmed our court's judgment. *Id.* at 465. Our opinion in *Kimble* remains binding circuit precedent because the judgment was left undisturbed and because the Supreme Court's decision was in no way irreconcilable with our analysis. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that circuit precedent remains binding unless it is "clearly irreconcilable" with an intervening Supreme Court decision).

58. Kimble, the patent-holder, settled an infringement and breach of contract lawsuit with Marvel, which had been selling a "Web Blaster." *Id.* at 858. The terms of the settlement agreement provided that Marvel would purchase the patent from Kimble in exchange for a lump sum and an ongoing royalty of 3% on both "product sales that would infringe the Patent . . . as well as sales of the Web Blaster product." *Id.* at 858–59.

We stated that, under *Brulotte*, royalties on sales of a product that embodies both a patented invention and a non-patent right (such as a trade secret) must "provide[] a discount for the non-patent rights from the patent-protected rate" after the patent expires. *Id.* at 863. "This is because—in the absence of a discount or other clear indication that the license was in no way subject to patent leverage—we presume that the post-expiration royalty payments are for the then-current patent use, which is an improper extension of the patent monopoly under *Brulotte*." *Id.* at 863–64.

We concluded that the agreement's post-expiration royalties were barred by *Brulotte*. We noted that the 3% royalty did not decrease upon expiration of the patent and applied to "both patent and Web Blaster rights, with no discount or other clear indication that the Web Blaster royalties were not subject to patent leverage." *Id.* at 864. We rejected the idea that there were two separate royalties, one for patent rights and one for the Web Blaster product, explaining that the parties' agreement referred both to patent rights and to the Web Blaster product only because litigation over whether the product actually infringed the patent was ongoing at the time of the settlement. *Id.* We concluded that "the rights were intertwined and [could not] be separated in any principled manner." *Id.* We therefore rejected the argument that the case fell outside *Brulotte* because it

concerned a "'hybrid' *agreement*, that coincidentally included both patent and non-patent rights, as opposed to a 'hybrid' *product*, consisting of both patented and non-patented ideas." *Id.* at 865. We noted that "a discounted [post-expiration] rate may not be necessary to avoid *Brulotte* in every case," but we held that "in the absence of a discounted rate, there must be some other clear indication" that the royalty was not for use of the patent after its expiration. *Id.*

#### B.

In this case, the district court made factual findings about why the parties included the minimum royalty provision in their licensing agreement. Those factual findings do not control our review, however, because the application of the *Brulotte* rule is a question of law that depends on the terms of the contract at issue. The *Brulotte* inquiry does not turn on the parties' motivations, the course of their negotiations, or the consideration received by either party in exchange for the inclusion of a particular contractual term. Of course, what the parties' obligations are when a contractual provision is ambiguous can be a factual question that turns on what the parties intended the contract to require. But once a factfinder has answered that question, whether the contract's requirements constitute patent misuse under *Brulotte* is a question of law. Here, there is no dispute about what the parties' licensing agreement requires. There is only a dispute about whether those requirements constitute patent misuse under *Brulotte*. We review that question of law de novo.

Our conclusion that the *Brulotte* inquiry is a question of law is consistent with every controlling precedent. In *Brulotte* itself, the Supreme Court analyzed the "provisions

of the license agreements" at issue and held that the terms were improper "on their face." 379 U.S. at 31–32. The Court did not inquire into the parties' negotiations. Consistent with that analysis, the Court later explained that "[a] court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent." *Kimble*, 576 U.S. at 459.

We have likewise treated the application of *Brulotte* as a question of law turning on the terms of a licensing agreement. In *Zila*, we applied *Brulotte* based on the terms of the contract at issue. 502 F.3d at 1022–27. We did so again in the *Kimble* decision that was reviewed by the Supreme Court. *See* 727 F.3d at 864–66. To be sure, in *Kimble* we noted a few extrinsic facts to provide context for our analysis. For example, we noted that "[a]t the time the parties negotiated the agreement, the patent infringement claim was not definitively resolved." *Id.* at 864. We used that fact to determine that the parties' agreement was not referring to two distinct rights when it referred to patent rights and rights to the "Web Blaster" product. *Id.* But our *Brulotte* analysis turned on the requirements actually imposed by the agreement, not the back-and-forth of the negotiations through which the parties agreed to those terms. *See id.* at 864–66 (observing that the parties' agreement provided for post-expiration royalties and lacked "any clear indication that the Web Blaster royalties were not subject to patent leverage").

Other circuits likewise apply the *Brulotte* rule by looking at the terms of the agreement at issue. *See, e.g.*, *Meehan v. PPG Indus., Inc.*, 802 F.2d 881, 886 (7th Cir. 1986) ("The terms of the contract must be examined."); *Boggild v. Kenner Prods.*, 853 F.2d 465, 469 (6th Cir. 1988) (declining to remand for an inquiry into the parties' bargaining

history);[6] *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1373 (11th Cir. 1983) (concluding that an agreement violated *Brulotte* because of "two provisions in the agreement"). We know of no published decision by any Court of Appeals that treats the application of *Brulotte* as a factual question turning on the parties' motivations during negotiations.

Treating the application of *Brulotte* as a factual inquiry into the parties' motivations would run afoul of the Supreme Court's statement that parties may "find ways around *Brulotte*." *Kimble*, 576 U.S. at 453. Parties seeking to find a way around *Brulotte* may evince motivations that are in some sense contrary to *Brulotte*, even if the unambiguous terms of the agreement themselves are permissible. Indeed, as this case illustrates, the parties themselves often cannot cleanly or consistently identify their motivations for entering into an agreement, and each party may value a given provision differently. By contrast, looking only at the terms of the agreement is consistent with both the Supreme Court's statement that *Brulotte* is "simplicity itself to apply," *id.* at 459, and our statement that "our task is not to expand *Brulotte*'s holding beyond its terms," *Zila*, 502 F.3d at 1020.

## C.

Having concluded that the *Brulotte* rule is a question of law that we review de novo, we now turn to its application in this case. We "need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Kimble*, 576 U.S. at 459. We emphasize that the parties do not dispute what

---

[6] One concurring judge explained *Boggild* as holding that the application of *Brulotte* depends on "the terms of the license and that other evidence of the motivation of the parties with respect to leverage is irrelevant." *Boggild*, 853 F.2d at 470 (Brown, J., concurring).

the terms of their contract require—only whether those requirements are permissible under *Brulotte*.

The licensing agreement terms unambiguously require a 15% per-unit royalty on U.S. sales until the expiration of the U.S. patent and a 15% per-unit royalty on Canadian sales until the expiration of the Canadian patent, which does not violate *Brulotte*. The agreement states that Atrium will pay "a royalty of fifteen percent (15%) of the Net Sales of all Licensed Products sold during the Term." "Licensed Products" refers to covered products "that are made, used, offered for sale and/or imported or sold in a country where one or more claims of the Licensed Patents are issued and outstanding." And "Licensed Patents" refers to Bard's U.S. patent, as well as "all other patents . . . issued anywhere in the world that rely on the [U.S.] patent for priority." The "Licensed Patents," then, encompass the U.S. and Canadian patents. The per-unit royalty provision plainly complies with *Brulotte* because it simply provides royalties on each respective patent only until that patent expires.

Next, the minimum royalty provision establishes a minimum amount due for the use of all unexpired patents in their respective countries. The minimum royalty provision states "in no event will royalties for any calendar quarter of the Term be less than" $3.75 million ($15 million per year). The agreement provides that the minimum royalty provision would terminate only if the FDA approved iCast for vascular use or rescinded approval for any use. Otherwise, the agreement—and thus the minimum royalty provision—was to remain in effect "until the last to expire of all of the patents included within the Licensed Patents." The last "Licensed Patent" to expire was the Canadian patent in 2024. Thus, absent another condition triggering the end of the minimum payment provision, Atrium was required to pay Bard at least

$3.75 million per quarter until the expiration of the Canadian patent.

We conclude that the minimum royalty provision also complies with *Brulotte*. After the expiration of the U.S. patent, the agreement provides for minimum royalties only on Canadian sales, not U.S. sales. The provision therefore does not provide for royalties on "post-expiration use" of the U.S. patent. From 2011 to August 2019, the minimum royalty provision applied to use of both the U.S. patent in the United States and the Canadian patent in Canada. Beginning in August 2019, when the U.S. patent expired, the minimum royalties applied only to use of the Canadian patent in Canada. Atrium was obligated to pay a 15% royalty, and no less than $3.75 million per quarter, on its covered Canadian sales. Atrium's post-expiration U.S. sales were completely irrelevant. Even if they had increased a thousand-fold, it would not have affected the payments Atrium owed to Bard. The agreement therefore does not "provide[] royalties for post-expiration use" of the U.S. patent. *Kimble*, 576 U.S. at 459. *Brulotte* concerns only whether royalties are "by their terms for use during" the post-expiration period. 379 U.S. at 31. It does not prohibit royalties that are, by their terms, royalties for something other than use of the expired U.S. patent.[7]

Atrium argues that the presence of U.S.-focused conditions in the licensing agreement demonstrates that the minimum royalties are royalties on U.S. sales. The agreement contains two termination triggers for the minimum royalties, providing that they shall cease if the

---

[7] We note that, even absent ongoing post-expiration sales in another country, parties may contract for flat post-expiration payments that are not a royalty for ongoing use. *See Kimble*, 576 U.S. at 453–54.

FDA grants approval for vascular use of the iCast stent or if the FDA rescinds all previously approved iCast uses.

Although those provisions certainly concern the U.S. market, they do not affect the character of the royalties provided for in the agreement. The fact that Atrium sells the iCast stent only in the United States is wholly within Atrium's control. Had Atrium started selling it in Canada, Atrium would have had to pay per-unit royalties for those sales under the Canadian patent once the FDA approved it for vascular use. And although the FDA is a U.S. regulator, conditioning payments on possible FDA actions simply serves to allocate risk between the parties. The minimum royalty payments incentivized Atrium to seek prompt FDA approval of vascular iCast uses, from which Bard stood to benefit. On the other hand, had the FDA rescinded "its approval to market or sell" iCast for "any and all" uses, such an unexpected and drastic event would no doubt have had significant consequences for Atrium's finances, so that provision guarded against a disastrous outcome for Atrium. Neither of those provisions dictates whether the minimum royalties are royalties on U.S. sales.

Atrium also implies that the minimum royalty payments at issue are not Canadian royalties—and are therefore prohibited U.S. royalties—because they are far greater than the 15% per-unit royalty on Atrium's Canadian sales. We reject that argument. A minimum royalty provision has effect only if it may require payments greater than the per-unit royalty. And *Brulotte* establishes a per se rule, so we have no occasion to decide whether the size of a royalty is reasonable. *See Kimble*, 576 U.S. at 459 (declining to replace *Brulotte*'s per se rule with a reasonableness analysis). Whether $3.75 million per quarter is a reasonable

royalty for Atrium's Canadian sales does not affect whether such payments *are* Canadian royalties.

Finally, Atrium suggests that the minimum royalty provision violates *Brulotte* because the amount of the minimum royalties is not discounted upon expiration of the U.S. patent. We disagree. That argument stems from the rule concerning post-expiration royalties on U.S. sales of products that implicate both a patent and a non-patent right. If such post-expiration royalties reflect a discount compared to the pre-expiration royalties, that discount indicates that the portion of the royalty attributable to the patent right has properly ended upon the patent's expiration. That rule is not applicable here because the royalties at issue are not royalties on sales reflecting "inseparable patent and non-patent rights." *Kimble*, 727 F.3d at 857.

The parties' agreement provides for U.S. royalties only through the expiration of the U.S. patent, so it does not constitute patent misuse under *Brulotte*.

## IV.

For the foregoing reasons, we reverse the district court's entry of judgment for Atrium on Bard's breach of contract claim.